# Complaint

# Exhibit A

**KNIGHT**
**FIRST AMENDMENT**
**INSTITUTE**

at Columbia University

**DANIELA NOGUEIRA**
Legal Fellow

February 15, 2019

**via email**

Melissa Golden
Lead Paralegal and FOIA Specialist
Office of Legal Counsel
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Room 5511
Washington, DC 20530

Re:     **Freedom of Information Act Request**

Dear Ms. Golden,

This is a request under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552(a)(3), for all Office of Legal Counsel ("OLC") formal written opinions issued prior to February 15, 1994. The request is submitted by five scholars whose work relies on historical research and two non-profit organizations: Matthew J. Connelly, Mary L. Dudziak, Megan Ming Francis, Matthew L. Jones, Hiroshi Motomura, the Campaign for Accountability, and the Knight First Amendment Institute at Columbia University (the "requesters").

### I. Background

Since 1789, the Attorney General has been charged by statute with providing legal "advice and opinion" to the Executive Branch.[1] The

---

[1] The Attorney General's opinion-writing duties are currently codified in two provisions of the federal code, *see* 28 U.S.C. § 511 ("The Attorney General shall give his advice and opinion on questions of law when required by the President."); *id*. § 512 ("The head of an executive department may require the opinion of the Attorney General on questions of law arising in the administration of his department."), which correspond to the Judiciary Act of 1789, *see* Judiciary Act of 1789, ch. 20, § 35, 1 Stat. 73, 93 (charging the Attorney General with "giv[ing] his advice and opinion upon questions of law when required by the President of the United States, or when requested by the heads of any of the departments, touching any matters that may concern their departments").

475 Riverside Drive, Suite 302, New York, NY 10115  |  (646) 745-8500  |  daniela.nogueira@knightcolumbia.org

Attorney General, however, has delegated "virtually all"[2] of his opinion-writing duties to the OLC since 1933.[3] Created as the Office of the Assistant Solicitor General that year,[4] the OLC's "core function" is to settle legal questions or resolve interagency disputes.[5] In discharging its duties, the "OLC generally avoids abstract or code-like decrees."[6] Instead, the office occupies a "quasi-judicial" role within the Executive Branch that follows a "decisional process resembl[ing that of] a court: it is case specific and

---

[2] Douglas W. Kmiec, *OLC's Opinion Writing Function: The Legal Adhesive for A Unitary Executive*, 15 Cardozo L. Rev. 337, 337 (1993).

[3] Under 28 C.F.R. § 0.25—which, today, remains substantially similar to the version of the regulation originally adopted in 1969, *see* 28 C.F.R. § 0.25 (1969)—the OLC is responsible for, in relevant part

> (a) Preparing the formal opinions of the Attorney General; rendering informal opinions and legal advice to the various agencies of the Government; and assisting the Attorney General in the performance of his functions as legal adviser to the President and as a member of, and legal adviser to, the Cabinet.

> (b) Preparing and making necessary revisions of proposed Executive orders and proclamations, and advising as to their form and legality prior to their transmission to the President; and performing like functions with respect to regulations and other similar matters which require the approval of the President or the Attorney General.

> (c) Rendering opinions to the Attorney General and to the heads of the various organizational units of the Department on questions of law arising in the administration of the Department.

> (d) Approving proposed orders of the Attorney General, and orders which require the approval of the Attorney General, as to form and legality and as to consistency and conformity with existing orders and memoranda.

[4] The OLC was renamed in 1953 and took its modern form in 1977. *See* Daphna Renan, *The Law Presidents Make*, 103 Va. L. Rev. 805, 819–30 & n.44 (2017).

[5] Memorandum from David J. Barron, Acting Assistant Att'y Gen., Office of Legal Counsel, to Attorneys of the Office, Re: Best Practices for OLC Legal Advice and Written Opinions 1 (July 16, 2010) [hereinafter Best Practices Memorandum], *available at* http://www.justice.gov/olc/pdf/olc-legal-advice-opinions.pdf (The "OLC's core function . . . is to provide controlling advice to Executive Branch officials on questions of law."); *see also* Kmiec, *supra* note 2 (discussing how the OLC details the President's constitutional objections to pending legislation; advises the President on executive orders, executive privilege, and other programmatic and legal matters; advises Executive Branch agencies on legal questions; and resolves interagency disputes, among other duties); Eric Messinger, *Transparency and the Office of Legal Counsel*, 17 N.Y.U. J. Legis. & Pub. Pol'y 239, 245 (2014).

[6] *See* Renan, *supra* note 4, at 815.

2

precedent based."[7]

To that end, the OLC often issues "formal written opinions."[8] These opinions bind the Executive Branch in its interpretation of the law unless or until they are withdrawn or reconsidered by the OLC, displaced by a judicial ruling, or overruled by either the President or Attorney General.[9] Because overruling by the President or Attorney General "happens rarely,"[10] the OLC generally has the final word on how the Executive Branch interprets and applies the law. In this way, the OLC is, as one former official has described it, akin to the "Supreme Court of the executive branch."[11]

As such, the OLC's opinions create "a body of formal, written law that is relied upon, distinguished, and evaluated over time."[12] This body of law is critically important to understanding the government's powers, policies, and responsibilities, as well as the private rights of individuals. But the OLC has published "only a fraction" of its formal written opinions.[13] As a result, the Executive Branch has been relying on "secret law," in violation of basic democratic principles. The requesters submit this request to help the public access the secret law that governs this country.

---

[7] *Id.*

[8] These OLC opinions are sometimes referred to as "Attorney General opinion[s]" or "memorandums." *See* Daniel L. Pines, *Are Even Torturers Immune from Suit? How Attorney General Opinions Shield Government Employees from Civil Litigation and Criminal Prosecution*, 43 Wake Forest L. Rev. 93, 94 (2008).

[9] Randolph D. Moss, *Executive Branch Legal Interpretation: A Perspective from the Office of Legal Counsel*, 52 Admin. L. Rev. 1303, 1305 (2000) ("When the views of the Office of Legal Counsel are sought on the question of the legality of a proposed executive branch action, those views are typically treated as conclusive and binding within the executive branch. The legal advice of the Office, often embodied in formal, written opinions, constitutes the legal position of the executive branch, unless overruled by the President or the Attorney General."); *see also* Renan, *supra* note 4, at 816 ("Barring [the President's or Attorney General's] reversal, OLC creates the binding law of the executive."); Messinger, *supra* note 5, at 246.

[10] *See* Renan, *supra* note 4, at 816.

[11] *Homeland Security Secretary 'Fully Confident' in Legality of Obama's Immigration Action*, PBS NewsHour (Nov. 24, 2014, 6:35 PM), *available at* http://www.pbs.org/newshour/bb/homeland-securitysecretary-fully-confident-legality-obamas-immigration-action [https://perma.cc/4MSL-2C6Q] (quoting Jeh Johnson, former Secretary of the Department of Homeland Security).

[12] *See* Renan, *supra* note 4, at 815.

[13] Trevor Morrison, *Stare Decisis in the Office of Legal Counsel*, 110 Colum. L. Rev. 1448, 1476 (2010).

## II. The Requesters

Matthew J. Connelly is a Professor in the Department of History at Columbia University. His work focuses on covert operations, state surveillance, and war powers. He has spent several years preparing a history of official secrecy in the United States based on research at presidential libraries and the U.S. National Archives. Without access to OLC opinions, however, it has been difficult for him to determine how Presidents have made crucial decisions on behalf of the American people even decades in the past, and to learn from past experiences and apply any lessons to the future.

Mary L. Dudziak is the Asa Griggs Candler Professor of Law at Emory University School of Law. She writes and teaches about civil rights history, foreign relations history, constitutional law, and the history of war's impact on American law and politics. She has a particular scholarly interest in OLC opinions regarding the use of force, especially, but not limited to, opinions that discuss (1) whether a specific use of force is lawful, (2) whether a specific use of force is within the president's authority without a congressional authorization, and (3) what the scope of any existing authorizations may be.

Megan Ming Francis is an Associate Professor in the Department of Political Science at the University of Washington. She studies American politics, race, and the development of constitutional law. She is especially interested in OLC opinions that relate to (1) questions of criminal procedure or criminal justice, (2) workplace discrimination, and (3) housing discrimination, especially as incidents emerged in greater numbers in the 1940s, 50s, and 60s. She also has a particular interest in OLC opinions that address civil rights issues related to education, including those that help illuminate how the federal government dealt with the vastly changed civil rights landscape following the Supreme Court's decision in *Brown v. Board of Education*.

Matthew L. Jones is the James R. Barker Professor of Contemporary Civilization in the Department of History at Columbia University. He studies the intersection of new communications technologies and the legal and regulatory structures that govern their interception in the United States and its Five Eyes allies. He has undertaken detailed inquiry into the writing and subsequent interpretation of Executive Order 12,333 based on extensive work at presidential libraries and via FOIA. He is particularly interested in OLC opinions on these issues, as well as on information warfare and information operations.

Hiroshi Motomura is the Susan Westerberg Prager Distinguished Professor of Law at the University of California, Los Angeles School of Law. His research has focused on a variety of immigration and citizenship

law topics. He is interested in OLC opinions that relate to these topics, including, but not limited to, (1) the evolution of executive branch understandings of state and local authority to enforce immigration law, (2) the history of discretion in the enforcement of immigration law by federal executive branch officers, and (3) the role of the federal executive branch in the formulation of immigration law and policy.

The Campaign for Accountability ("CfA") is a non-profit, non-partisan organization that uses litigation, research, and advocacy to hold public officials accountable. CfA works on behalf of the public interest to expose corruption, negligence, and unethical behavior wherever it may occur. As part of its research, CfA uses government records made available to it under public information laws to investigate public officials and government agencies.

The Knight First Amendment Institute at Columbia University is a non-profit corporation based at Columbia University. The Institute works to defend and expand the freedoms of speech and the press through strategic litigation, research, and public education. The Institute has, since its founding, worked to expose information essential to informed and democratic self-governance, including the formal written opinions of the OLC.

### III. Records Requested

The requesters request all of the OLC's formal written opinions,[14] or equivalent thereof, created on or before February 15, 1994. This request encompasses *all* such opinions, including, but not limited to:

1. *Opinions resolving interagency disputes*. Executive Order 12,146 directs federal agencies to submit interagency legal disputes to the OLC for resolution. *See* Exec. Order No. 12,146, 44 F.R. 42,657 (1979). The request encompasses all of the OLC's formal written opinions resolving interagency disputes, whether

---

[14] By "formal written opinions," the requesters mean to include any OLC document that satisfies guiding principles set out in any of the office's best practices memoranda, *see, e.g.*, David J. Barron, *Re: Best Practices for OLC Legal Advice and Written Opinions*, OLC (July 16, 2010); Steven G. Bradbury, *Re: Best Practices for OLC Opinions*, OLC (May 16, 2005), any document that satisfies principles *similar* to those outlined in the OLC's best practices memoranda, or any document "containing substantive final legal advice of [the] OLC, transmitted to a client agency, and signed by an OLC Assistant Attorney General or Deputy Assistant Attorney General" or the Attorney General, *see* Letter from Assistant Attorney Gen. Peter J. Kadzik to Rep. Jason Chaffetz, Chairman of the Comm. on Oversight and Gov't Reform, and Rep. Elijah E. Cummings, Ranking Member of the Comm. on Oversight and Gov't Reform (April 1, 2016) (attached here). The requesters also mean to include any cover letter or attachments to such opinions.

submitted pursuant to Executive Order 12,146 or otherwise;[15]

2. *Opinions adjudicating or determining private rights.* As former OLC lawyer and then–Judge Alito has written, "many of the questions on which OLC opines do involve private rights."[16] The request encompasses all of the OLC's formal written opinions that involve private rights;[17]

3. *Opinions interpreting non-discretionary legal obligations.* The request encompasses all of the OLC's formal written opinions that interpret statutes or other authorities that impose non-discretionary legal obligations on federal agencies or officials;[18]

4. *Opinions concluding that a statute is unconstitutional.* The request encompasses all of the OLC's formal written opinions determining that a federal statute is unconstitutional in whole or in part and that, as a result, federal agencies may decline to give the statute effect;[19] and

5. *Opinions concerning the scope of presidential power.* The request encompasses all of the OLC's opinions concerning the scope of presidential power, particularly those regarding the use of force, surveillance, and the formulation and enforcement of immigration law and policy.[20]

---

[15] For an example of this type of OLC opinion, see Office of Legal Counsel, Dep't of Justice, *The Authority of the Equal Employment Opportunity Commission To Order a Federal Agency To Pay a Monetary Award To Remedy a Breach of a Settlement Agreement* (2008), *available at* https://www.justice.gov/opinion/file/833591/download [https://perma.cc/5YX2-TX24].

[16] Samuel A. Alito, Jr., *Change in Continuity at the Office of Legal Counsel*, 15 Cardozo L. Rev. 507, 509–10 (1993).

[17] For an example of an OLC opinion that involves private rights, see Office of Legal Counsel, Dep't of Justice, *Whether the Defense of Marriage Act Precludes the Nonbiological Child of a Member of a Vermont Civil Union From Qualifying for Child's Insurance Benefits Under the Social Security Act* 1 n.1 (2007), *available at* https://www.justice.gov/file/451616/download [https://perma.cc/8TW4-UX8D].

[18] For an example of this type of OLC opinion, see *id.*

[19] For an example of this type of OLC opinion, see Office of Legal Counsel, Dep't of Justice, *Constitutionality of the Direct Reporting Requirement in Section 802(e)(1) of the Implementing Recommendations of the 9/11 Commission Act of 2007* (2008), *available at* https://www.justice.gov/file/477336/download [https://perma.cc/BA7R2NZ9].

[20] For an example of this type of OLC opinion, see Office of Legal Counsel, Dep't of Justice, *Deployment of United States Armed Forces into Haiti* (1994), *available at*

Given the requesters' scholarly interests, we ask that, to the extent possible, you prioritize the processing of OLC opinions related to national security, the use of military force, immigration, and civil rights.[21]

We also ask that you disclose all segregable portions of otherwise exempt records, *see* 5 U.S.C. § 552(b), provide responsive electronic records in their native file format, *see id.* § 552(a)(3)(B), and process our request on a rolling basis.

### IV. Application for Waiver or Limitation of Fees

The requesters request a waiver of document search, review, and duplication fees on three independent grounds. First, the disclosure of the requested records is in the public interest and is "likely to contribute significantly to the public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester." 5 U.S.C. § 552(a)(4)(A)(iii). Second, the requesters qualify for the "educational" exception under FOIA because their purposes include "scholarly . . . research" and the records are not sought for commercial use. *Id.* § 552(a)(4)(A)(ii)(II). Third, the requesters are "representative[s] of the news media" within the meaning of FOIA and, again, the records are not sought for commercial use. *Id.*

First, the documents sought are needed to inform the public about actual or alleged government activity. Specifically, the requested records constitute the Executive Branch's authoritative interpretation of the law. This body of secret law is the final legal authority on a wide range of issues relevant to the public, from torture policy to welfare benefits. But because most of the OLC's opinions remain secret, it is not possible for the public to discern whether the Executive Branch is acting outside its authority, meeting its obligations, or violating the private rights of citizens and residents. For these reasons, disclosure of the records would be in the public interest.

Second, the requesters request a waiver of search and review fees on the ground that they qualify as "educational . . . institution[s]" or whose purposes include "scholarly . . . research" and the records are not sought for commercial use. *Id.* The requesters include a group of scholars who seek the OLC's opinions to inform their research on a variety of topics. These topics include issues in domestic and foreign policy that are critical to understanding how the Executive Branch governs—from the right to an

---

https://www.justice.gov/file/20306/download          [https://perma.cc/MR5H-HNF6].

[21] For example, the requesters are especially interested in an OLC opinion authored by then–Assistant Attorney General Theodore B. Olson on or around May 24, 1984, which the requesters believe is entitled "Constitutionality of Certain National Security Agency Electronic Surveillance Activities Not Covered Under the Foreign Intelligence Surveillance Act of 1978."

adequate education to state-sponsored surveillance of U.S. citizens.

The organizational requesters also have substantial educational missions. CfA operates a number of research and advocacy initiatives to inform the public about issues like consumer protection violations and corporate influence in government. For example, in 2016, CfA launched the Google Transparency Project to track, analyze, and expose how Google influences elected officials, public policies, and daily life.[22] CfA also regularly publishes publicly available reports on its research.[23]

Situated within a prominent academic research university, the Knight Institute is an educational institution that performs scholarly research on pressing First Amendment questions. The Institute's research program brings together academics and practitioners of different disciplines to study contemporary First Amendment issues and offer informed, non-partisan commentary and solutions. It publishes that commentary in many forms—in scholarly publications, in long-form reports, and in short-form essays. For example, the Institute published papers from leading thinkers on rising or intensifying threats to free expression in its *Emerging Threats* series.[24] The Institute also regularly hosts public events and symposia to educate the public about the First Amendment questions it studies.[25]

Third, the requesters request a waiver of search and review fees on the ground that they are "representatives of the news media" within the meaning of FOIA and the records are not sought for commercial use. 5 U.S.C. § 552(a)(4)(A)(ii)(II).

The requesters meet the statutory definition of a "representative of the news media" because they "gather[] information of potential interest to a segment of the public, use[] [their] editorial skills to turn the raw materials into a distinct work, and distribute[] that work to an audience." *Id.* § 552(a)(4)(A)(ii); *see also Nat'l Sec. Archive v. Dep't of Def.*, 880 F.2d 1381, 1387 (D.C. Cir. 1989) (finding that an organization that gathers information,

---

[22] *See generally Google Transparency Project*, Campaign for Accountability, *available at* https://www.googletransparencyproject.org/ (last visited Feb. 15, 2019).

[23] *See generally Reports*, Campaign for Accountability, *available at* https://campaignforaccountability.org/works/reports/ (last visited Feb. 15, 2019).

[24] *See generally Emerging Threats*, Knight First Amendment Institute at Columbia University, *available at* https://knightcolumbia.org/emergingthreats (last visited Dec. 10, 2018).

[25] *See, e.g., A First Amendment for All? Free Expression in an Age of Inequality*, Knight First Amendment Institute at Columbia University, *available at* https://knightcolumbia.org/content/3232018-first-amendment-all-free-expression-age-inequality; *see also Events*, *available at* https://knightcolumbia.org/content/events.

exercises editorial discretion in selecting and organizing documents, "devises indices and finding aids," and "distributes the resulting work to the public" is a "representative of the news media" for purposes of FOIA); *accord Serv. Women's Action Network v. Dep't of Def.*, 888 F. Supp. 2d 282 (D. Conn. 2012); *ACLU of Wash. v. Dep't of Justice*, No. 09-0642, 2011 WL 887731, at *10 (W.D. Wash. Mar. 10, 2011); *ACLU v. Dep't of Justice*, 321 F. Supp. 2d 24, 30 n.5 (D.D.C. 2004). Courts have found other non-profit requesters, whose mission of research and public education is similar to that of the requesters here, to be "representatives of the news media." *See, e.g., Cause of Action v. IRS*, No. 13-0920, 2015 WL 5120863 (D.C. Cir. Aug. 28, 2015); *Elec. Privacy Info. Ctr. v. Dep't of Def.*, 241 F. Supp. 2d 5, 10–15 (D.D.C. 2003) (finding non-profit group that disseminated an electronic newsletter and published books was a "representative of the news media" for purposes of the FOIA); *Nat'l Sec. Archive*, 880 F.2d at 1387; *Judicial Watch, Inc. v. Dep't of Justice*, 133 F. Supp. 2d 52, 53–54 (D.D.C. 2000) (finding Judicial Watch, self-described as a "public interest law firm," a news media requester).

Finally, disclosure would not further the requesters' commercial interests. CfA and the Knight Institute are non-profit organizations and will make any information disclosed available to the public at no cost. The requesters who are scholars will "make their [scholarly research] available" either at no cost or "for purchase by or subscription by or free distribution to the general public." 5 U.S.C. § 552(a)(4)(A)(ii)(III). Thus, a fee waiver would fulfill Congress's legislative intent in amending FOIA to ensure "that it be liberally construed in favor of waivers for noncommercial requesters." *See Judicial Watch, Inc. v. Rossotti*, 326 F.3d 1309, 1312 (D.C. Cir. 2003).

For these reasons, the requesters are entitled to a fee waiver.

\*       \*       \*

Thank you for your attention to our request. We would be happy to discuss its terms with you over the phone or via email to clarify any aspect of it or, where reasonable, to narrow our request.

I certify that the statements made herein are true and correct to the best of my knowledge and belief.

Sincerely,

/s/ *Daniela Nogueira*

Daniela Nogueira
Alex Abdo
Jameel Jaffer
Knight First Amendment Institute at
    Columbia University

9

475 Riverside Drive, Suite 302
New York, NY 10115
daniela.nogueira@
    knightcolumbia.org
(646) 745-8500



**U.S. Department of Justice**

Office of Legislative Affairs

---

Office of the Assistant Attorney General          *Washington, D.C. 20530*

April 1, 2016

The Honorable Jason Chaffetz
Chairman
Committee on Oversight and Government Reform
U.S. House of Representatives
Washington, DC   20515

The Honorable Elijah E. Cummings
Ranking Member
Committee on Oversight and Government Reform
U.S. House of Representatives
Washington, DC   20515

Dear Chairman Chaffetz and Ranking Member Cummings:

This responds to your letter to the Attorney General, dated March 14, 2016, which requested documents regarding the Office of Legal Counsel (OLC), its processes and the work it performs.   We have endeavored to provide answers to your inquiries directly in this letter, including our best estimates for the numbers requested, and explanations for the information provided, wherever possible.

   1. **Documents sufficient to show how many full-time employees work in OLC, and of those, how many are attorneys.**

      OLC generally employs between eighteen and twenty-five attorneys and between three and six full-time paralegals and support staff.   As of March 31, 2016, excluding two employees currently on detail elsewhere in the executive branch, OLC has 28 total full-time employees.   Of these, 22 are attorneys.

   2. **Documents sufficient to show how many requests for formal opinions OLC has received each year from 2005 to 2015.**

      OLC has no comprehensive system in place for tracking each incoming request for a formal opinion.   Such requests can come in many forms, including by telephone or in person.   Moreover, it is not unusual for such requests to be withdrawn or made moot by subsequent events, resulting in no formal opinion being prepared or issued. Consequently, we are not in a position to provide a reliable estimate of the number of requests received in any given calendar year.

The Honorable Jason Chaffetz
The Honorable Elijah E. Cummings
Page 2

3.  **Documents sufficient to show how many formal opinions OLC has issued each year from 2005 to 2015, including the number which were classified and the number which were unclassified.**

OLC's practices have varied over the years and the term "formal opinions" has been used to refer to different categories of documents by different people.  In the interest of clarity, for this question and others, this response uses the term "formal opinion" to describe a letter or memorandum containing substantive final legal advice of OLC, transmitted to a client agency, and signed by an OLC Assistant Attorney General or Deputy Assistant Attorney General, generally drafted pursuant to the process described in the "Best Practices Memorandum" cited in your letter.[1]  We also want to note that due to the nature of compartmented information, OLC does not maintain a complete list of classified formal opinions.  As a result, the numbers in the following chart represent OLC's best efforts to estimate the number of classified opinions issued for each year, but it is possible that this count may inadvertently omit one or more compartmented opinions issued during these time periods:

| Calendar Year | Estimate of Unclassified Opinions Issued | Estimate of Classified Opinions Issued |
|---|---|---|
| 2005 | 29 | 8 |
| 2006 | 16 | 4 |
| 2007 | 28 | 10 |
| 2008 | 28 | 4 |
| 2009 | 31 | 9 |
| 2010 | 18 | 8 |
| 2011 | 12 | 2 |
| 2012 | 16 | 2 |
| 2013 | 12 | 1 |
| 2014 | 5 | 0 |
| 2015 | 4 | 1 |

[1] *See* Memorandum for Attorneys of the Office, from David J. Barron, Acting Assistant Attorney General, Office of Legal Counsel, *Re: Best Practices for OLC Legal Advice and Written Opinions* (July 16, 2010) ("Best Practices Memorandum"), *available at* https://www.justice.gov/sites/default/files/olc/legacy/2010/08/26/olc-legal-advice-opinions.pdf.

The Honorable Jason Chaffetz
The Honorable Elijah E. Cummings
Page 3

4.  **Documents sufficient to show how many regulations requiring the Attorney General's approval OLC reviewed each year from 2005 to 2015, and of those, how many each year resulted in the issuance of a formal opinion.**

In 28 C.F.R. § 0.25(d), the Attorney General has assigned to OLC responsibility for reviewing all orders of the Attorney General for form and legality.   Department of Justice regulations published in the Federal Register are issued by order of the Attorney General and, consequently, undergo form and legality review by OLC under this provision.   At the same time, Attorney General orders include not only regulations published in the Federal Register but also internal administrative orders of various types, including, for example, the appointment or designation of Department officials or Department delegations, the number of which are affected by many factors and may vary widely from year to year.   For each Attorney General order reviewed, OLC prepares a short form and legality memorandum to the Attorney General providing advice on the lawfulness and form of the order.   Although OLC does not track the circumstances in which requests for formal opinions arise in connection with proposed Attorney General orders or Department regulations, it is possible that issues raised during the form-and-legality review process may prompt a client agency request for a formal opinion on legal issues relating to a proposed order or regulation.   In such an event, the resulting opinion would be counted among the total number of formal opinions issued by the Office provided in response to question 3 above.   The following chart represents an estimate of the number of Attorney General orders reviewed by OLC each year, and an estimate of how many of those orders were published as regulations in the Federal Register:

| Calendar Year | Estimate of Total AG Orders | Estimate of Orders Published in Federal Register |
|---|---|---|
| 2005 | 47 | 11 |
| 2006 | 60 | 12 |
| 2007 | 71 | 13 |
| 2008 | 103 | 21 |
| 2009 | 94 | 10 |
| 2010 | 108 | 17 |
| 2011 | 75 | 13 |
| 2012 | 44 | 14 |
| 2013 | 51 | 11 |
| 2014 | 75 | 23 |
| 2015 | 122 | 15 |

The Honorable Jason Chaffetz
The Honorable Elijah E. Cummings
Page 4

5. **Documents sufficient to show how many formal OLC opinions have been released publicly each year from 2005 to 2015.**

Formal OLC opinions may be released publicly through a variety of mechanisms. First, as described in the Best Practices Memorandum, OLC has a process in place for regular consideration and selection of its opinions for official publication. In deciding whether an opinion merits publication, OLC considers such factors as the potential importance of the opinion to other agencies or officials in the Executive Branch, the likelihood that similar questions may arise in the future, the historical importance of the opinion or the context in which it arose, and the potential significance of the opinion to OLC's overall jurisprudence. OLC also considers countervailing considerations such as the need "to preserve internal executive branch deliberative processes or protect the confidentiality of information covered by the attorney-client relationship between OLC and other executive offices." Best Practices Memorandum at 6. If OLC makes a preliminary judgment that the opinion may be appropriate for publication, OLC solicits the views of the requesting Executive Branch official or agency and any other Department components or Executive Branch agencies or entities that have interests that might be affected by publication. After receiving any views, OLC makes a final determination regarding publication.

In addition, when OLC receives FOIA requests that cover formal opinions, as with all other documents, it considers whether the documents are exempt from disclosure, and, if so, whether the documents are appropriate for discretionary release. The numbers set forth in the chart below do not include opinions that were released under FOIA but not formally published. For information on that process, see the response below to question 8.

The following hardbound volumes of the Opinions of the Office of Legal Counsel were published over the time period for which your letter requests information.[2] With the exception of the opinions published in the first volume of a new supplemental series,[3] many of these were published online before the final publication dates of the hardbound volumes:

| Volume | Year of Publication | Number of OLC Opinions |
|---|---|---|
| Vol. 21 (1997) | 2005 | 28 opinions |
| Vol. 22 (1998) | 2005 | 31 opinions |
| Vol. 23 (1999) | 2006 | 24 opinions |
| Vol. 24 (2000) | 2006 | 29 opinions |

---

[2] Imaged copies (i.e., in PDF form) of all hardbound volumes published by OLC are available online at https://www.justice.gov/olc/opinions-volume. Imaged copies of the individual opinions in all hardbound volumes are also available in a searchable index at https://www.justice.gov/olc/opinions.

[3] The purpose of this supplemental series (Op. O.L.C. Supp.) is to provide a vehicle for publishing opinions that predate the commencement of the primary series (Op. O.L.C.) in 1977 and also for publishing post-1977 opinions even after publication of the hardbound volume for that opinion year.

The Honorable Jason Chaffetz
The Honorable Elijah E. Cummings
Page 5

| Volume | Year of Publication | Number of OLC Opinions |
|---|---|---|
| Vol. 25 (2001) | 2012 | 34 opinions |
| Vol. 26 (2002) | 2012 | 22 opinions |
| Vol. 27 (2003) | 2013 | 19 opinions |
| Vol. 28 (2004) | 2013 | 23 opinions |
| Supp. Vol. 1 (1933–77) | 2013 | 50 opinions |
| Vol. 29 (2005) | 2014 | 16 opinions |
| Vol. 30 (2006) | 2014 | 8 opinions |
| Vol. 31 (2007) | 2014 | 19 opinions |
| Vol. 32 (2008) | 2014 | 14 opinions |

For the years not yet covered by hardbound volumes in the primary series, the publication review process is continuing, and additional opinions issued during those years may still be published. The following numbers of OLC opinions for those years, however, has already been published online, available at https://www.justice.gov/olc/opinions:

| Calendar Year | Opinions Already Published Online |
|---|---|
| 2009 | 19 opinions |
| 2010 | 10 opinions |
| 2011 | 11 opinions |
| 2012 | 11 opinions |
| 2013 | 4 opinions |
| 2014 | 3 opinions |
| 2015 | 1 opinion |

6. **Documents sufficient to show how many formal OLC opinions have been shared with Congress each year from 2005 to 2015, other than those shared publicly.**

In accordance with the new procedure established by the Attorney General and the Director of National Intelligence pursuant to section 322 of the Intelligence Authorization Act for Fiscal Year 2014, Pub. L. No. 113-126, 128 Stat. 1390, 1400-01 (2014), OLC now evaluates each classified opinion it issues to an element of the intelligence community to determine whether it would be appropriate for publication if not for the fact that the opinion contains classified national security information. Any opinion that meets these criteria will be shared with the appropriate committees of Congress. As of this time, no opinions have been shared pursuant to this procedure, although one classified opinion from 2015 is currently under review. OLC has no system in place to track any other limited disclosures of opinions that may have occurred during the noted time period.

The Honorable Jason Chaffetz
The Honorable Elijah E. Cummings
Page 6

7. **Documents sufficient to show how many FOIA requests OLC received each year from 2005 to 2015 requesting OLC opinions.**

OLC receives FOIA requests on a variety of topics.   These requests may be divided roughly into three categories: (1) requests that expressly seek formal OLC opinions or, more generally, records containing OLC legal advice; (2) broader requests—for example those that seek correspondence between OLC and other executive branch entities, or all documents concerning a given topic or individual—that may include formal opinions among the responsive records, if such opinions exist, but do not expressly seek such opinions; and (3) requests that are extremely unlikely to include formal opinions as responsive, such as those seeking OLC's FOIA logs.

The following chart represents OLC's total FOIA requests, as reported by the Department's Office of Information Policy ("OIP") at https://www.justice.gov/oip/reports-1, and an estimate of how many of those requests could be construed to potentially call for any responsive formal OLC opinions or other records containing OLC legal advice (that is, how many fall within the first two categories discussed above), regardless of whether any OLC formal opinions existed that were responsive to the requests.   Please note that this chart, in keeping with Department and government-wide practice, tracks FOIA requests by fiscal year, rather than by calendar year:

| Fiscal Year | Total FOIA Requests | Estimate of FOIA Requests That Potentially Call For Formal Opinions or Other Legal Advice |
|---|---|---|
| 2005 | 80 | N/A[4] |
| 2006 | 78 | N/A |
| 2007 | 72 | 48 |
| 2008 | 57 | 34 |
| 2009 | 79 | 64 |
| 2010 | 72 | 52 |
| 2011 | 77 | 49 |
| 2012 | 130 | 84 |
| 2013 | 86 | 47 |
| 2014 | 91 | 59 |
| 2015 | 111 | 67 |

---

[4] OLC's FOIA logs prior to Fiscal Year 2007 do not contain enough detail to identify the subject matter of the requests or the content of OLC's responses, and OLC's FOIA records from that era are not organized in a way that allows for this information to be easily reconstructed.

The Honorable Jason Chaffetz
The Honorable Elijah E. Cummings
Page 7

8. **Documents sufficient to show how many formal OLC opinions were released under FOIA each year from 2005 to 2015.**

We have provided below estimates of how many formal OLC opinions were provided to FOIA requesters in each year from 2005 to 2015.   Determining these numbers is particularly difficult because OLC's records do not track whether a document provided in response to a FOIA request in a given year was released for the first time in response to that request, or if it had also previously been released to another FOIA requester. Consequently, the following chart identifies OLC's estimate of how many formal opinions were provided to FOIA requesters in a given fiscal year.   Because OLC's FOIA records do not generally reflect when an opinion released in response to a FOIA request had been previously released to other FOIA requesters, these estimates include all opinions released to FOIA requesters in a given year regardless of whether the same opinions may have been previously released to another FOIA requester, except that we have excluded opinions from these counts where OLC's readily available records or other context clearly establish that the opinion had been previously released or published:

| Calendar Year | Estimate of Opinions Released to FOIA Requesters |
|---|---|
| 2005 | N/A[5] |
| 2006 | N/A |
| 2007 | 8 |
| 2008 | 2 |
| 2009 | 63 |
| 2010 | 19 |
| 2011 | 39 |
| 2012 | 56 |
| 2013 | 11 |
| 2014 | 21 |
| 2015 | 7 |

9. **Documents sufficient to show the average length of time each year from 2005 to 2015 for OLC to respond to FOIA requests.**

The following chart provides the median number of days taken by OLC to process simple, complex, and expedited FOIA requests, by fiscal year, drawn from data reported publicly by OIP at https://www.justice.gov/oip/reports-1:[6]

---

[5] *See supra* note 4.
[6] Prior to Fiscal Year 2008, the Department tracked only the median number of days taken by components to respond in each category.   From Fiscal Year 2008 to the present, further information, including the mean, median, highest, and lowest number of days for requests in each category, may be found in the published reports.

The Honorable Jason Chaffetz
The Honorable Elijah E. Cummings
Page 8

| Fiscal Year | Simple | Complex | Expedited |
|---|---|---|---|
| 2005 | 10 | 30 | 40 |
| 2006 | 10 | 60 | 45 |
| 2007 | 10 | 60 | N/A |
| 2008 | 35 | 134 | N/A |
| 2009 | 38 | 75 | N/A |
| 2010 | 15 | 178 | N/A |
| 2011 | 23.5 | 376 | 211 |
| 2012 | 7 | 195 | 118 |
| 2013 | 13 | 173 | 92.5 |
| 2014 | 11.5 | 193 | 46.5 |
| 2015 | 15 | 198 | 133 |

**10. Documents sufficient to show how many OLC employees have FOIA responsibilities in their job descriptions, along with the roles and responsibilities of each.**

OLC's FOIA administration and processing are carried out primarily by a FOIA Attorney and a Lead Paralegal under the supervision of a number of senior attorneys in OLC, with additional duties undertaken by OLC's Paralegal Supervisor and two other paralegals, as needed. Other OLC attorneys also assist in the process as necessary, consistent with their other job responsibilities.

**11. Documents sufficient to show the records disposition guidelines that apply to OLC for Federal Records Act purposes.**

OLC records retention and disposition is covered by SF-115 Records Retention Schedule N1-060-10-31. As described more fully therein, OLC program records are permanent with a 30-year retention after cut off. The SF-115 includes the following eight categories of OLC records:

    a. OLC Leadership Program Records
    b. Daybooks
    c. Attorney General Orders
    d. Form and Legality Memoranda
    e. Presidential Executive Orders and Proclamations Tracking Logs
    f. Attorney General Numbering Log
    g. Formal Legal Opinions
    h. File Memoranda

E-mail records of OLC senior leadership are governed by Records Retention Schedule

The Honorable Jason Chaffetz
The Honorable Elijah E. Cummings
Page 9

SF-115, DAA-0060-2015-0006, the Department's Capstone schedule for Assistant
Attorneys General and their direct reports.[7]

**12. Documents sufficient to show whether OLC, or the Department more generally,
utilizes any automatic program, such as Capstone, for Federal Records Act purposes.**

DOJ Order 0801 and DOJ Policy Statement 0801.04 provide high level policy for
Department-wide Records and Information Management and Department-wide e-mail
record retention respectively.   Capstone is not an automated program.   The Capstone
approach is a revised approach to record keeping that permits agencies to treat e-mail as a
records series (rather than segregate e-mail records by substance) for officials considered
Capstone officials.   As stated above, DOJ Policy Statement 0801.04 provides
Department-wide guidance on e-mail retention and sets forth the Department's
implementation of the "Capstone" approach in accordance with the Capstone schedule for
e-mail referenced above in response to question 11.   Records retention schedule
DAA-0060-2015-0006 applies the Capstone approach to OLC.   These records are
retained for thirty years after the individual's tenure ends and are then accessioned to
NARA.   For more information on Department-wide records retention, please refer to the
Department's Senior Agency Official for Records Management FY2015 Annual Report to
NARA, dated January 27, 2016, available at
https://www.archives.gov/records-mgmt/agency/doj-sao-annual-report-2015.pdf.

**13. Documents sufficient to show the number of requests for informal advice received
and the number of requests in which OLC provided informal advice each year from
2005 to 2015, including whether the request originated within the Department,
another agency, or the Executive Office of the President.**

OLC provides legal advice to client agencies throughout the executive branch.   Similar to
a law firm, OLC receives requests for legal advice and provides that legal advice in many
forms and across many media, both oral and written.   Consequently, OLC has no system
in place to track or record every conversation or communication that could be viewed as a
request for legal advice.

OLC treats prior advice of the Office as precedential, as described in the Best Practices
Memorandum.   To facilitate research regarding past OLC advice, OLC maintains a
database of unclassified legal advice provided to clients, formal and informal, for its own
internal research, regardless of the form the legal advice took or whether it was formally
published.[8]   The only mechanism OLC has for attempting to make a reasonable estimate
regarding the total quantity of legal advice given in a particular year across all formats is to

---

[7] The Records Retention Schedules discussed in this paragraph are enclosed.  They, and all other such schedules for
the Department, are publicly available at the website of the National Archives and Records Administration
("NARA"), at http://www.archives.gov/records-mgmt/rcs/schedules/?dir=/departments/department-of-justice/.

[8] Because it is kept current for OLC's internal research purposes, this database is also the starting point for most of
OLC's searches for records responsive to FOIA requests, especially when such requests seek records containing OLC
legal advice transmitted outside of the Office.

The Honorable Jason Chaffetz
The Honorable Elijah E. Cummings
Page 10

count the items in the database from each year, excluding records of OLC's decisions not to comment on proposed legislation or testimony, which are referred to as "bill no-comments" and stored separately.   Because of the nature of the database, the counts in the following chart necessarily include the unclassified opinions noted in response to question 3, above, and the form and legality memoranda associated with the AG orders discussed in response to question 4, above:

| Calendar Year | Total Items, Excluding Bill No-Comments |
|---|---|
| 2005 | 304 |
| 2006 | 570 |
| 2007 | 742 |
| 2008 | 706 |
| 2009 | 610 |
| 2010 | 612 |
| 2011 | 699 |
| 2012 | 571 |
| 2013 | 521 |
| 2014 | 586 |
| 2015 | 628 |

14. **Information on whether Department e-mails containing legal guidance from OLC to the President, the Attorney General, or other agencies, whether formal or informal, are considered to be permanent federal records under the Department's applicable records schedules.**

OLC considers its written legal advice, no matter the form, to fall within one or more of the categories of permanent federal records retained by OLC noted in response to question 11 above.

We hope this information is helpful.   Please do not hesitate to contact this office if we may provide additional assistance regarding this or any other matter.

Sincerely,

for

Peter J. Kadzik
Assistant Attorney General

# Complaint

# Exhibit B



**U.S. Department of Justice**

Office of Legal Counsel

---

Office of the Assistant Attorney General                    *Washington, D.C. 20530*

July 16, 2010

## MEMORANDUM FOR ATTORNEYS OF THE OFFICE

*Re: Best Practices for OLC Legal Advice and Written Opinions*[*]

By delegation, the Office of Legal Counsel (OLC) exercises the Attorney General's authority under the Judiciary Act of 1789 to provide the President and executive agencies with advice on questions of law. OLC's core function, pursuant to the Attorney General's delegation, is to provide controlling advice to Executive Branch officials on questions of law that are centrally important to the functioning of the Federal Government. In performing this function, OLC helps the President fulfill his or her constitutional duties to preserve, protect, and defend the Constitution, and to "take Care that the Laws be faithfully executed." It is thus imperative that the Office's advice be clear, accurate, thoroughly researched, and soundly reasoned. The value of OLC advice depends upon the strength of its analysis. OLC must always give candid, independent, and principled advice—even when that advice is inconsistent with the aims of policymakers. This memorandum reaffirms the longstanding principles that have guided and will continue to guide OLC attorneys in all of their work, and then addresses the best practices OLC attorneys should follow in providing one particularly important form of controlling legal advice the Office conveys: formal written opinions.

### I. Guiding Principles

Certain fundamental principles guide all aspects of the Office's work. As noted above, OLC's central function is to provide, pursuant to the Attorney General's delegation, controlling legal advice to Executive Branch officials in furtherance of the President's constitutional duties to preserve, protect, and defend the Constitution, and to "take Care that the Laws be faithfully executed." To fulfill this function, OLC must provide advice based on its best understanding of what the law requires—not simply an advocate's defense of the contemplated action or position proposed by an agency or the Administration. Thus, in rendering legal advice, OLC seeks to provide an accurate and honest appraisal of applicable law, even if that appraisal will constrain the Administration's or an agency's pursuit of desired practices or policy objectives. This practice is critically important to the Office's effective performance of its assigned role, particularly because it is frequently asked to opine on issues of first impression that are unlikely to be resolved by the courts—a circumstance in which OLC's advice may effectively be the final word on the controlling law.

---

[*] This memorandum updates a prior memorandum, "Best Practices for OLC Opinions," issued May 16, 2005.

In providing advice, the Office should focus intensively on the central issues raised by a request and avoid addressing issues not squarely presented by the question before it. As much as possible, the Office should be attentive to the particular facts and circumstances at issue in the request, and should avoid issuing advice on abstract questions that lack the concrete grounding that can help focus legal analysis. And regardless of the Office's ultimate legal conclusions, it should strive to ensure that it candidly and fairly addresses the full range of relevant legal sources and significant arguments on all sides of a question. To be sure, the Office often operates under severe time constraints in providing advice. In such instances, the Office should make clear when it needs additional time to permit proper and thorough review of the relevant issues. If additional time is not available, the Office should make clear that its advice has been given with only limited time for review, and thus that more thorough consideration of the issue has not been possible.

On any issue involving a constitutional question, OLC's analysis should focus on traditional sources of constitutional meaning, including the text of the Constitution, the historical record illuminating the text's meaning, the Constitution's structure and purpose, and judicial and Executive Branch precedents interpreting relevant constitutional provisions. Particularly where the question relates to the authorities of the President or other executive officers or the allocation of powers between the Branches of the Government, precedent and historical practice are often of special relevance. On other questions of interpretation, OLC's analysis should be guided by the texts of the relevant documents, and should use traditional tools of construction in interpreting those texts. Because OLC is part of the Executive Branch, its analyses may also reflect the institutional traditions and competencies of that branch of the Government. For example, OLC opinions should consider and ordinarily give great weight to any relevant past opinions of Attorneys General and the Office. The Office should not lightly depart from such past decisions, particularly where they directly address and decide a point in question, but as with any system of precedent, past decisions may be subject to reconsideration and withdrawal in appropriate cases and through appropriate processes.

Finally, OLC's analyses may appropriately reflect the fact that its responsibilities also include facilitating the work of the Executive Branch and the objectives of the President, consistent with the law. As a result, unlike a court, OLC will, where possible and appropriate, seek to recommend lawful alternatives to Executive Branch proposals that it decides would be unlawful. Notwithstanding this aspect of OLC's mission, however, its legal analyses should always be principled, forthright, as thorough as time permits, and not designed merely to advance the policy preferences of the President or other officials.

## II. Opinion Preparation

While the Office frequently conveys its controlling legal advice in less formal ways, including through oral presentations and by e-mail, the best practices for preparing the Office's formal written opinions merit particular attention. These opinions take the form of signed memoranda, issued to an Executive Branch official who has requested the Office's opinion.

**A. *Evaluating opinion requests*.** Each opinion request is assigned initially to at least one Deputy Assistant Attorney General and one Attorney-Adviser, who will review the question

presented and any relevant primary materials, prior OLC opinions, and leading cases to determine preliminarily whether the question is appropriate for OLC advice and whether it appears to merit a signed written opinion. The legal question presented should be focused and concrete; OLC generally avoids providing a general survey of an area of law or issuing broad, abstract legal opinions. There should also be a practical need for the written opinion; OLC should avoid giving unnecessary advice, such as where it appears that policymakers are likely to move in a different direction. A written opinion is most likely to be necessary when the legal question is the subject of a concrete and ongoing dispute between two or more executive agencies. If we are asked to provide an opinion to an executive agency the head of which does not serve at the pleasure of the President (*e.g.*, an agency head subject to a "for cause" removal restriction), our practice is to issue our opinion only if we have received in writing from that agency an agreement that it will conform its conduct to our conclusion. As a prudential matter, OLC generally avoids opining on questions likely to arise in pending or imminent litigation involving the United States as a party (although the Office may provide assistance to Justice Department divisions engaged in ongoing litigation). Finally, the opinions of the Office should address legal questions prospectively; OLC avoids opining on the legality of past conduct (though from time to time we may issue prospective opinions that confirm or memorialize past advice or that necessarily bear on past conduct in addressing an ongoing legal issue).

   **B.  *Soliciting the views of interested agencies*.** Before we proceed with an opinion, our general practice is to ask the requesting agency for a detailed memorandum setting forth the agency's own analysis of the question; in many cases, we will have preliminary discussions with the requesting agency before it submits a formal opinion request to OLC, and the agency will be able to provide its analysis along with the opinion request. (A detailed analysis is not required when the request comes from the Counsel to the President, the Attorney General, or one of the other senior management offices of the Department of Justice.) In the case of an interagency dispute, we will ask each side to submit such a memorandum. We expect the agencies on each side of a dispute to share their memoranda with the other side, or permit us to share them, so that we may have the benefit of reply comments, when necessary. When appropriate and helpful, and consistent with the confidentiality interests of the requesting agency, we will also solicit the views of other agencies not directly involved in the opinion request that have subject-matter expertise or a special interest in the question presented. We will not, however, circulate a copy of an opinion request to third-party agencies without the prior consent of the requesting agency.

   **C.  *Researching, outlining, and drafting*.** A written OLC opinion is the product of a careful and deliberate process. After reviewing agency submissions and relevant primary materials, including prior OLC opinions and leading judicial decisions, the Deputy and Attorney-Adviser should meet to map out a plan for researching the issues and preparing an outline and first draft of the opinion. The Deputy and Attorney-Adviser should set target deadlines for each step in the process and should meet regularly to review progress on the opinion. Consultation with others in the Office is encouraged, as are meetings, as needed, with other Deputies and the Assistant Attorney General (AAG). An early first draft often will help identify weaknesses or holes in the analysis requiring greater attention than initially anticipated. As work on the opinion progresses, it will generally be useful for the Deputy and the Attorney-Adviser to meet from time to time with the AAG to discuss the status and direction of the draft opinion.

The Office must strive in our opinions for clear and concise analysis and a balanced presentation of arguments on each side of an issue. If the opinion resolves an issue in dispute between executive agencies, we should take care to consider fully and address impartially the points raised on both sides. In doing so, we generally avoid characterizing agencies with differing views as the "prevailing" and "losing" parties. OLC's obligation is to provide its view of the correct answer on the law, taking into account all reasonable counterarguments, whether provided by an agency or not.

   **D.   *Review of draft opinions*.**  Before an OLC opinion is signed it undergoes rigorous review within OLC. When the primary Deputy and the Attorney-Adviser responsible for the opinion are satisfied that the draft opinion is ready for secondary review, they should provide the draft opinion to a second Deputy for review. Along with the draft opinion, the Attorney-Adviser should provide to the second Deputy copies of any key materials, including statutes, regulations, important cases, relevant prior OLC opinions, and the views memoranda received from interested agencies. Once the second Deputy review is complete and the second Deputy's comments and proposed edits have been addressed, the primary Deputy should circulate the draft opinion for final review by the AAG, the remaining Deputies (though it is not necessary in each case for each of them to review an opinion), and any other attorneys within the Office with relevant expertise.

   Because OLC issues opinions pursuant to the Attorney General's delegated authority, the Office keeps the Office of the Attorney General and the Office of the Deputy Attorney General apprised of its work through regular meetings and other communications. This practice ensures that the leadership offices are kept informed about OLC's work, and also permits OLC to benefit from suggestions about additional interests OLC should consider or views OLC should solicit before finalizing its opinions, which are nevertheless based on its own independent analysis and judgment. The Office also keeps the Office of the Counsel to the President appropriately apprised of its work.

   Consistent with its tradition of providing advice that reflects its own independent judgment, OLC does not ordinarily circulate draft opinions outside the Office. However, as part of our process, we may share an aspect of a draft opinion's analysis with the requestor or others who will be affected by the opinion, particularly when their submissions have not addressed issues that arise in the draft. In some other cases, OLC may share the substance of an entire draft opinion or the opinion itself within the Department of Justice or with others, primarily to ensure that the opinion does not misstate any facts or legal points of interest.

   **E.   *Finalizing opinions*.**  Once all substantive work on an opinion is complete, it must undergo a thorough cite-check by our paralegal staff to ensure that all citations are accurate and that the opinion is consistent with the Office's rules of style. After all cite-checking changes have been approved and implemented, the final opinion should be printed on bond paper for signature. Each opinion ready for signature should include a completed opinion control sheet signed by the primary and secondary Deputies and the Attorney-Adviser. If the opinion is unclassified, after it is signed and issued to the requesting agency it must be loaded into our ISYS database and included in the Office's unclassified Day Books. A separate file containing a copy of the signed opinion, the opinion control sheet, and copies of key materials not readily

available, such as the original opinion request, the views memoranda of interested agencies, and obscure sources cited in the opinion, should also be retained in our files for future reference.

### III. Opinion Publication and Other Public Disclosure

Pursuant to Executive Order 12146 and directives from the Attorney General, OLC has a longstanding internal process in place for regular consideration and selection of significant opinions for official publication. At the first stage of the process, the attorneys who have worked on an opinion and the front-office personnel who have reviewed it are asked for a recommendation about whether the opinion should be published. After these recommendations are collected, the opinion is forwarded to an internal publication review committee, made up of attorneys from the front office, as well as at least one career attorney. If the committee makes a preliminary judgment that the opinion should be published, the opinion is circulated to the requesting Executive Branch official or agency and any other agencies that have interests that might be affected by publication, to solicit their views on whether there are reasons why the opinion should not be published. Taking this input into account, the publication committee then makes a final judgment about whether the Office should publish the opinion. After the Office makes a final decision to publish an opinion, the opinion is rechecked and reformatted for online publication; a headnote is prepared and added to the opinion; and the opinion is posted to the Department of Justice Web site at www.usdoj.gov/olc/opinions.htm. All opinions posted on the Web site as published opinions of the Office are eventually published in OLC's hardcover bound volumes.

In deciding whether an opinion is significant enough to merit publication, the Office considers such factors as the potential importance of the opinion to other agencies or officials in the Executive Branch; the likelihood that similar questions may arise in the future; the historical importance of the opinion or the context in which it arose; and the potential significance of the opinion to the Office's overall jurisprudence. In applying these factors, the Office operates from the presumption that it should make its significant opinions fully and promptly available to the public. This presumption furthers the interests of Executive Branch transparency, thereby contributing to accountability and effective government, and promoting public confidence in the legality of government action. Timely publication of OLC opinions is especially important where the Office concludes that a federal statutory requirement is invalid on constitutional grounds and where the Executive Branch acts (or declines to act) in reliance on such a conclusion. In such situations, Congress and the public benefit from understanding the Executive's reasons for non-compliance, so that Congress can consider those reasons and respond appropriately, and so that the public can be assured that Executive action is based on sound legal judgment and in furtherance of the President's obligation to take care that the laws, including the Constitution, are faithfully executed.

At the same time, countervailing considerations may lead the Office to conclude that it would be improper or inadvisable to publish an opinion that would otherwise merit publication. For example, OLC will decline to publish an opinion when disclosure would reveal classified or other sensitive information relating to national security. (Declassification decisions are made by the classifying agency, not OLC.) Similarly, OLC will decline to publish an opinion if doing so would interfere with federal law enforcement efforts or is prohibited by law. OLC will also

decline to publish opinions when doing so is necessary to preserve internal Executive Branch deliberative processes or protect the confidentiality of information covered by the attorney-client relationship between OLC and other executive offices. The President and other Executive Branch officials, like other public- and private-sector clients, sometimes depend upon the confidentiality of legal advice in order to fulfill their duties effectively. An example is when an agency requests advice regarding a proposed course of action, the Office concludes it is legally impermissible, and the action is therefore not taken. If OLC routinely published its advice concerning all contemplated actions of uncertain legality, Executive Branch officials would be reluctant to seek OLC advice in the early stages of policy formulation—a result that would undermine rule-of-law interests. Some OLC opinions also may concern issues that are of little interest to the public or others besides the requesting agency. OLC's practice of circulating opinions selected for publication to the requesting Executive Branch official or agency and any other agencies that have interests that might be affected by publication helps ensure that the Office is aware of these competing considerations. In cases where delaying publication may be sufficient to address any of these concerns, OLC will reconsider the publication decision at an appropriate time.

OLC also receives a large number of Freedom of Information Act (FOIA) requests for its unpublished legal opinions. The volume of such requests has increased substantially in recent years, particularly with respect to opinions concerning national security matters. By definition, these requests seek disclosure of documents that the Office has not yet chosen to release pursuant to its own internal publication procedures. In responding to these requests, OLC is guided by President Obama's January 21, 2009 FOIA Memorandum and Attorney General Holder's March 19, 2009 FOIA memorandum. As the Attorney General's memorandum observes, various FOIA exemptions protect "national security, . . . privileged records, and law enforcement interests." OLC will consult with relevant agencies in determining whether particular requested documents fall within and should be withheld under any applicable FOIA exemptions. If a requested document does not fall within an exemption, OLC will disclose it promptly. In addition, OLC will consider disclosing documents even if they technically fall within the scope of a FOIA exemption. As the Attorney General also stated in his March 19, 2009 memorandum, "an agency should not withhold information simply because it may do so legally." In particular, consistent with President Obama's directions, the Office will not withhold an opinion merely to avoid embarrassment to the Office or to individual officials, to hide possible errors in legal reasoning, or "because of speculative or abstract fears."

OLC has a unique mission, and a long-established tradition—sustained across many administrations—as to how its work should be carried out. The Office depends not only upon its leadership but also upon each of its attorneys to ensure that this tradition continues.

David J. Barron
Acting Assistant Attorney General

6

**Complaint**

**Exhibit C**



**U.S. Department of Justice**

Office of Legal Counsel

---

Office of the Principal Deputy Assistant Attorney General       *Washington, D.C. 20530*

May 16, 2005

## MEMORANDUM FOR ATTORNEYS OF THE OFFICE

*Re: Best Practices for OLC Opinions*

By delegation, the Office of Legal Counsel exercises the Attorney General's authority under the Judiciary Act of 1789 to advise the President and executive agencies on questions of law. OLC is authorized to provide legal advice only to the Executive Branch; we do not advise Congress, the Judiciary, foreign governments, private parties, or any other person or entity outside the Executive Branch. OLC's primary function is to provide formal advice through written opinions signed by the Assistant Attorney General or (with the approval of the AAG) a Deputy Assistant Attorney General. Our Office is frequently called upon to address issues of central importance to the functioning of the federal Government, and, subject to the President's authority under the Constitution, OLC opinions are controlling on questions of law within the Executive Branch. Accordingly, it is imperative that our opinions be clear, accurate, thoroughly researched, and soundly reasoned. The value of an OLC opinion depends on the strength of its analysis. Over the years, OLC has earned a reputation for giving candid, independent, and principled advice—even when that advice may be inconsistent with the desires of policymakers. This memorandum reaffirms the longstanding principles that have guided and will continue to guide OLC attorneys in preparing the formal opinions of the Office.

*Evaluating opinion requests.* Each opinion request is assigned to a Deputy and an Attorney-Adviser, who will review the question presented and any relevant statutory materials, prior OLC opinions, and leading cases to determine preliminarily whether the question is appropriate for OLC advice and whether it appears to merit a written opinion, as distinct from informal advice. The legal question presented should be focused and concrete; OLC generally avoids undertaking a general survey of an area of law or a broad, abstract legal opinion. There also should be a practical need for the opinion; OLC particularly should avoid giving unnecessary advice where it appears that policymakers are likely to move in a different direction. A formal opinion is more likely to be necessary when the legal question is the subject of a concrete and ongoing dispute between two or more executive agencies. If we are asked to provide an opinion to an executive agency whose head does not serve at the pleasure of the President (i.e., an agency whose head is subject to a "for cause" removal restriction), our practice is to receive in writing from that agency an agreement to be bound by our opinion. As a prudential matter, OLC should avoid opining on questions likely to be at issue in pending or imminent litigation involving the United States as a party (except where there is a need to resolve a dispute within the Executive Branch over a position to be taken in litigation). Finally, the opinions of the Office should address legal questions prospectively; OLC avoids opining on the

legality of past conduct (though from time to time we may issue prospective opinions that confirm or memorialize past advice or that necessarily bear on past conduct).

*Soliciting the views of interested agencies.* Before we proceed with an opinion, our general practice is to ask the requesting agency for a detailed memorandum setting forth the agency's own analysis of the question—in many cases, there will be preliminary discussions with the requesting agency before the formal opinion request is submitted to OLC, and the agency will be able to provide its analysis along with the opinion request. (A detailed analysis is not required when the request comes from the Counsel to the President, the Attorney General, or one of the three other Senior Management Offices of the Department of Justice.) In the case of an interagency dispute, we will ask each side to submit such a memorandum. Ordinarily, we expect the agencies on each side of a dispute to share their memoranda with the other side, or permit us to share them, so that we may have the benefit of reply comments, when necessary. When appropriate and helpful, and consistent with the confidentiality interests of the requesting agency, we will also solicit the views of other agencies not directly involved in the opinion request that have subject-matter expertise or a special interest in the question presented. For example, when the question involves the interpretation of a treaty or a matter of foreign relations, our practice is to seek the views of the State Department; when it involves the interpretation of a criminal statute, we will usually seek the views of the Justice Department's Criminal Division. We will not, however, circulate a copy of an opinion request to third-party agencies without the prior consent of the requesting agency.

*Researching, outlining, and drafting.* An OLC opinion is the product of a careful and deliberate process. After reviewing agency submissions and relevant statutes, OLC opinions and leading cases, the Deputy and Attorney-Adviser should meet to map out a plan for researching the issues and preparing an outline and first draft of the opinion. The Deputy and Attorney-Adviser should set target deadlines for each step in the process and should meet regularly to review progress on the opinion. A thorough working outline of the opinion will help to focus the necessary research and the direction of the analysis. An early first draft will help identify weaknesses or holes in the analysis requiring greater attention than initially anticipated. As work on the opinion progresses, it will generally be useful for the Deputy and the Attorney-Adviser to meet from time to time with the AAG to discuss the status and direction of the opinion project.

An OLC opinion should focus intensively on the central issues raised by a question of law and should, where possible, avoid addressing issues not squarely presented. On any issue involving a constitutional question, OLC's analysis should focus principally on the text of the Constitution and the historical record illuminating the original meaning of the text and should be faithful to that historical understanding. Where the question relates to the authorities of the President or other executive officers or the separation of powers between the Branches of the Government, past precedents and historical practice are often highly relevant. On questions of statutory and treaty interpretation, OLC's analysis will be guided by the text and will rely on traditional tools of construction in interpreting the text. OLC opinions should also consider and apply the past opinions of Attorneys General and this Office, which are ordinarily given great weight. The Office will not lightly depart from such past decisions, particularly where they directly address and decide a point in question. Decisions of the Supreme Court and courts of appeals directly on point often provide guiding authority and should be thoroughly addressed,

2

particularly where the issue is one that is likely to become the subject of litigation. Many times, however, our Office will be asked to opine on an issue of first impression or one that is unlikely to be resolved by the courts; in such instances, court decisions in relevant or analogous areas may serve as persuasive authority, depending on the strength of their analysis.

In general, we strive in our opinions for clarity and conciseness in the analysis and a balanced presentation of arguments on each side of an issue. If the opinion resolves an issue in dispute between executive agencies, we should take care to consider fully and address impartially the points raised on both sides; in doing so, it is best, to the extent practicable, to avoid ascribing particular points of view to the agencies in a way that might suggest that one side is the "winner" and the other the "loser." OLC's interest is simply to provide the correct answer on the law, taking into account all reasonable counterarguments, whether provided by an agency or not. It is therefore often not necessary or desirable to cite or quote agencies' views letters.

*Secondary review of draft opinions.* Before an OLC opinion is finalized it undergoes rigorous review by the Front Office within OLC and often by others outside the Office. When the primary Deputy and the Attorney-Adviser responsible for the opinion are satisfied that the draft opinion is ready for secondary review, the opinion is generally assigned to a second Deputy for a "second Deputy read." Along with the draft opinion, the Attorney-Adviser should provide to the second Deputy copies of any key materials, including statutes, regulations, key cases, relevant prior OLC opinions, and the views memoranda received from interested agencies. Once the second Deputy read is complete and the second Deputy's comments have been addressed, the primary Deputy should circulate the draft opinion for final review by the AAG, the remaining Deputies, and any particular attorneys within the Office with relevant expertise.

Once OLC's internal review is complete, a draft of the opinion may be shared outside the Office. In some cases, because of time constraints, OLC may circulate a draft opinion before the internal review is complete. Our general practice is to circulate draft opinions to the Office of the Attorney General and the Office of the Deputy Attorney General for review and comment. When and as warranted, we also circulate an informational copy of the draft opinion to the Office of the Counsel to the President. In addition, in most cases, we will circulate a draft to the requesting agency (or, in cases where we are resolving a dispute between agencies, to those agencies that are parties to the dispute) for review, primarily to ensure that the opinion does not misstate the facts or the legal points of interest to the agencies. On certain occasions, where we determine it appropriate, we may circulate a draft opinion to one or more other agencies that have special expertise or interest in the subject matter of the opinion, particularly if they have offered views on the question.

*Finalizing opinions.* Once all substantive work on the opinion is complete, it must undergo a thorough cite check by our paralegal staff to ensure the accuracy of all citations and consistency with the Office's rules of style. After all cite-checking changes have been approved and made, the final opinion should be printed on bond paper for signature. Each opinion ready for signature should include a completed opinion control sheet signed by the primary Deputy, the Attorney-Adviser, and the Deputy who did the second Deputy read. After it is signed and issued, if the opinion is unclassified, it will be loaded into our ISYS database and included in the Office's unclassified Day Books. A separate file containing a copy of the signed opinion, the

opinion control sheet, and copies of key materials not readily available, such as the original opinion request, the views memoranda of interested agencies, and obscure sources cited in the opinion, will also be retained in our files for future reference.

*Opinion publication.* Most OLC opinions consist of confidential legal advice for senior Executive Branch officials. Maintaining the confidentiality of OLC opinions is often necessary to preserve the deliberative process of decisionmaking within the Executive Branch and attorney-client relationships between OLC and other executive offices; in some cases, the disclosure of OLC advice also may interfere with federal law enforcement efforts. These confidentiality interests are especially great for OLC opinions relating to the President's exercise of his constitutional authorities, including his authority as Commander in Chief. It is critical to the discharge of the President's constitutional responsibilities that he and the officials under his supervision are able to receive confidential legal advice from OLC.

At the same time, many OLC opinions address issues of relevance to a broader circle of Executive Branch lawyers or agencies than just those officials directly involved in the opinion request. In some cases, the President or an affected agency may have a programmatic interest in putting other agencies, Congress, or the public on notice of the legal conclusion reached by OLC and the supporting reasoning. In addition, some OLC opinions will be of significant practical interest and benefit to lawyers outside the Executive Branch, or of broader interest to the general public, including historians. In such cases, and when consistent with the legitimate confidentiality interests of the President and the Executive Branch, it is the policy of our Office to publish OLC opinions. This publication program is in accordance with a directive from the Attorney General to OLC to publish selected opinions on an annual basis for the convenience of the Executive, Legislative, and Judicial Branches of the Government, and of the professional bar and the general public.

At the time an opinion is signed, the attorneys responsible for the opinion will make a preliminary recommendation as to whether it may be appropriate for eventual publication. Thereafter, on a rolling or periodic basis, each opinion issued by the Office is reviewed for possible publication by the OLC Publication Review Committee. If the Publication Review Committee decides that the opinion meets the Office's basic criteria for publication; the Committee will solicit the views of the agency or Justice Department component that requested the opinion, and any agency or component likely to be affected by its publication, as to whether the opinion is appropriate for current publication, whether its publication should be deferred, or whether it should not be published. OLC gives due weight to the publication recommendations of interested agencies and components, particularly where they raise specific concerns about programmatic or litigation interests that might be advanced or compromised by publication of the opinion. OLC also generally solicits the views of the Office of the Attorney General and the Office of the Counsel to the President on publication questions, particularly with respect to significant opinions of the Office.

After the final decision is made to publish an opinion, the opinion is rechecked and reformatted for online publication; a headnote is prepared and added to the opinion; and the opinion is posted to the Department of Justice Web site at www.usdoj.gov/olc/opinions.htm. All opinions posted on the Web site are eventually published in OLC's hardcover bound volumes.

4

\*       \*       \*

Please let me know if you have any questions about the principles set forth above or any suggestions for revising or adding to the guidance provided in this memorandum.

Steven G. Bradbury
Principal Deputy Assistant Attorney General

**Complaint**

**Exhibit D**

# FBI Authority to Charge User Fees for Record Check Services

The Federal Bureau of Investigation has authority to charge the Department of State user fees for FBI record check services used by the State Department to determine whether visa applicants have criminal records and are thus ineligible for visas.

The imposition of user fees by the FBI for record check services is discretionary.

February 11, 1991

MEMORANDUM OPINION FOR THE ASSISTANT DIRECTOR
FEDERAL BUREAU OF INVESTIGATION

This memorandum responds to your request for our opinion whether the Appropriations Act for the Departments of Commerce, Justice, and State, the Judiciary and Related Agencies for Fiscal Year 1990 ("the FY 1990 CJS Act") authorizes the Federal Bureau of Investigation ("FBI") to charge the Department of State user fees for FBI fingerprint identification and name check services ("record check services") provided to the State Department in connection with its review of visa applications. We conclude that the Act authorizes the FBI to establish and collect fees for record check services that are requested for, among other things, "non-criminal justice" purposes. Because the State Department's requests for such visa-related record checks are for a "non-criminal justice" purpose, the FBI may charge the State Department a user fee for record check services provided in response to such requests. We also conclude that the imposition of user fees by the FBI for record check services is discretionary.

I.

The FY 1990 CJS Act authorized the FBI to "establish and collect fees to process fingerprint identification records and name checks for non-criminal justice, non-law enforcement employment and licensing purposes." Pub. L. No. 101-162, 103 Stat. 988, 998-99 (1989) (the "user fee provision"). Based upon this authority, the FBI notified all federal agencies that use record check services that it would charge user fees for all such services that are not specifically for criminal justice or law enforcement purposes. Letter to All Federal Users of FBI Identification Division Services, from Assistant Director in Charge, Identification Division, FBI, at 1 (Dec. 8, 1989). The State Department subsequently asked the FBI to confirm that user fees would

18

not be charged for any visa-related record check services, asserting that "[t]he purpose of such namechecks is to avoid issuance of visas to persons who are excludable from the United States by law; they are, therefore, inextricably intertwined with the enforcement and administration of the criminal and immigration laws of the United States." Letter to William S. Sessions, Director, FBI, from Elizabeth M. Tamposi, Assistant Secretary for Consular Affairs, State Department, at 1 (Feb. 2, 1990).

In responding to the State Department's request, the FBI distinguished between two types of record checks of interest to the State Department. *See* Letter to Elizabeth M. Tamposi, from William S. Sessions (Mar. 26, 1990). The FBI explained that record checks ordered by the FBI's Intelligence or Criminal Investigative Divisions based upon requests submitted by the State Department are considered to be "primary source information in support of the [i]ntelligence and [c]ounterterrorism missions of the FBI's national security responsibilities," and consequently no user fee would be charged for such requests. *Id.* at 2-3. However, the FBI stated that other record checks requested by the State Department in connection with visa applications would be subject to a user fee because they are not "used in support of the FBI's intelligence and counterterrorism, or even criminal investigative mission responsibilities." *Id.* at 3.

The FBI and the State Department attempted to resolve their differences over the FBI's authority to charge user fees for visa-related record checks. That attempt was unsuccessful, and the FBI subsequently requested the opinion of this Office on the scope of the FBI's authority to charge user fees under the FY 1990 CJS Act.

## II.

The FY 1990 CJS Act, as noted above, authorizes the FBI to establish and collect user fees for record check services provided "for non-criminal justice, non-law enforcement employment and licensing purposes." 103 Stat. at 998-99. The State Department asserts that this language, by its terms, authorizes fees only for services provided for "employment and licensing purposes." *See* Letter to Joseph R. Davis, Assistant Director, Legal Counsel, FBI, from Alan Kreczko, Deputy Legal Adviser, Department of State, at 2 (May 24, 1990) ("Kreczko Letter"). Under this reading, the terms "non-criminal justice" and "non-law enforcement" are construed as coordinate adjectives that together modify the word "employment."[1] The FBI, by contrast, argues that the user fee provision must be read as a series of three adjectives, each of

---

[1] Alternatively, these two terms might be considered as modifying the entire phrase "employment and licensing purposes," so that the provision would be read as covering both non-criminal justice, non-law enforcement employment purposes and non-criminal justice, non-law enforcement licensing purposes. The State Department has not taken a clear position as to whether, under its reading of the provision, these two terms modify both "employment" and "licensing" or just "employment." In any event, it is clear that the State Department's use of FBI record check services is not for an employment or a licensing purpose.

19

which modifies the word "purposes." Thus read, the user fee provision authorizes the FBI to impose fees for record check services provided for any of three purposes: a "non-criminal justice" purpose, a "non-law enforcement employment" purpose, or a "licensing" purpose. *See* Letter to Alan Kreczko, from Joseph R. Davis, at 2 (May 2, 1990) ("Davis Letter").

Applying ordinary rules of English grammar, syntax and usage, we conclude that the phrase "non-criminal justice, non-law enforcement employment and licensing purposes" is susceptible of either of two permissible constructions. On the one hand, it would be consistent with ordinary usage to read the terms "non-criminal justice" and "non-law enforcement" as coordinate adjectives that both modify the word "employment." The use of a comma rather than the word "and" between these two terms does not defeat this construction; it is well established that coordinate adjectives may properly be separated by commas. *See, e.g., The Chicago Manual of Style* § 5.45, at 142 (13th ed. 1982) (giving as an example "a faithful, sincere friend"); Government Printing Office ("GPO"), *Style Manual* § 8.38, at 121 (1984) ("short, swift streams").

On the other hand, it would also be consistent with ordinary usage to construe the user fee provision as comprising a series of three terms ("non-criminal justice," "non-law enforcement employment" and "licensing"), each of which modifies the word "purposes." The absence of a comma after the word "employment" does not imply that the provision may not be read as a list of three items. Although grammarians appear to be divided on the strict propriety of omitting the comma before the word "and" in a list of three or more items, *see, e.g., The Chicago Manual of Style* § 5.50, at 143 (final comma should always be used); GPO, *Style Manual* § 8.43, at 122 (same); *see generally* R. Copperud, American Usage and Style 78-79 (1980) ("Opinion is divided on whether the comma should be used before 'and' in a series . . . ."), it is nonetheless consistent with ordinary English usage to leave out the final, or "serial," comma. *See, e.g.,* L. Todd & I. Hancock, *International English Usage* 389 (1987) (comma is used "with words or phrases in a series but not before 'and'"); *see also The World Almanac Guide to Good Word Usage* 52 (M. Manser & J. McQuain eds. 1989) ("the final comma preceding 'and' or 'or' is optional"). At any rate, whatever the views of grammarians, it is clear that Congress regards it as acceptable to leave out the serial comma. In the very same section that enacts the user fee provision, Congress omitted the final comma in a context where it clearly intended that the enumerated activities comprise a series of four activities. *See* 103 Stat. at 998 (appropriating funds to the FBI for expenses for "acquisition, lease, maintenance and operation of aircraft").[2] Accordingly, the FBI's construction of the user fee provision is consistent both with ordinary English usage and, more importantly, with congressional usage.

---

[2] Indeed, Congress does not appear to follow consistently any particular rule with respect to the use of the serial comma. In another list of items in the same section, Congress did use a serial comma. 103 Stat. at 998 (appropriating funds necessary for "detection, investigation, and prosecution of crimes").

20

The State Department argues that the FBI's construction of the user fee provision renders part of the provision superfluous and that therefore the State Department's construction is syntactically preferable. Kreczko Letter, at 2. We disagree. While "non-criminal justice" purposes, "non-law enforcement employment" purposes and "licensing" purposes are overlapping categories, none of them is completely subsumed within the other two. For example, there are "licensing" purposes that are related to criminal justice and thus *not* within the "non-criminal justice" category (*e.g.*, a firearms license for a court bailiff). Similarly, there are "non-law enforcement employment" purposes that are related to criminal justice (*e.g.*, hiring of a public defender). Accordingly, we cannot conclude that the FBI's construction renders any portion of the user fee provision superfluous.[3]

Because both the construction suggested by the State Department and the one offered by the FBI are grammatically permissible readings of the statutory language, the user fee provision is ambiguous. The legislative history, however, establishes that the FBI's construction is the only one that fulfills Congress' intent in enacting the provision.

The legislative history establishes that the user fee provision in the FY 1990 CJS Act was intended to effect a significant expansion in the authority of the FBI to charge user fees for record check services. Prior appropriations acts had provided the FBI only limited authority to institute a user fee program. Since 1982, appropriations acts for the Department of Justice included language authorizing the FBI to charge fees only for fingerprint identification record checks requested for "noncriminal employment and licensing purposes." Pub. L. No. 97-257, 96 Stat. 818, 823 (1982); *see also, e.g.*, Pub. L. No. 100-459, 102 Stat. 2186, 2195 (1988) (appropriations act for fiscal year 1989). By its terms, this statutory language permitted the FBI to charge user fees only for fingerprint identification record checks and then only if requested for "employment" purposes or "licensing" purposes.

In the FY 1990 CJS Act, Congress deleted this earlier, narrow formulation of the FBI's user fee authority in favor of the current language. The report submitted by the Senate Appropriations Committee, which added the new language, explained that the change was intended to expand significantly the FBI's authority to charge user fees for record check services:

> The expanded authority would permit the FBI to institute a user fee for processing of *all requests for other than law enforcement purposes*, including those for other Federal

---

[3] At any rate, the FBI's reading is no more redundant than that suggested by the State Department. Because the terms "non-criminal justice" and "non-law enforcement" substantially overlap, construing *both* words as simultaneously modifying the term "employment" renders the second adjective largely redundant.

21

> Government agencies. The costs to the FBI of providing name
> check and fingerprint identification services for nonlaw en-
> forcement purposes are considerable and have begun to negatively
> impact on its basic law enforcement mission. The Committee
> recognizes the value of these services to other Federal users,
> however, and believes it is important that the FBI continue to
> make them available, although on a reimbursable basis.

S. Rep. No. 144, 101st Cong., 1st Sess. 46 (1989) (emphasis added). The
Senate Committee thus recognized that the increasing cost of record check
services "for nonlaw enforcement purposes" was having an adverse effect on
the FBI's overall budget and, consequently, on its ability to perform "its
basic law enforcement mission." It therefore expanded the FBI's authority
so as to permit the collection of user fees for all record check requests "for
other than law enforcement purposes," rather than just the employment and
licensing purposes previously authorized. *Id.*

The FBI's construction of the user fee provision is the only reading that
gives effect to this unmistakable congressional intent to expand the FBI's
authority to charge user fees for all record check services "for other than
law enforcement purposes." Under the FBI's reading of the provision, the
FBI is authorized to charge a user fee for any record check that is requested
for, among other things, a "non-criminal justice" purpose. Because there is
a substantial overlap between the term "non-law enforcement," which is
used in the Senate Report, and the statutory term "non-criminal justice," the
FBI's construction substantially effectuates the congressional intent that the
FBI have the authority to collect user fees for record checks performed for
all "non-law enforcement" purposes.

By contrast, the State Department's construction fails to expand the range
of purposes for which a record check request would be subject to the FBI's
user fee authority. Under the State Department's reading, Congress simply
substituted a new set of adjectives to describe the type of *employment* pur-
poses for which the FBI could charge a user fee: the coordinate adjectives
"non-criminal justice, non-law enforcement" were substituted for the earlier
adjective "noncriminal." The State Department has not pointed to any evi-
dence in the legislative history — and we have been unable to find any
evidence — that Congress intended to limit the FBI's expanded user fee
authority to employment and licensing purposes. On the contrary, this read-
ing of the provision fails to carry out Congress' explicit intent to expand the
FBI's authority so that it would cover "all requests for other than law en-
forcement purposes." S. Rep. No. 144, *supra,* at 46. Indeed, the State
Department's reading may actually *contract* the FBI's authority in this re-
gard. To the extent that the two new adjectives do not completely overlap in
meaning, the set of employment purposes that are *both* "non-criminal justice"
and "non-law enforcement" is necessarily smaller than the comparatively

22

broad set of "noncriminal" employment purposes.[4]

The State Department argues that the FBI's conclusion that it may charge a user fee for record checks conducted for "non-criminal justice" purposes is, on its face, inconsistent with the Senate Report's statement that the provision "would permit the FBI to institute a user fee for processing of all requests for other than *law enforcement* purposes." S. Rep. No. 144, *supra*, at 46 (emphasis added); Kreczko Letter, at 3. In essence, the State Department contends that the FBI's reading places primary emphasis on the wrong statutory term. We find this argument unpersuasive. Under *any* reading of the user fee provision, the term "non-law enforcement" modifies the word "employment"; therefore, there is no sense in which the statutory language can be read to align *precisely* with the description in the Senate Report. Under these circumstances, our task is to determine which of the facially permissible constructions of the statutory text best fulfills the congressional purpose. As explained above, "non-criminal justice" is sufficiently close in meaning to "non-law enforcement" that the FBI's reading effectuates Congress' intent. Indeed, the FBI's reading is the *only* construction that fulfills that intent.[5]

Accordingly, we conclude that the FY 1990 CJS Act must be construed to authorize the FBI to impose a user fee for any record check services performed for a "non-criminal justice" purpose, a "non-law enforcement employment" purpose or a "licensing" purpose.

## III.

The State Department asserts that the record check requests it submits to the FBI "have no other purpose than to support a law enforcement objective" and that they are therefore not subject to a user fee. Kreczko Letter, at

---

[4] Both the State Department and the FBI assert that their respective constructions are supported by the statement in the Senate Report that the new user fee provision was intended to give the FBI authority to charge fees for record checks performed for "all civil, nonlaw enforcement employment and licensing purposes." S. Rep. No. 144, *supra*, at 45 *See* Kreczko Letter, at 3; Davis Letter, at 3. Although we believe that this language helps to clarify the meaning of the term "non- criminal justice," *see infra* p. 24, we do not believe that it assists in determining which of the two constructions is the correct one, because the passage includes precisely the same grammatical ambiguity as the statutory language

[5] Although the State Department's reading fails to give effect to Congress' intent that FBI have the authority to charge a user fee for all record checks conducted for non-law enforcement purposes, S. Rep. No. 144, *supra*, at 46, both constructions of the provision would expand the FBI's user fee authority in three other respects intended by Congress. First, the Senate Report makes clear that, in making these changes to the user fee provision, Congress intended that the provision would be given its full literal scope and therefore that the FBI was authorized to collect user fees from other federal agencies. *Id.* at 45-46. Despite the broad terms of the 1982 provision, the FBI had not collected user fees from federal agencies between 1982 and 1989  Second, the new language also authorized the FBI to charge user fees in connection with "name checks" of criminal records in addition to "fingerprint identification" record checks. *Compare* Pub. L. No. 101-162, 103 Stat. at 999 *with* Pub. L  No. 97-257, 96 Stat. at 823. Third, the new provision also allowed the FBI to charge a user fee for record checks performed "for certain employees of private sector contractors with classified Government contracts." Pub. L  No  101-162. 103 Stat  at 999. Either reading of the provision would effectuate the congressional purpose on these three points. but only the FBI's construction fulfills Congress' intent that the FBI have the authority to collect user fees *for all record checks conducted for non-law enforcement purposes*.

23

2. It says that its only purpose in submitting name checks in connection with visa applications is "to avoid issuance of visas to persons who are excludable from the United States by law." *Id.* Because "[s]ections 212(a)(9), (10), and (23) of the [Immigration and Nationality Act ("INA")] forbid the issuance of visas to aliens who have criminal records," the State Department argues, its record check requests are submitted for the purpose of enforcing the law and therefore should not be subject to a user fee. *Id.*; *see also* Letter for Paul P. Colborn, Senior Counsel, Office of Legal Counsel, from Alan Kreczko, at 1 (Aug. 31, 1990) ("the sole and exclusive justification for the namecheck/ fingerprint function in the first instance is a criminal justice, law enforcement one, *i.e.*, the detection and exclusion of criminal aliens from the United States in accordance with Congress' intent in the relevant exclusionary provisions of the [INA]").

We conclude, however, that the State Department's requests for record checks in connection with visa applications are for a "non-criminal justice" purpose. In ordinary usage, the term "criminal justice" refers to the administration and enforcement of the criminal law. *See, e.g., Webster's Third New International Dictionary* 1228 (1986) (defining "justice" as the "administration of law"). Accordingly, a "non-criminal justice" purpose is a purpose that is not related to the administration of criminal laws. The Senate Report confirms this understanding of "non-criminal justice" purposes by generally equating them with "civil" purposes. *See* note 4 *supra.* The State Department's requests for visa-related record checks relate not to the administration of criminal laws, but to the administration of certain civil provisions of the INA. The State Department does not request record checks for visa applicants for the purpose of investigating whether those applicants have violated the criminal laws of the United States and should be arrested or prosecuted, but rather to determine whether a visa applicant already has a criminal record that would require his or her exclusion from the United States. *See* 8 U.S.C. § 1182(a)(9), (10), (23) (listing classes of aliens with criminal records who "shall be ineligible to receive visas and shall be excluded from admission into the United States"). Indeed, a decision by the State Department to deny a visa does not involve any criminal penalty. *See id.* § 1201. In short, the State Department's role under the INA does not include criminal justice responsibilities, but rather the administration of a civil program.[6]

---

[6] The State Department also argues that, even if these record checks are not requested for "criminal justice" purposes, they are nonetheless for "law enforcement" purposes and for this reason should be exempt from user fees. It is not clear from the statutory text whether the term "law enforcement" is meant to embrace just the enforcement of *criminal* laws — which we believe to be the more conventional use of the term — or whether it is also intended to include the enforcement of civil laws. As noted above, however, the Senate Report is clear that this term is being used in the narrower sense of criminal law enforcement. *See* S. Rep. No. 144, *supra*, at 45 (user fees generally authorized for record checks requested for "civil" purposes). The State Department's argument ultimately fails in any event because the term "non-law enforcement," as used in the user fee provision, modifies the word "employment." There is, of course, no suggestion that the State Department's review of visa applications is in any way associated with potential employment of aliens by agencies that conduct law enforcement, whether it be civil or criminal.

The State Department's purpose in requesting a record check of a visa applicant is, therefore, a civil, rather than a criminal justice, purpose.[7] Because the record check services that the FBI provides the State Department in connection with visa applications serve a "non-criminal justice" purpose, we conclude that the FBI is authorized to charge user fees for such services.[8]

## IV.

The FBI has also asked whether, if it has such authority, it is *required* to charge the State Department for these services. This question is resolved by the language of the user fee provision, which states that "the Director of the [FBI] *may* establish and collect fees to process fingerprint identification records and name checks for non-criminal justice, non-law enforcement employment and licensing purposes." 103 Stat. at 998-99 (emphasis added). In using the permissive "may," rather than the mandatory "shall," Congress clearly authorized, but did not require, the FBI to charge user fees.[9]

## CONCLUSION

We conclude for the reasons stated that the FY 1990 CJS Act authorizes the Federal Bureau of Investigation to charge the Department of State user fees for FBI record check services used by the State Department to determine whether visa applicants have criminal records and are thus ineligible for visas. We also conclude that the FBI's exercise of this authority is discretionary.

J. MICHAEL LUTTIG
*Assistant Attorney General*
*Office of Legal Counsel*

---

[7] We agree with both the FBI and the State Department that record checks ordered by the FBI's Intelligence or Criminal Investigative Divisions, based upon requests submitted by the State Department, are conducted for a criminal justice purpose and thus are not subject to a user fee.

[8] In light of this conclusion, we do not address the FBI's argument that the Economy Act, 31 U.S.C. § 1535, is available as a separate and independent source of authority. Nor do we consider the FBI's authority to charge user fees to any other particular federal agency, because to do so would require examination of the particular purposes for which the services would be provided. We note, however, that the analytical framework used in this opinion will generally be applicable in the context of record check services provided by the FBI to other federal agencies. We also note that the conclusions and analysis in this opinion remain applicable for the current fiscal year because the user fee provision in the FY 1990 CJS Act has been reenacted verbatim in the fiscal year 1991 appropriations legislation for the FBI *See* Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, 1991, Pub. L. No. 101-515, 104 Stat. 2101, 2112 (1990).

[9] The provision of record check services to the State Department for visa-related purposes does not implicate the rule prohibiting augmentations of agency appropriations that are not authorized by law. *See generally* United States General Accounting Office, Office of General Counsel, *Principles of Federal Appropriations Law*, at 5-62 through 5-93 (1982). In granting the FBI discretionary authority to impose user fees, Congress has expressly authorized any resulting augmentation in the appropriations of either the FBI or any agency to which it provides record check services.

**Complaint**

**Exhibit E**

# The Authority of the Equal Employment Opportunity Commission to Order a Federal Agency to Pay a Monetary Award to Remedy a Breach of a Settlement Agreement

Based on principles of sovereign immunity, the Equal Employment Opportunity Commission lacks authority to order the Social Security Administration to pay a monetary award as a remedy for breach of a settlement agreement entered to resolve a dispute under Title VII of the Civil Rights Act of 1964.

August 13, 2014

MEMORANDUM OPINION FOR THE GENERAL COUNSEL
SOCIAL SECURITY ADMINISTRATION

This memorandum responds to your letter of March 28, 2013, requesting our views on the authority of the Equal Employment Opportunity Commission ("EEOC") to order the Social Security Administration ("SSA") to pay a monetary award as a remedy for breach of a settlement agreement entered to resolve a dispute under Title VII of the Civil Rights Act of 1964.[1] We conclude, based on principles of sovereign immunity, that EEOC lacks authority to order SSA to pay such a monetary award for breach of the settlement agreement.

## I.

Title VII of the Civil Rights Act of 1964 prohibits employment discrimination based on race, color, religion, sex, and national origin. 42 U.S.C. § 2000e-2(a) (2012). A provision of Title VII extends this prohibition to employment by the federal government. Title VII's federal-sector provision states that "[a]ll personnel actions affecting employees or applicants for employment . . . in executive

---

[1] Memorandum for Virginia A. Seitz, Assistant Attorney General, Office of Legal Counsel ("OLC"), from David Black, General Counsel, Social Security Administration, *Re: Equal Employment Opportunity Commission's Monetary Award Authority* (Mar. 28, 2013). In considering SSA's request, we received additional views from that agency. *See* E-mail for OLC from Andrew Maunz, Office of the General Counsel, Social Security Administration, *Re: Additional Questions* (June 14, 2013) ("Maunz E-mail"); E-mail for OLC from Jay Ortis, Director, Labor and Employment Division, Office of General Law, Social Security Administration, *Re: Fwd: Solicitation of Views* (July 17, 2013 9:58 AM). We also obtained the views of EEOC and the Civil Division of the Department of Justice. *See* Letter for John E. Bies, Deputy Assistant Attorney General, Office of Legal Counsel, from Peggy R. Mastroianni, Legal Counsel, Equal Employment Opportunity Commission, *Re: Social Security Administration Request for OLC Opinion* (July 2, 2013; E-mail for OLC from Gary Hozempa, Office of Legal Counsel, Equal Employment Opportunity Commission, *Re: EEOC Breach of Settlement Decisions re Social Security Administration* (July 23, 2013 2:16 PM); E-mail for OLC from Kerry A. Bollerman, Civil Division, Department of Justice, *Re: Solicitation of Views* (May 14, 2013 5:20 PM).

agencies . . . shall be made free from any discrimination based on race, color, religion, sex, or national origin." *Id.* § 2000e-16(a). Congress authorized EEOC "to enforce the provisions of [section 2000e-16(a)] through appropriate remedies, including reinstatement or hiring of employees with or without back pay." *Id.* § 2000e-16(b). In addition, Congress authorized EEOC to "issue such rules, regulations, orders and instructions as it deems necessary and appropriate to carry out its responsibilities under [section 2000e-16]." *Id.*

Title VII and EEOC regulations set out a procedure for the filing, processing, and adjudication of complaints of unlawful discrimination in federal employment. The regulations, however, reflect a preference for voluntary settlement of discrimination complaints, *see* 29 C.F.R. § 1614.603 (2013), and treat settlement agreements as binding on the parties, *id.* § 1614.504(a). If a complainant believes that the respondent agency has failed to comply with the agreement, the regulations allow the complainant to "request that the terms of the settlement agreement be specifically implemented or, alternatively, that the complaint be reinstated for further processing from the point processing ceased." *Id.* If EEOC determines that the agency is not in compliance with the settlement agreement, the regulations provide that EEOC may "order . . . compliance with the . . . settlement agreement, or, alternatively, . . . order that the complaint be reinstated for further processing from the point processing ceased." *Id.* § 1614.504(c). The regulations further provide that "allegations that subsequent acts of discrimination violate a settlement agreement shall be processed as separate complaints . . . rather than [through actions to enforce the settlement]." *Id.*

In 1995, a group of African-American male employees working in the Baltimore, Maryland headquarters of SSA filed a class complaint alleging that the agency had discriminated against them with respect to promotions, awards, bonuses, and other personnel decisions. EEOC certified the class in 1998. The parties subsequently decided to settle their dispute and entered into an agreement under which the class members received monetary and non-monetary relief in exchange for dismissing their complaint. *See* Settlement Agreement, *Burden v. Barnhart*, EEOC Case No. 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X (Jan. 11, 2002) ("Settlement Agreement"). The Settlement Agreement made clear that it did not "represent an admission of liability by [SSA]." *Id.* at 20.

Pertinent here, Provision III.D of the Settlement Agreement, which appears under the heading "Non-Monetary Relief," reads in relevant part:

> [SSA] agrees that its policies and practices for granting performance awards and Quality Step Increases will be fair and equitable and consistent with merit principles. [SSA] agrees that it will correct any misapplications of its policies for granting performance awards and Quality Step Increases to ensure fair and equitable distribution of such awards, consistent with merit principles. At [SSA's] discretion,

*Authority of EEOC to Order Federal Agency to Pay Monetary Award*

> an expert may be retained to recommend ways to assess these poli-
> cies and practices and to ensure compliance with relevant statutes,
> regulations, EEO principles, and applicable collective bargaining
> agreements in [SSA's] awards process. Any corrections [SSA] im-
> plements will be made after providing a 30-day notice and comment
> period to the Oversight Committee. [SSA] will provide a report to
> the Administrative Judge within 6 months of the Effective Date of
> this agreement of the actions it has taken to comply with this para-
> graph.

*Id.* at 10. The Settlement Agreement provided that the Administrative Judge ("AJ") would "retain jurisdiction over this matter for a period of 4 years" to monitor compliance with the agreement. *Id.* at 6.

In 2005, the class contended that SSA had not fulfilled its obligation to correct "misapplications of its policies for granting performance awards and Quality Step Increases." The class accordingly requested that the agency provide a "corrective action plan." Letter for John E. Bies, Deputy Assistant Attorney General, Office of Legal Counsel, from Peggy R. Mastroianni, Legal Counsel, Equal Employment Opportunity Commission, *Re: Social Security Administration Request for OLC Opinion* at 2 (July 2, 2013) ("EEOC Letter"). SSA responded that the expert analysis on which the class premised its request was flawed, and promised to hire another expert. *Id.*

SSA delivered a second expert report to the class in 2006. That report showed underrepresentation of African-American males in the distribution of Quality Step Increases ("QSIs"), cash awards, and honor awards in certain SSA offices. In a September 2006 letter, SSA set forth a plan to address the areas of concern identified in the report and to prevent future disparities.

The class subsequently requested that the AJ find that SSA was not in compli-
ance with the Settlement Agreement, arguing that the agency had not offered a plan to correct all of the disparities revealed in the second expert report. *See Jefferson v. Astrue*, Hearing No. 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X, slip op. at 11 (Apr. 28, 2011) ("OFO Decision"). The judge denied the motion as moot because SSA had provided the statistical information the class demanded. *Id.* at 12.

The complainants appealed the AJ's decision to EEOC's Office of Federal Operations ("OFO"). In their appeal, the class members requested specific implementation of Provision III.D, which, they argued, included retroactive awards and Quality Step Increases for class members who had been unfairly denied those benefits. Class Brief in Support of Appeal at 13–14, *Burden v. Astrue*, EEOC Case No. 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X (May 20, 2008) ("Class Brief in Support of Appeal"). SSA, on the other hand, took the position that implementation of Provision III.D did not include retroactive awards and Quality Step Increases. The Settlement Agreement, the agency contended, did not authorize prospective relief

3

for any alleged breach; while SSA had agreed to ensure that its policies for awarding promotions and other honors would be fair and equitable and to correct any misapplications of its policies, it had not agreed that the distribution of such benefits would be mathematically exact, or that the class members would be entitled to relief in the event they disagreed with the distribution of awards. Agency's Response to Class' Brief on Appeal at 8–10, *Burden v. Astrue*, EEOC Case No. 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X (May 20, 2008) ("Agency's Response to Class' Brief on Appeal").

OFO, acting on behalf of the Commission, reversed the AJ's decision. Relying on the 2006 expert report, OFO found that "the Agency did not ensure that its policies and practices for granting performance awards and QSIs were fair and equitable between April 1, 2003 and September 30, 2005." OFO Decision at 18. OFO further found that SSA had failed to correct misapplications of its policies to ensure fair and equitable distribution of awards. OFO explained that there was no evidence to show that the policies and procedures described in SSA's September 2006 letter had been implemented or that the agency had effectively corrected the misapplication of its policy for granting performance awards and QSIs. *See id.* at 19.

Based on these conclusions, OFO determined that the complaining class members were "entitled to specific enforcement of the class settlement agreement." *Id.* OFO then ordered that "all African-American males working for the Agency's Headquarters Office in Baltimore, Maryland from April 1, 2003, through September 30, 2005, [be] presumptively entitled to the average honor award, monetary award, and QSI received during the relevant time." *Id.* OFO added that "the presumption of entitlement to the average honor award, monetary award, and QSI can be rebutted if the Agency can establish by clear and convincing evidence that an employee is not entitled to this relief." *Id.* OFO remanded the case to an administrative judge to oversee the processing of relief, including calculating the total and individual amounts due. *Id.* at 20.

SSA sought reconsideration of the decision, arguing that the relief awarded exceeded the scope of EEOC's authority. OFO denied the motion. *Jefferson v. Astrue*, Hearing No. 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X (Dec. 18, 2012). SSA then submitted its request for the views of this Office on whether EEOC had authority to order the agency to pay a monetary award for breach of a settlement agreement, contending that the absence of an applicable waiver of sovereign immunity precludes EEOC from ordering SSA to pay such a monetary award.

*Authority of EEOC to Order Federal Agency to Pay Monetary Award*

## II.

### A.

The question whether EEOC has authority to issue a monetary award to remedy a breach of a settlement agreement by a federal agency turns on the doctrine of sovereign immunity, which bars suit against the federal government except to the extent it has consented. *FDIC v. Meyer*, 510 U.S. 471, 475 (1994). Consent to suit must be provided by Congress explicitly, in clear statutory language; ambiguous statements will not suffice. *See Lane v. Pena*, 518 U.S. 187, 192 (1996); *see also United States v. Shaw*, 309 U.S. 495, 500–01 (1940) (explaining that "without specific statutory consent, no suit may be brought against the United States. No officer by his action can confer jurisdiction"). Waivers of sovereign immunity are "strictly construed, in terms of [their] scope, in favor of the sovereign." *Lane*, 518 U.S. at 192. Waivers for one type of relief, such as injunctive relief, do not thereby waive immunity for other forms of relief, such as money damages. *See id.* at 195–96; *United States v. Nordic Village*, 503 U.S. 30, 34–37 (1992) (relying on sovereign immunity principles to construe statutory waiver of sovereign immunity to permit equitable but not monetary claims); *cf. Library of Congress v. Shaw*, 478 U.S. 310, 317–19 (1986) (statutory waiver of immunity from attorney's fees does not thereby waive immunity from interest on those fees). Rather, "[t]o sustain a claim that the Government is liable for awards of monetary damages, the waiver of sovereign immunity must extend unambiguously to such monetary claims." *Lane*, 518 U.S. at 192. We have previously explained that a statutory provision "does not waive sovereign immunity for monetary claims" where the provision can plausibly be read in a manner that would not authorize monetary relief. *Authority of the Equal Employment Opportunity Commission to Impose Monetary Sanctions Against Federal Agencies for Failure to Comply with Orders Issued by EEOC Administrative Judges*, 27 Op. O.L.C. 24, 26–27 (2003) ("Navy Opinion") (citing *Availability of Money Damages Under the Religious Freedom Restoration Act*, 18 Op. O.L.C. 180, 180 (1994)). The rule that suit is permitted only on the terms Congress has authorized extends as well to matters of forum; a waiver of immunity for suits in one forum does not necessarily constitute a waiver in all forums. *See Shaw*, 309 U.S. at 501 ("Even when suits [against the United States] are authorized[,] they must be brought only in designated courts.").

As we observed in a prior opinion, "[a]lthough most of the sovereign immunity case law arises in the context of suits before federal district courts, these principles apply with equal force to agency adjudications." Navy Opinion, 27 Op. O.L.C. at 27. "In our view, there can be no doubt that normal sovereign immunity presump-

tions apply" to the question whether an agency can itself grant a particular form of relief against the government. *Id.* at 28.[2]

In 2003, we considered whether the statute conferring authority on EEOC to enforce Title VII's federal-sector provision through "appropriate remedies," 42 U.S.C. § 2000e-16(b), supplied the requisite waiver of sovereign immunity to support an order of attorney's fees against an agency as a sanction for failure to follow an administrative judge's orders. We concluded that it did not. We observed that section 2000e-16(b) waives federal agencies' immunity from suits seeking remedies for unlawful discrimination, but "[a]ttorney's fees imposed as a sanction for failure to comply with AJ orders relating to the adjudicatory process . . . are not a remedy for any act of discrimination." Navy Opinion, 27 Op. O.L.C. at 29. We further explained that "neither section 2000e-16(b), nor any other statute, contains a provision that even pertains to violations of AJ orders, much less provides an explicit waiver of the government's immunity to monetary sanctions for violations of such orders." *Id.* Finally, we rejected EEOC's argument that the Federal Rules of Civil Procedure supplied the necessary waiver. "[E]ven if Congress had waived sovereign immunity for violations of the Federal Rules of Civil Procedure in federal court," we explained, "it would not follow that it has also waived immunity for arguably analogous (though formally distinct) violations before an entirely different body where these rules do not apply." *Id.* at 31. "Indeed, . . . the doctrine of sovereign immunity requires the exact opposite presumption." *Id.*

### B.

Within this framework, we consider EEOC's authority to award the monetary relief at issue in this case. Our 2003 opinion, SSA argues, compels the conclusion that EEOC may not issue such an award absent an express waiver of sovereign immunity. No such waiver exists, the agency urges, because Title VII waives the government's immunity only for damage awards upon a finding of unlawful discrimination, and the Settlement Agreement included no admission of liability. Memorandum for Virginia A. Seitz, Assistant Attorney General, Office of Legal Counsel, from David Black, General Counsel, Social Security Administration, *Re: Equal Employment Opportunity Commission's Monetary Award Authority* at 3 (Mar. 28, 2013) ("SSA Memorandum").

---

[2] In *West v. Gibson*, 527 U.S. 212 (1999), the Supreme Court suggested in dicta that "ordinary sovereign immunity presumptions" may not apply to the question whether an agency may grant relief against the government when Congress has unambiguously waived sovereign immunity with respect to that form of relief for claims brought in district court. *Id.* at 217. In our 2003 opinion, we disagreed with that suggestion, observing that "'[i]t is settled law that a waiver of sovereign immunity in one forum does not effect a waiver in other forums.'" Navy Opinion, 27 Op. O.L.C. at 27–28 (quoting *West*, 527 U.S. at 226 (Kennedy, J., dissenting)).

*Authority of EEOC to Order Federal Agency to Pay Monetary Award*

EEOC responds that our 2003 opinion is inapposite because the Commission did not impose sanctions on SSA for failing to comply with an AJ's order. Rather, "the relief awarded . . . pertains only to SSA's breach of an EEOC settlement agreement." EEOC Letter at 10. In the past, EEOC observes, we have held that "an agency can award through a settlement agreement any relief which a court could order if a finding of prohibited discrimination were made." *Id.* (citing *Proposed Settlement of* Diamond v. Department of Health and Human Services, 22 Op. O.L.C. 257, 262 (1998) ("Diamond Opinion")); *see also Authority of USDA to Award Monetary Relief for Discrimination*, 18 Op. O.L.C. 52, 53 (1994) ("USDA Opinion"). In EEOC's view, it follows that, "when an agency breaches an EEO settlement, EEOC can order as relief whatever a court could award upon a finding of a breach." EEOC Letter at 10. Hence, the Commission asserts, if a court may order monetary relief upon finding that an agency has breached a Title VII settlement, so too can EEOC.

EEOC does not appear to dispute that the waiver of sovereign immunity in Title VII applies only to claims of unlawful discrimination and does not extend to monetary claims against the government for breach of a Title VII settlement. *See* EEOC Letter at 5 & n.2. Rather, EEOC argues that courts may award money damages for breach of a settlement agreement under the Tucker Act, which waives the government's sovereign immunity with respect to claims "founded . . . upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1) (2012). EEOC notes that in *Holmes v. United States*, 657 F.3d 1303 (Fed. Cir. 2011), the Federal Circuit determined that the Court of Federal Claims may exercise jurisdiction under the Tucker Act over suits alleging breach of a Title VII settlement, provided that the agreement itself contemplates money damages in the event of a breach. *Id.* at 1311–15. The agreement at issue in this matter, EEOC argues, contemplates money damages in the manner *Holmes* requires. Therefore, in EEOC's view, the Tucker Act's waiver applies, and sovereign immunity poses no bar to the Commission's order of the monetary relief at issue in this matter.

EEOC further contends that "the fact that the waiver [of sovereign immunity] is found in the Tucker Act rather than Title VII "is not significant vis-à-vis EEOC's authority to award back pay." EEOC Letter at 11. In *West v. Gibson*, 527 U.S. 212 (1999), EEOC notes, the Supreme Court held that EEOC may award compensatory damages as an "appropriate remed[y]" for a violation of Title VII, 42 U.S.C. § 2000e-16(b), even though the provision authorizing that form of relief is found in a 1991 Title VII amendment that expanded the remedial authority of courts without explicitly referring to EEOC proceedings. 527 U.S. at 217. Similarly, here, EEOC argues that the Commission has authority to award money damages for breach of a Title VII settlement agreement because of the waiver of immunity contained in the Tucker Act. A contrary conclusion, EEOC contends, would "strip EEOC's authority to enforce Title VII against agencies through

7

appropriate remedies, and rob it of the ability to ensure that an agency complies with its Title VII settlement promises." EEOC Letter at 11 (internal quotation marks omitted).

## III.

### A.

We are not persuaded by EEOC's arguments. EEOC's reliance on the Tucker Act is misplaced because the Tucker Act confers jurisdiction only on the Court of Federal Claims to hear contractual claims against the United States exceeding $10,000. *See* 28 U.S.C. § 1491(a)(1) ("The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.").[3] That limited waiver of sovereign immunity does not authorize EEOC to provide a forum for such disputes. *See Shaw*, 309 U.S. at 501 ("Even when suits [against the United States] are authorized[,] they must be brought only in designated courts."); *cf. Minnesota v. United States*, 305 U.S. 382, 388 (1939) ("[I]t rests with Congress to determine not only whether the United States may be sued, but in what courts the suit may be brought.").

### 1.

In *Holmes*, on which EEOC places principal reliance, the Federal Circuit determined that Title VII posed no bar to the Court of Federal Claims' exercise of jurisdiction under the Tucker Act to adjudicate a claim that an agency breached a Title VII settlement agreement, notwithstanding Title VII's comprehensive remedial scheme and its conferral of jurisdiction on federal district courts. 657 F.3d at 1312–13.[4] In so holding, the court relied on the Supreme Court's decision in *Kokkonen v. Guardian Life Insurance*, 511 U.S. 375 (1994), which held that a court with jurisdiction over an underlying dispute does not necessarily also have jurisdiction over claims that parties have breached an agreement settling that dispute. *Id.* at 381. Rather, the Court ruled, an independent basis of jurisdiction is

---

[3] 28 U.S.C. § 1346, known as the "Little Tucker Act," confers jurisdiction on United States district courts for claims founded "upon any express or implied contract with the United States" that do not exceed $10,000.

[4] Neither party challenges this aspect of the Federal Circuit's decision; we therefore assume that it is correct for purposes of this opinion. As it is irrelevant to our resolution of the question presented, we likewise take no position on the parties' dispute over whether the contract at issue contemplates money damages. *Compare* EEOC Letter at 6–8 *with* Maunz E-mail, *supra* note 1.

*Authority of EEOC to Order Federal Agency to Pay Monetary Award*

generally needed for a federal court to adjudicate such breach of settlement claims. *Id.*; *see Holmes*, 657 F.3d at 1312–13. Following *Kokkonen*, the Federal Circuit explained that, "although the [settlement agreement] arose out of Title VII litigation, [the plaintiff's] suit for breach of contract is just that: a suit to enforce a contract with the government." 657 F.3d at 1312. The court therefore held that the case was properly heard in the Court of Federal Claims under the Tucker Act, rather than in the federal district courts authorized to hear claims under Title VII.

Conversely, federal courts with jurisdiction over Title VII claims have held that they may *not* adjudicate claims for damages resulting from a federal agency's breach of a Title VII settlement agreement. *See Taylor v. Geithner*, 703 F.3d 328, 334 (6th Cir. 2013); *see also Munoz v. Mabus*, 630 F.3d 856, 861–64 (9th Cir. 2010); *Frahm v. United States*, 492 F.3d 258, 262–63 (4th Cir. 2007); *Lindstrom v. United States*, 510 F.3d 1191, 1194–96 (10th Cir. 2007). Those courts have explained that the waiver of sovereign immunity in Title VII, which authorizes suits against federal agencies for unlawful discrimination, "does not expressly extend to monetary claims against the government for breach of a settlement agreement that resolves a Title VII dispute." *Frahm*, 492 F.3d at 262. And while the waiver of sovereign immunity in the Tucker Act does extend to such claims, "invoking the Tucker Act is a non sequitur" in federal district court, "because where . . . a suit involves a claim for money damages over $10,000, the Act waives the government's immunity only in the Court of Federal Claims." *Franklin-Mason v. Mabus*, 742 F.3d 1051, 1054 (D.C. Cir. 2014); *see id.* at 1056 ("[T]he Tucker Act does not contain a waiver of sovereign immunity *in the district court* for breach of a Title VII settlement agreement seeking damages in excess of $10,000." (emphasis added)); *accord Munoz*, 630 F.3d at 864 ("Because [the plaintiff's] breach of settlement agreement claim is essentially a contract action against the federal government whose resolution requires no interpretation of Title VII itself, his claim cannot seek jurisdictional refuge in Title VII and belongs, if anywhere, in the Court of Federal Claims.").[5]

This case law highlights why, even if we were to accept EEOC's position that it "can order as relief whatever a court could award upon a finding of a breach," EEOC Letter at 10, that standard does not help its case. The waiver of sovereign immunity in the Tucker Act is limited to cases heard in the Court of Federal Claims. It does not waive the federal government's immunity, either in federal district court or in EEOC proceedings, for claims arising from breach of a

---

[5] Notably, "unlike the district courts, . . . the [Court of Federal Claims] has no general power to provide equitable relief against the Government or its officers." *United States v. Tohono O'Odham Nation*, 563 U.S. 307, 313 (2011). And the Federal Circuit has found that "[e]xcept in strictly limited circumstances . . . there is no provision in the Tucker Act authorizing the Court of Federal Claims to order equitable relief." *Massie v. United States*, 226 F.3d 1318, 1321 (2000).

settlement agreement. As explained above, waivers of sovereign immunity are to be "strictly construed, in terms of [their] scope, in favor of the sovereign." *Lane*, 518 U.S. at 192. Consequently, the Tucker Act provides no authority for EEOC to award money damages to remedy a federal agency's breach of a Title VII settlement.

### 2.

The Supreme Court's decision in *West* does not compel a contrary result. In that case, the Supreme Court construed the provision granting EEOC authority to enforce Title VII "through appropriate remedies," 42 U.S.C. § 2000e-16(b), as including the power to order remedies Congress deemed appropriate for enforcing Title VII's substantive provisions in a later Title VII amendment. 527 U.S. at 218. Because Congress determined that compensatory damages are an appropriate remedy for victims of discrimination by federal agencies in the Civil Rights Act of 1991, the Court concluded, section 2000e-16(b) authorizes EEOC to afford such relief in its enforcement proceedings. *Id.* at 218–19.

*West* provides no support for construing the limited waiver of sovereign immunity in the Tucker Act to apply to breach of settlement proceedings before EEOC. Unlike the Civil Rights Act of 1991, which amended Title VII itself, the Tucker Act is an unrelated statute that predated Title VII by several decades and as such says nothing about the remedies Congress considered suitable to effectuate the aims of Title VII. *Cf. id.* at 218 ("[I]n context the word 'appropriate' most naturally refers to forms of relief that *Title VII itself authorizes*." (emphasis added)). More fundamentally, this matter does not concern the scope of EEOC's authority to award "appropriate remedies" for workplace discrimination, but its authority to award remedies for a federal agency's breach of a settlement agreement. *See Frahm*, 492 F.3d at 262–63 (section 2000e-16(b) waives the government's sovereign immunity with respect to substantive Title VII claims but "does not expressly extend to monetary claims against the government for breach of a settlement agreement that resolves a Title VII dispute"). The Court's interpretation of the term "appropriate remedies" as it appears in Title VII provides no basis for reading the limited waiver of sovereign immunity in the Tucker Act to authorize EEOC to award monetary relief for a federal agency's breach of a Title VII settlement agreement.

### B.

In addition to considering EEOC's argument that the Tucker Act allows it to order a compensatory remedy for breach of a settlement agreement, we have also considered whether EEOC's award of monetary relief is authorized by Title VII itself insofar as the award constitutes an order to perform on promises SSA made in the Settlement Agreement—in particular, promises to "distribute performance

*Authority of EEOC to Order Federal Agency to Pay Monetary Award*

awards on a fair and equitable basis, consistent with merit principles" and "to take corrective action if it did not keep this promise." *See* EEOC Letter at 12 ("SSA promised to distribute performance awards on a fair and equitable basis, consistent with merit principles. It also promised to take corrective action if it did not keep this promise. OFO found that SSA breached these promises. As relief, EEOC ordered SSA to take corrective action, the very corrective action which SSA promised to, but did not, take.").

As EEOC notes, this Office has repeatedly recognized that Title VII's waiver of sovereign immunity means that an agency may settle an administrative Title VII complaint by awarding monetary relief to a complainant, even without admitting liability for the alleged discrimination. USDA Opinion, 18 Op. O.L.C. at 52–54; *see* Diamond Opinion, 22 Op. O.L.C. at 261 & n.6 (quoting *Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland*, 478 U.S. 501, 515 (1986)). As long as the intended relief does not exceed the scope of remedies available in court, the government's consent to be sued for violations of Title VII ordinarily permits voluntary settlement of a complaint alleging such violations. *See* Diamond Opinion, 22 Op. O.L.C. at 261–62 & n.6; *see also* USDA Opinion, 18 Op. O.L.C. at 53 (explaining that, under appropriations law, "agencies have authority to provide for monetary relief in a voluntary settlement of a discrimination claim only if the agency would be subject to such relief in a court action regarding such discrimination brought by the aggrieved person").

It might follow from this principle that EEOC has authority in certain circumstances to enforce a settlement agreement by ordering an agency to perform on its promises, even if those promises include a commitment to pay money to a complainant. If, for example, the agency had settled a Title VII claim by promising to provide a particular amount of back pay or other monetary relief and the complainant requested specific performance of that promise, EEOC might be able to order that relief without violating the doctrine of sovereign immunity. In such a circumstance, one could argue that the dispute is not, in essence, a contract dispute with the federal government, but rather a continuation of the same Title VII proceeding that gave rise to the settlement itself. Consequently, the same waiver of sovereign immunity that permitted the agency to resolve the Title VII complaint by voluntary settlement might also permit EEOC to compel the agency to make good on its promise.[6]

But whatever effect the waiver of sovereign immunity in Title VII might have on EEOC's authority to award monetary relief in other circumstances, we do not believe it authorizes the monetary award at issue here. The award at issue was not

---

[6] Editor's Note: The text of this footnote has been redacted. It includes privileged information and addresses an issue not necessary for the discussion here.

11

an order to perform on an agreement that provided back pay or other specific monetary relief to settle an underlying Title VII claim alleging past misconduct. Rather, it was an order to perform on a promise to take corrective action in the future to remedy any failure to distribute performance awards and QSIs on a "fair and equitable basis." EEOC Letter at 12. Based on two principal considerations, we conclude that, for purposes of the sovereign immunity analysis, the dispute at issue here cannot fairly be characterized as merely a continuation of the same Title VII proceeding that gave rise to the settlement itself. Accordingly, the remedy EEOC awarded is not authorized by the waiver of sovereign immunity that allowed SSA to settle the class complaint and provide relief to the claimants in the first place.

The nature of the present dispute over the meaning and application of Provision III.D illustrates that the dispute was not merely a continuation of the Title VII claim that gave rise to the settlement, but rather a distinct proceeding beyond the scope of the waiver of sovereign immunity upon which the settlement rested. First, the present dispute does not concern a specific settlement term that imposes clear obligations on the SSA—such as an agreement to provide a particular sum in back pay—but instead concerns SSA's alleged failure to comply with a non-specific prospective promise to "correct any misapplications of its policies for granting performance awards and Quality Step Increases to ensure fair and equitable distribution of such awards, consistent with merit principles." Settlement Agreement at 10. As SSA points out, in agreeing to this provision, it neither expressly consented to a particular numerical distribution of awards and QSIs, nor expressly agreed that the class members would be entitled to monetary relief in the event that they were dissatisfied with the number of awards and promotions received. Agency's Response to Class' Brief on Appeal at 8–10. Provision III.D, SSA observes, "contains no discussion of a monetary component and neither memorializes nor evidences a meeting of the minds between the parties that all class members could receive the average monetary award, or any monetary award for that matter, for the oversight period." SSA Memorandum at 3–4. Rather, in SSA's view, the disputed settlement term simply required compliance with merit principles and active oversight of its policies for issuing promotions and performance awards. *See* Maunz E-mail, *supra* note 1 ("[S]pecific enforcement [of Provision III.D] could include an ordered review of the agency's policies, perhaps even by an expert."). As a consequence, the proceedings regarding the enforcement dispute at issue required not only extensive debate over the meaning of SSA's promise to distribute awards and QSIs on a "fair and equitable basis" and to "correct any misapplications of its policies," but also extensive fact-finding

*Authority of EEOC to Order Federal Agency to Pay Monetary Award*

regarding SSA's post-settlement conduct to determine whether the relevant standards had been met. *See* OFO Decision at 16–19.[7]

Second, the present dispute does not concern monetary remedies for the alleged Title VII violations underlying the settlement, but monetary remedies for failure to comply with a settlement term governing SSA's *future* conduct, i.e., SSA's failure to distribute performance awards and QSIs on a "fair and equitable" basis after the settlement was reached. That is apparent from the extensive fact-finding required to determine SSA's compliance with Provision III.D—if the monetary remedy awarded to the class members in the present dispute rested on the conduct that gave rise to their initial Title VII claims, there would have been no need for such additional fact-finding because those claims were resolved by the Settlement Agreement. It is, at a minimum, questionable whether the waiver of sovereign immunity in Title VII that permitted SSA to enter the Settlement Agreement in the first place would also permit SSA to promise to provide a monetary remedy in the event it failed to abide by a promise to refrain from particular conduct in the future. We have previously observed that, consistent with limitations on agencies' ability to compromise or abandon claims made against the United States in litigation, "settlement of a discrimination claim should be based on the agency's good faith assessment of the litigation risk that a court might find complainants entitled to relief" based on the claims raised in their complaint. Diamond Opinion, 22 Op. O.L.C. at 262. An agreement to provide monetary relief in the event of future noncompliance with a term of the settlement agreement would arguably be an impermissible agreement to compensate complainants for injuries not alleged in their complaint. Such conduct would not be at issue if the complainants were to proceed to court on their original claim. As such, an agreement to provide

---

[7] Although OFO characterized its order as "specific enforcement" of the Settlement Agreement, we note that OFO's order appears more akin to a legal remedy for breach than the equitable remedy of specific performance as that term is generally understood in contract law. The Supreme Court has observed that specific performance requires an agreement that is "certain, fair, and just in all its parts." *Dalzell v. Dueber Watch-Case Mfg. Co.*, 149 U.S. 315, 325 (1893). "'The contract which is sought to be specifically executed ought not only to be proved,'" the Court explained, "'but the terms of it should be so precise that neither party could reasonably misunderstand them.'" *Id.* at 326 (quoting *Colson v. Thompson*, 15 U.S. (2 Wheat) 336, 341 (1817)). Accordingly, "'[i]f the contract be vague or uncertain . . . a court of equity will not exercise its extraordinary jurisdiction to enforce it, but will leave the party to his legal remedy.'" *Id.* (quoting *Colson*, 15 U.S. (2 Wheat) at 341); *see also* Restatement (Second) of Contracts § 368 (1981) ("Specific performance . . . will not be granted unless the terms of the contract are sufficiently certain to provide a basis for an appropriate order.").

In determining that the class members were presumptively "entitled to the average honor award, monetary award, and QSI" (a number unknown at the time of decision), we do not believe that OFO enforced a term "'so precise as that neither party could reasonably misunderstand [it].'" *Dalzell*, 149 U.S. at 326 (quoting *Colson*, 15 U.S. (2 Wheat) at 341); *cf. TAS Distributing Co., Inc. v. Cummins Engine Co., Inc.*, 491 F.3d 625, 637 (7th Cir. 2007) (rejecting claim that district court abused its discretion in refusing to order defendant to specifically perform on its "obligation to make 'all reasonable efforts' to manufacture and market the subject technology").

*Opinions of the Office of Legal Counsel in Volume 38*

monetary compensation for future noncompliance would raise significant questions about whether the agency had acted in a manner consistent with its obligation to provide settlement remedies based on a "good faith assessment" of the complainants' likely recovery from the pending complaint.[8]

For both of these reasons, taken together, we conclude that the dispute at issue was not merely a continuation of the underlying Title VII proceedings that resulted in the Settlement Agreement, and that the waiver of sovereign immunity upon which the settlement rested therefore cannot be said to authorize the award EEOC provided to remedy SSA's alleged failure to comply with Provision III.D of the Settlement Agreement.[9]

## IV.

We conclude that the doctrine of sovereign immunity precludes the monetary relief ordered in this case.

JOHN E. BIES
*Deputy Assistant Attorney General*
*Office of Legal Counsel*

---

[8] We do not suggest that an agency is precluded from including in a settlement its promise not to discriminate in the future. Title VII explicitly authorizes courts to enjoin agencies from engaging in unlawful employment practices. 42 U.S.C. § 2000e-5(g)(1). And we have recognized that "an appropriate remedy under Title VII . . . may include relief, including injunctive relief, that will make the plaintiff whole, prevent future violations of the act, and prevent retaliation against complainants." Diamond Opinion, 22 Op. O.L.C. at 263. Because agencies may settle a discrimination claim and award any relief that would be available in court, a promise to refrain from discriminatory behavior in the future would be entirely proper.

[9] As noted in Part I, EEOC's regulations provide that "allegations that subsequent acts of discrimination violate a settlement agreement shall be processed as separate complaints . . . rather than [through actions to enforce the settlement]." 29 C.F.R. § 1614.504(c). In proceedings before OFO, SSA argued that this provision precluded the class from receiving relief on their claims that the agency's unequal post-settlement distribution of awards violated the Settlement Agreement. We express no view on this question, and do not address the scope of EEOC's regulations. Rather, we consider the fact that EEOC effectively compensated the class members for discrimination that followed the settlement only insofar as that fact informs our view that the Commission's award is barred by the doctrine of sovereign immunity.

**Complaint**

**Exhibit F**

# Payment of Back Wages to Alien Physicians Hired Under the H-1B Visa Program

The statute authorizing the H-1B visa program does not waive the federal government's sovereign immunity. Therefore, an administrative award of back wages to alien physicians hired by the Department of Veterans Affairs under the program is barred by sovereign immunity.

February 11, 2008

MEMORANDUM OPINION FOR THE GENERAL COUNSEL
DEPARTMENT OF VETERANS AFFAIRS
AND THE SOLICITOR
DEPARTMENT OF LABOR

The Department of Labor ("DOL") has determined that the Department of Veterans Affairs ("VA") failed to pay the required prevailing wage to eleven alien physicians employed by VA hospitals pursuant to the H-1B visa program. VA requested our opinion regarding its statutory authority to pay back wages pursuant to the DOL order. DOL also provided its views on this issue. Before resolving the merits of this dispute, we requested additional views from both agencies regarding whether sovereign immunity bars the award of such monetary relief in an administrative proceeding. We now conclude that the statute authorizing the H-1B program does not waive the federal government's sovereign immunity, and the award of back wages is therefore barred.

## I.

The H-1B visa program (which takes its name from the paragraph of the Immigration and Nationality Act ("INA") in which it is codified) allows aliens to enter the United States on a temporary basis to perform certain specialty occupations, including the practice of medicine. *See* 8 U.S.C. § 1101(a)(15)(H)(i)(b) (2000). In order to obtain an H-1B visa, the alien's prospective "employer" (a term not defined in the Act) must submit a "labor condition application" to the Secretary of Labor. As part of that application, the employer must agree to pay wages that are at least "the actual wage level paid by the employer" to similarly situated employees or "the prevailing wage level" in the area, whichever is greater. *Id.* § 1182(n)(1)(A) (2000). The INA charges the Secretary of Labor with investigating and resolving any complaints over the employer's compliance with those conditions. *See id.* § 1182(n)(2)(A). Should the Secretary find, after a hearing, that "an employer has not paid wages at the wage level specified under the application," then the Secretary "shall order the employer to provide for payment of such amounts of back pay as may be required to comply." *Id.* § 1182(n)(2)(D).

Two VA hospitals submitted labor condition applications and hired eleven physicians under the H-1B program. The hospitals set the physicians' pay based

47

on VA's government pay scale. *See* 38 U.S.C. § 7404(b) (Supp. V 2005). Most of the physicians also received additional pay pursuant to VA's special pay authorities. *See id.* §§ 7431–7433 (Supp. V 2005). Several years later, the physicians filed administrative complaints asserting that the hospitals had failed to pay them the prevailing wages for the areas in which they were employed. The DOL Administrative Review Board ruled in the complainants' favor and ordered the VA to pay approximately $230,000 in back wages.

## II.

The principles governing sovereign immunity are well-established. As the Supreme Court has recognized, "[a]bsent a waiver, sovereign immunity shields the Federal Government and its agencies from suit." *FDIC v. Meyer*, 510 U.S. 471, 475 (1994); *see also United States v. Mitchell*, 463 U.S. 206, 212 (1983) ("It is axiomatic that the United States may not be sued without its consent."). Sovereign immunity bars any action against the United States if "the judgment sought would expend itself on the public treasury or domain, or interfere with the public administration, or if the effect of the judgment would be to restrain the Government from acting, or to compel it to act." *Dugan v. Rank*, 372 U.S. 609, 620 (1963) (internal quotation marks and citation omitted). The Executive Branch has no authority to waive the federal government's sovereign immunity; rather, that authority rests solely with Congress. *See, e.g.*, *United States v. Shaw*, 309 U.S. 495, 500–01 (1940) (explaining "that without specific statutory consent, no suit may be brought against the United States. No officer by his action can confer jurisdiction."); *United States v. N.Y. Rayon Importing Co.*, 329 U.S. 654, 660 (1947) ("It has long been settled that officers of the United States possess no power through their actions to waive an immunity of the United States."). And the terms of any statutory waiver must be unambiguous, both as to the nature of relief that may be ordered and the forum in which the relief may be sought. *See, e.g.*, *Lane v. Pena*, 518 U.S. 187, 192 (1996).

Because Congress has the sole authority to set the terms of any waiver, an administrative agency has no more authority to prosecute or adjudicate a claim against the federal government than does a federal court. The federal courts accordingly have applied the same sovereign immunity principles in reviewing administrative adjudications as they have in federal court suits. *See, e.g.*, *United States v. Nordic Village, Inc.*, 503 U.S. 30, 37 (1992) (applying sovereign immunity principles to bankruptcy proceedings); *Ardestani v. INS*, 502 U.S. 129, 137 (1991) (holding that sovereign immunity bars fee award to prevailing party in INS proceeding); *Foreman v. Dep't of Army*, 241 F.3d 1349, 1352 (Fed. Cir. 2001) (applying sovereign immunity principles to conclude that the Merit Systems Protection Board lacks authority to impose monetary damages); *cf. Fed. Mar.*

*Payment of Back Wages to Alien Physicians Hired Under the H-1B Visa Program*

*Comm'n v. S.C. State Ports Auth.*, 535 U.S. 743, 76061 (2002) (state sovereign immunity applies in federal administrative proceeding).[1]

This Office likewise has recognized that sovereign immunity principles "apply with equal force to agency adjudications." *Authority of the Equal Employment Opportunity Commission to Impose Monetary Sanctions Against Federal Agencies for Failure to Comply With Orders Issued by EEOC Administrative Judges*, 27 Op. O.L.C. 24, 27 (2003) ("EEOC Opinion"). For instance, we recently concluded that sovereign immunity prevents the EEOC from imposing an attorney's fee award against the federal government during an administrative adjudication. *Id.* at 33. We also found that the USDA generally lacks the authority to award monetary relief to individuals whom it finds to have been discriminated against in USDA programs. *See Authority of USDA to Award Monetary Relief for Discrimination*, 18 Op. O.L.C. 52 (1994) ("USDA Opinion"). And we found that the Special Counsel for Immigration Related Unfair Employment Practices may not bring administrative employment claims against a federal agency because the anti-discrimination statute in question did not expressly include the federal government within its ambit. *See Enforcement Jurisdiction of the Special Counsel for Immigration Related Unfair Employment Practices*, 16 Op. O.L.C. 121 (1992) ("Special Counsel Opinion"); *see also Waiver of Sovereign Immunity With Respect to Whistleblower Provisions of Environmental Statutes*, 29 Op. O.L.C. 171, 174 (2005) (concluding that Clean Water Act whistleblower provision does not waive federal government's sovereign immunity).

Notwithstanding these decisions, DOL contends that sovereign immunity should not apply to enforcement actions between two federal agencies. In support, DOL relies principally upon our opinion in *EPA Assessment of Penalties Against Federal Agencies for Violation of the Underground Storage Tank Requirements of the Resource Conservation and Recovery Act*, 24 Op. O.L.C. 84 (2000) ("EPA Opinion"), where, in concluding that the statute at issue clearly granted the EPA the authority to assess administrative penalties against federal agencies, we observed that "the doctrine of sovereign immunity does not apply to enforcement actions by one federal government agency against another." *Id.* at 88. In another opinion, we observed that with respect to a dispute between two agencies, a sovereign immunity issue "would only arise if the judicial enforcement aspect of the enforcement scheme were found applicable." *Authority of Department of Housing and Urban Development to Initiate Enforcement Actions Under the Fair Housing Act Against Other Executive Branch Agencies*, 18 Op. O.L.C. 101, 104 n.4 (1994) ("HUD Opinion").

---

[1] Cases addressing state sovereign immunity may provide some guidance, as the Supreme Court has applied similar principles in the state and federal sovereign immunity contexts. *See, e.g., Nordic Village*, 503 U.S. at 37.

*Opinions of the Office of Legal Counsel in Volume 32*

These opinions suggest that an administrative action, consisting of a dispute between two federal agencies, and resolved entirely within the Executive Branch, would not constitute a "suit" against the United States. *See* Special Counsel Opinion, 16 Op. O.L.C. at 124 n.3 ("We assume *for purposes of this opinion* that sovereign immunity would not bar administrative proceedings in which one executive agency would press charges against another executive agency and final decisional authority would be vested in the Executive.") (emphasis added). In such a context, the resulting administrative penalty would neither "expend itself on the public treasury or domain," *Dugan*, 372 U.S. at 620, nor result in a judicial order requiring or prohibiting agency action. Instead, the administrative penalty would amount simply to the transfer of money from one part of the federal government to another. *See* Special Counsel Opinion, 16 Op. O.L.C. at 124 n.4 ("The assessment of a civil penalty against a federal agency in a sense would not expend itself upon the fisc, because it would not have any net effect on the Treasury balance.").

Although some language in the EPA and HUD Opinions may be in tension with our subsequent recognition that sovereign immunity principles "apply with equal force to agency adjudications," EEOC Opinion, 27 Op. O.L.C. at 27, we need not resolve that tension here, because the dispute between DOL and VA does not fall wholly within the Executive Branch. Rather, DOL's order follows an administrative adjudication brought at the behest, and on behalf, of private parties—namely, the H-1B physicians. In the VA cases, DOL has ordered the payment of back pay awards that would go directly to the physicians in question—relief that clearly would "expend itself on the public treasury," *Dugan*, 372 U.S. at 620. As the D.C. Circuit has recognized, sovereign immunity applies to actions like these, which are "brought by a government official acting for the benefit of private parties." *Dep't of Army v. FLRA*, 56 F.3d 273, 276 (D.C. Cir. 1995); *see also Hubbard v. MSPB*, 205 F.3d 1315, 1317 (Fed. Cir. 2000) (affirming MSPB's holding that sovereign immunity barred its award of back pay against EPA).

DOL disagrees with this characterization and maintains that it should not be regarded as "acting for the benefit of private parties," but rather should be seen as representing the public interest in enforcing the conditions on the H-1B program. DOL points out that the prevailing wage provisions of the H-1B program are not primarily intended to reward alien physicians, but rather to protect the wages of American workers from cheaper foreign competition. This may be so, but the argument does not bear on the sovereign immunity question. Federal agencies may represent the public interest through a wide variety of actions, but they do not have the authority to permit private parties to bring judicial or administrative suits against the government, or to order another federal agency to pay money judgments to private parties, unless Congress has unambiguously waived sovereign immunity.

*Payment of Back Wages to Alien Physicians Hired Under the H-1B Visa Program*

### III.

We consider then whether Congress waived sovereign immunity for DOL administrative proceedings brought against federal employers under section 212(n)(2) of the INA. *See* 8 U.S.C. § 1182(n)(2). The Supreme Court has made clear that any waiver of the federal government's sovereign immunity "must be unequivocally expressed in statutory text . . . and will not be implied." *Lane*, 518 U.S. at 192 (citations omitted); *see also Nordic Village*, 503 U.S. at 37 (a reading of a statute that imposes monetary liability on the government will not be adopted unless it is "unambiguous"). Waivers of immunity are "construed strictly in favor of the sovereign and not enlarged beyond what the language requires." *Dep't of Energy v. Ohio*, 503 U.S. 607, 615 (1992) (internal quotation marks, citations, and alterations omitted). If an alternative reading of a statutory provision is available, then Congress has not waived sovereign immunity. *See Nordic Village*, 503 U.S. at 37.

In this regard, we take it as a given that the fact that a VA hospital may qualify as an employer under the H-1B visa program does not conclusively establish that Congress waived sovereign immunity. Federal agencies may well be subject to substantive obligations when participating in a particular statutory program without falling subject to the statute's remedial provisions. *See, e.g.*, *Dep't of Energy*, 503 U.S. at 623 (distinguishing among "substantive and procedural requirements" of statute, "administrative authority," and "process and sanctions"); *see also* USDA Opinion, 18 Op. O.L.C. at 72 (concluding that although antidiscrimination provisions of both Fair Housing Act and Rehabilitation Act expressly apply to the federal government, these statutes do not waive sovereign immunity for monetary relief); *Shaw*, 309 U.S. at 500–01 (sovereign immunity may be waived only by Congress through statute, not by actions of Executive Branch officers). In the Eleventh Amendment context, the Supreme Court has held that states do not waive their constitutional immunity merely by participating in a federal program, even though the relevant statutes expressly contemplate that states fall within the class of beneficiaries. *See, e.g.*, *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 245–47 (1985) (although Rehabilitation Act applies to states, state does not waive Eleventh Amendment immunity by participating in program); *Edelman v. Jordan*, 415 U.S. 651, 673–74 (1974) (mere fact that state participated in federal aid program does not waive Eleventh Amendment immunity, which bars retroactive award of benefits). Accordingly, the question is not whether federal agencies, such as VA, may hire workers through the H-1B visa program, but whether Congress has unambiguously determined that those agencies shall be subject to DOL's remedial authority to adjudicate administrative complaints under the H-1B program and to award back pay.

We are unable to find such an unambiguous waiver in this case. Congress did not expressly address the federal government's sovereign immunity anywhere in the H-1B program. Nor did Congress clearly provide that a federal employer

would be subject to DOL's remedial authority under section 212(n)(2) of the INA. *See* 8 U.S.C. § 1182(n)(2). Section 212(n)(2) does not contain a definition of "employer," nor is the term otherwise defined for purposes of the H-1B program. We have recognized that general terms such as "employer" or "person" "should not be read to include federal agencies in the absence of affirmative evidence that Congress intended that they be included." Special Counsel Opinion, 16 Op. O.L.C. at 124; *see also United States v. United Mine Workers*, 330 U.S. 258, 270 (1947) (declining to construe "employer" under the Norris-LaGuardia Act to include the United States "where there is no express reference to the United States and no evident affirmative grounds for believing that Congress intended to withhold an otherwise available remedy [obtaining a restraining order] from the Government").[2] That rule of construction would preclude the finding of an "unambiguous" waiver of sovereign immunity, unless some other provision of the INA made clear that federal agencies must be included under the back pay provisions of section 212(n)(2).[3]

Seeking to identify such provisions, DOL points to several that it asserts show Congress's expectation that federal agencies would fall within the scope of the term "employer" for purposes of section 212(n)(2). The first provision, 8 U.S.C. § 1184(*l*)(1) (2000), allows an "interested Federal agency" to request the waiver of a foreign residence requirement for alien graduate students who, following their education, seek to remain in the United States for employment at a health care facility. The statute specifically addresses "the case of a request by the Department of Veterans Affairs" for a waiver on behalf of an alien who "agrees to practice primary care or specialty medicine." *Id.* § 1184(*l*)(1)(D)(i) (Supp. V 2005). This provision, however, does not apply only to applicants for H-1B visas, but also to aliens seeking other types of immigration benefits. The provision likewise does not directly refer to DOL's remedial authority under section 212(n)(2). According-

---

[2] The Secretary of Labor has defined "employer" by regulation to mean "a person, firm, corporation, contractor, or other association or organization in the United States that has an employment relationship with H-1B . . . nonimmigrants and/or U.S. worker(s)." 20 C.F.R. § 655.715 (2007); *see also* 8 C.F.R. § 214.2(h)(4)(ii) (2007) (similar definition in Department of Homeland Security regulations). This regulatory definition could not waive the federal government's sovereign immunity, because the waiver "must be unequivocally expressed in statutory text." *Lane*, 518 U.S. at 192. We note, however, that like the statute, this regulatory definition is ambiguous as to whether federal agencies fall within its ambit, because neither "person" nor "other association or organization in the United States" clearly includes federal agencies. *See, e.g., Vt. Agency of Natural Res. v. United States*, 529 U.S. 765, 780 (2000) (noting "longstanding interpretive presumption that 'person' does not include the sovereign").

[3] The lack of an explicit waiver in the H-1B statute contrasts sharply with other statutes expressly authorizing one federal agency to enforce the statute's requirements against another federal agency. *See, e.g.*, 42 U.S.C. § 2000e-16(b) (2000) (authorizing EEOC to enforce antidiscrimination provisions of Title VII against federal agencies in administrative proceedings, including through award of back pay); *id.* § 6903(15) (2000) (defining "person" to "include each department, agency, and instrumentality of the United States" for purposes of DOL's administrative enforcement of whistleblower provisions of Solid Waste Disposal Act).

*Payment of Back Wages to Alien Physicians Hired Under the H-1B Visa Program*

ly, we cannot regard this provision as an unequivocal waiver of sovereign immunity for the award of back pay.

DOL also points to a 1998 amendment to the INA prescribing special rules for an H-1B employer that is "an institution of higher education . . . or a related or affiliated nonprofit entity; or . . . a nonprofit research organization, or a Governmental research organization," 8 U.S.C. § 1182(p)(1) (2000). With respect to institutions and organizations covered by this provision, "the prevailing wage level shall only take into account employees at such institutions and organizations in the area of employment." *Id*. In addition, such employers are exempt from paying the H-1B filing fee, *id*. § 1184(c)(9)(A) (Supp. V 2005), and from the annual numerical limitations on H-1B visas, *id*. § 1184(g)(5). DOL reasons that Congress's efforts to prescribe special rules for "Governmental research organizations" demonstrates an understanding that federal agencies as a class would be H-1B employers. The statute does not define the term "Governmental research organization," however.[4] Even assuming that this term includes certain federal government entities such as the National Institutes of Health, it could not be read unambiguously to waive sovereign immunity for all federal agencies under section 212(n)(2). The 1998 amendment demonstrates that Congress did address one way in which the prevailing wage requirement might impact universities, nonprofit organizations, and some government research entities.[5] Congress spoke with no such clarity, however, as to whether federal agencies generally could be subject to administrative complaints and the award of monetary relief.

Finally, section 212(j)(2) of the INA permits an H-1B nonimmigrant who is a medical school graduate, but who has not fulfilled certain licensing requirements, to teach or conduct research for "a public or nonprofit private educational or research institution or agency in the United States." 8 U.S.C. § 1182(j)(2) (2000). Once again, this phrase is ambiguous. An "educational or research institution or agency *in* the United States" does not clearly include federal agencies. Even if this phrase does signal that a federal agency may be an employer under the H-1B program, the phrase neither appears in the definition portion of the statute, nor in the remedial provisions. Insofar as a waiver of sovereign immunity "must be unequivocally expressed in statutory text . . . and will not be implied," *Lane*, 518

---

[4] DOL regulations define this term to mean "a United States Government entity whose primary mission is the performance or promotion of basic research and/or applied research." 20 C.F.R. § 656.40(e)(1) (2007).

[5] The legislative history of this provision indicates that Congress recognized a distinction between private entities and the nonprofit or government entities in question. The Senate Report on a bill containing an earlier version of this provision noted that it "separates the prevailing wage calculations between academic and research institutions and other nonprofit entities and those for for-profit businesses. . . . The bill establishes in statute that wages for employees at colleges, universities, nonprofit research institutes, and other nonprofit entities must be calculated separately from industry." S. Rep. No. 105-186, at 29–30 (1998).

U.S. at 192, we cannot read this provision as an express waiver of sovereign immunity.

We agree with DOL that these provisions, taken together, suggest that Congress contemplated that certain federal entities may file applications as employers under the H-1B program, but we do not regard these suggestions as the unambiguous text required to subject the United States to liability for back pay judgments. The Supreme Court has demanded a "clear statement" of waiver so as to ensure that Congress directly considers the consequences of exposing the federal government to suit and potential financial liability. As the initial dispute between DOL and VA demonstrates, it is hardly clear that Congress gave such consideration in enacting the INA provisions governing the H-1B program. Indeed, the INA makes no provision for the potential conflict between the INA's "prevailing wage" require-ment and the pay scales established by the federal civil service laws. Nor did Congress address this conflict in 1998, when it created certain exceptions to the H-1B rules for educational and research entities, but made no express provision for federal agencies other than "Governmental research organizations."

The present dispute between VA and DOL itself constitutes evidence that Congress did not directly consider the consequences of applying the H-1B program to federal employers, much less that it considered the consequences of waiving sovereign immunity and exposing the VA hospitals to financial liability. VA originally requested our advice as to whether it had the statutory authority to depart from civil service pay scales and pay a prevailing wage. The uncertainty over that question reflects the fact that in contrast to other federal laws, here, Congress did not clearly address the impact of the H-1B program on federal pay statutes. *See, e.g.*, 10 U.S.C. § 2164(e) (2000) (authorizing Secretary of Defense to appoint school staff "without regard to the provisions of any other law relating to the number, classification, or compensation of employees" based on consideration of compensation paid to comparable employees by local educational agencies in the State in which the military installation is located); 42 U.S.C. § 288-4(c)(3) (2000) (authorizing Director of National Institutes of Health to appoint certain individuals "without regard to the provisions of title 5 relating to appointment and compensation"). Congress's silence on this issue demonstrates why a clear statement of a waiver is required and further supports the conclusion that the INA does not constitute an "unambiguous" waiver of sovereign immunity.

## IV.

DOL requests that if we find that the administrative awards of back pay are barred by sovereign immunity, we nonetheless clarify that VA must comply with the prevailing wage requirements in future cases. We agree that VA should not file a labor condition application seeking DOL approval under the H-1B program unless VA is able, under its statutory pay authorities, to honor the prevailing wage requirements of that application. Although VA has no authority to pay an H-1B

*Payment of Back Wages to Alien Physicians Hired Under the H-1B Visa Program*

employee compensation beyond what is authorized by its pay statutes, *see, e.g.*, *Kizas v. Webster*, 707 F.2d 524, 535–37 (D.C. Cir. 1983), VA's special pay authorities do appear to provide it with sufficient flexibility to enable the Department to pay the prevailing wage in many instances. Should VA determine that it underpaid employees wages to which they were entitled under the law, we agree with DOL that VA may correct that error to the extent that it could have paid the higher wage in the first instance. *See, e.g.*, 3 General Accounting Office, *Principles of Federal Appropriations Law* 12-5 (2d ed. 1994) (recognizing that an agency has authority to pay an employee money erroneously not paid). In the absence of a clear waiver of sovereign immunity, however, VA may neither be required to defend itself in an administrative proceeding nor compelled to pay back wages as a result of that administrative proceeding.[6]

Congress, of course, provided an additional mechanism for ensuring compliance with these requirements by granting DOL the authority to review labor condition applications in advance and to deny any that do not meet the statutory requirements. *Cf. In re Hunter Holmes McGuire Veterans Affairs Med. Ctr.*, No. 94-INA-00210, 1996 WL 616606, at *1 (Bd. Alien Labor Cert. App. Oct. 7, 1996) (affirming denial of labor certification where VA hospital was unable under federal law to offer prevailing wage to anesthesiologist; finding "that the labor certification regulations do not provide an exception, either express or implied, for a Federal wage schedule"). It is true that the statute permits DOL to review applications "only for completeness and obvious inaccuracies." 8 U.S.C. § 1182(n). Still, an employer's failure to list an acceptable source of prevailing wage data, as we understand occurred with respect to the applications submitted by some of the VA hospitals in question, would seem to fall within the scope of that review. Congress's failure to waive sovereign immunity may limit DOL's ability to enforce the H-1B requirements retrospectively, but DOL retains authority to ensure compliance at the front-end through its review of these applications before an alien may receive an H-1B visa.

STEVEN A. ENGEL
*Deputy Assistant Attorney General*
*Office of Legal Counsel*

---

[6] We note in this regard that sovereign immunity does not apply simply to awards of retrospective relief, such as back pay. Rather, sovereign immunity also would prevent a private party from bringing an administrative action against VA under the INA's retaliation provision, 8 U.S.C. § 1182(n)(2)(C)(iv), or requiring VA to reinstate an employee after such a proceeding. *See, e.g.*, *Dugan*, 372 U.S. at 620 (sovereign immunity bars an action against the United States "if the effect of the judgment would be to restrain the Government from acting, or to compel it to act").

**Complaint**

**Exhibit G**

## APPLICABILITY OF THE EMOLUMENTS CLAUSE AND THE FOREIGN GIFTS AND DECORATIONS ACT TO THE PRESIDENT'S RECEIPT OF THE NOBEL PEACE PRIZE

*The Emoluments Clause of the Constitution does not apply to the President's receipt of the Nobel Peace Prize.*

*The Foreign Gifts and Decorations Act does not bar the President from accepting the Peace Prize without congressional consent.*

December 7, 2009

### MEMORANDUM OPINION FOR THE COUNSEL TO THE PRESIDENT

This memorandum concerns whether the President's receipt of the Nobel Peace Prize would conflict with the Emoluments Clause of the Constitution, which provides that "no Person holding any Office of Profit or Trust under [the United States], shall, without the Consent of the Congress, accept of any present, Emolument, Office, or Title, of any kind whatever, from any King, Prince, or foreign State." U.S. Const. art. I, § 9, cl. 8. As we previously explained in our oral advice and now explain in greater detail, because the Nobel Committee that awards the Peace Prize is not a "King, Prince, or foreign State," the Emoluments Clause does not apply. You have also asked whether the Foreign Gifts and Decorations Act, 5 U.S.C. § 7342 (2006), bars the President from receiving the Peace Prize. Here, too, we confirm our previous oral advice that it does not.

### I.

On October 9, 2009, the Norwegian Nobel Committee (the "Peace Prize Committee" or the "Committee"), headquartered in Oslo, Norway, announced that the President will be this year's recipient of the Nobel Peace Prize. The 2009 Peace Prize, which will consist of ten million Swedish Kroner (or approximately $1.4 million), a certificate, and a gold medal bearing the image of Alfred Nobel, is expected to be awarded by the Nobel Committee to the President on December 10, 2009—the anniversary of Nobel's death. *See Statutes of the Nobel Foundation* § 9, *available at* http://nobelprize.org/nobelfoundation/statutes.html (last visited Nov. 24, 2009) ("Nobel Foundation Statutes"); *see also The Nobel Prize Amounts*, *available at* http://nobelprize.org/nobel_prizes/amounts.html (last visited Nov. 24, 2009).

The Peace Prize is a legacy of Swedish chemist Alfred Bernhard Nobel. In his will, Nobel directed that a portion of his wealth be used to establish a set of awards, one of which, the Peace Prize, was intended to honor the person or entity that "shall have done the most or the best work for fraternity between nations, for the abolition or reduction of standing armies and for the holding and promotion of peace congresses." Nobel Foundation Statutes § 1 (setting forth the pertinent provision of Nobel's will). The relevant assets of the Nobel estate have been managed since 1900 by the Nobel Foundation, a private institution based in Stockholm, Sweden. *See* Birgitta Lemmel, *The Nobel Foundation: A Century of Growth and Change* (2007), *available at* http://nobelprize.org/nobelfoundation/history/lemmel (last visited Nov. 24, 2009). The

*Opinions of the Office of Legal Counsel in Volume 33*

Foundation is responsible for managing the assets of the bequest in such a manner as to provide for the annual award of the Nobel prizes and the operation of the prize-awarding bodies, including the Nobel Committee that selects the Peace Prize.  Nobel Foundation Statutes § 14; *see also* Lemmel, *supra* ("One vital task of the Foundation is to manage its assets in such a way as to safeguard the financial base of the prizes themselves and of the prize selection process.").  Unlike the other Nobel prizes, for accomplishments in fields such as literature and physics, which are awarded by committees appointed by Swedish institutions, Nobel specified in his will that the recipient of the prize "for champions of peace" was to be selected "by a committee of five persons to be elected by the Norwegian Storting [i.e., the Norwegian Parliament]."  Nobel Foundation Statutes § 1.

On April 26, 1897, the Storting formally agreed to carry out Nobel's will and, in August of that year, elected the first members of the Nobel Committee that would award the prize funded by Nobel's estate.  That Committee—not the Storting itself, or any other official institution of the Norwegian government, or the Nobel Foundation—has selected the Peace Prize recipients since 1901.  To be sure, in its nascent years, the Nobel Committee was more "closely linked not only to the Norwegian political establishment in general, but also to the Government," than it is today.  *See* Øyvind Tønnesson, *The Norwegian Nobel Committee* (1999), *available at* http://nobelprize.org/nobel_prizes/peace/articles/committee (last visited Nov. 24, 2009).  Indeed, until 1977, the Committee's official title was the Nobel Committee of the Norwegian Storting.  Nevertheless, it has long been recognized that the "[C]ommittee is formally independent even of the Storting, and since 1901 it has repeatedly emphasized its independence."  Tønnesson, *supra*.  In 1936, for instance, the Norwegian Foreign Minister and a former Prime Minister recused themselves from the Committee's deliberations out of concern that bestowing the award on the German pacifist Carl von Ossietzky would be perceived as an act of Norwegian foreign policy.  *Id.*; *see also Berlin Protests Ossietzky Award*, N.Y. Times, Nov. 26, 1936, at 22 (noting that "Norway [d]enies [r]esponsibility for Nobel [d]ecision").  To make clear the independent nature of the Committee's decisions, moreover, the Storting in the very next year, 1937, barred government ministers from sitting on the Nobel Committee.  *See Special Regulations for the Award of the Nobel Peace Prize and the Norwegian Nobel Institute, etc., adopted by the Nobel Committee of the Norwegian Storting on the 10th day of April in the year 1905 (including amendments of 1977, 1991, 1994, 1998 and 2000)* § 9, *available at* http://nobelprize.org/nobelfoundation/ statutes-no.html (last visited Nov. 24, 2009) ("Nobel Peace Prize Regulations") ("If a member of the [Nobel] Committee is appointed a member of the Government during his period of office, or if a member of the Government is elected a member of the Committee, he shall resign from the Committee for as long as he continues in office as a Minister").  Furthermore, for more than 30 years, no member of the Committee has been permitted as a general matter to continue serving in the Storting.  *See* Tønnesson, *supra* ("[I]n 1977 . . . the Storting decided that its members should not participate in nonparliamentary committees appointed by the Storting itself.").[1]  That said, an appointment to the Committee does not appear to require a sitting member of the Storting to resign immediately from his or her government position, and thus two of the current members, who joined the Nobel Committee in 2009, appear to have served on the Storting during much, if not all, of the period during which this year's

---

[1]  To further emphasize the Committee's independence from the Norwegian government, including the monarchy, "[u]nlike the prize award ceremony in Stockholm [for the other Nobel Prizes], it is the Chairperson of the Nobel Committee, and not the King [of Norway]" who formally presents the Peace Prize.  Tønnesson, *supra*.

*Applicability of the Emoluments Clause and the Foreign Gifts and Decorations Act to the President's Receipt of the Nobel Peace Prize*

Prize recipient was selected.  *See* List of Nobel Committee Members, *available at* http://nobelpeaceprize.org/en_GB/nomination_committee/members/ (last visited Dec. 4, 2009). The other three members of the Committee were private individuals.  *Id.*

Apart from the Storting's role in selecting the members of the Nobel Committee, the Norwegian government has no meaningful role in selecting the Prize recipients or financing the Prize itself.  In addition to fully funding the Prize, the Sweden-based private Nobel Foundation, established pursuant to Alfred Nobel's will, is responsible for the Committee's viability and the administration of the award.  Specifically, your Office has informed us that the Committee's operations, including the salaries of the various Committee members and of the staff, are funded by the Foundation and not by the Norwegian or Swedish governments.  *See* E-mail from Virginia R. Canter, Associate Counsel to the President, to David J. Barron, Acting Assistant Attorney General, Office of Legal Counsel (Nov. 2, 2009, 19:11 EST) ("E-mail to Barron") (summarizing telephonic interview with Geir Lundestad, Secretary to the Nobel Committee and Director of the Nobel Institute); *see also* Nobel Foundation Statutes § 11 ("The Board of the Foundation shall establish financial limits on the work that the prize-awarding bodies perform in accordance with these statutes"); *id.* § 6 ("A member of a Nobel Committee shall receive remuneration for his work, in an amount to be determined by the prize-awarding body [i.e., the Nobel Committee]."). The Committee also deliberates and maintains staff in the Nobel Institute building, which is owned by the private Nobel Foundation rather than by the government of Sweden or Norway. *See The Nobel Institute*, *available at* http://nobelpeaceprize.org/en_GB/institute/ (last visited Dec. 4, 2009) (noting that Nobel Institute building is also where the recipient of the Peace Prize is announced); *see also* Description of Nobel Institute Building, *available at* http://nobelpeaceprize.org/en_GB/institute/nobel-building/ (last visited Dec. 4, 2009).  Although the Nobel Foundation plays a critical role in sustaining the Nobel Committee and the Peace Prize, it is the Nobel Committee that independently selects the Prize recipients.  *See* Organizational Structure of the Nobel Entities, *available at* http://nobelprize.org/ nobelfoundation/org_structure.html (last visited Nov. 24, 2009) ("The Nobel Foundation does not have the right or mandate to influence the nomination and selection procedures of the Nobel Laureates."); *see also* Lemmel, *supra* ("[T]he Prize-Awarding Institutions are not only entirely independent of all government agencies and organizations, but also of the Nobel Foundation.").

## II.

The Emoluments Clause provides that "no Person holding any Office of Profit or Trust under [the United States], shall, without the Consent of the Congress, accept of any present, Emolument, Office, or Title, of any kind whatever, from any King, Prince, or foreign State." U.S. Const. art. I, § 9, cl. 8.  Adopted unanimously at the Constitutional Convention, the Emoluments Clause was intended to recognize the "necessity of preserving foreign Ministers & other officers of the U.S. independent of external influence," specifically, undue influence and corruption by foreign governments.  *See* 2 *The Records of the Federal Convention of 1787*, at 389 (Max Farrand ed., rev. ed. 1966) (notes of James Madison); *see also* 3 *id.* at 327 ("It was thought proper, in order to exclude corruption and foreign influence, to prohibit any one in office from receiving or holding any emoluments from foreign states." (remarks of Governor Randolph)); *Applicability of the Emoluments Clause to Non-Government Members of ACUS*,

3

*Opinions of the Office of Legal Counsel in Volume 33*

17 Op. O.L.C. 114, 116 (1993) ("*ACUS*"); *President Reagan's Ability to Receive Retirement Benefits from the State of California*, 5 Op. O.L.C. 187, 188 (1981) (discussing the background of the ratification of the Clause).

The President surely "hold[s] an[] Office of Profit or Trust," and the Peace Prize, including its monetary award, is a "present" or "Emolument . . . of any kind whatever." U.S. Const. art I, § 9, cl. 8. The critical question, therefore, concerns the status of the institution that makes the award. Based on the consistent historical practice of the political branches for more than a century with respect to receipt of the Peace Prize by high federal officials, as well as our Office's precedents interpreting the Emoluments Clause in other contexts, we conclude that the President in accepting the Prize would not be accepting anything from a "foreign State" within the Clause's meaning. Accordingly, we do not believe that the President's acceptance of the Peace Prize without congressional consent would violate the Emoluments Clause.

## A.

None of our Office's precedents concerning the Emoluments Clause specifically considers the status of the Nobel Committee (or the Nobel Foundation), but there is substantial and consistent historical practice of the political branches that is directly relevant. The President would be far from the first government official holding an "Office of Profit or Trust" to receive the Nobel Peace Prize. Rather, since 1906, there have been at least six federal officers who have accepted the Prize while serving in their elected or appointed offices. The Peace Prize has been received by two other sitting Presidents—Theodore Roosevelt and Woodrow Wilson—by a sitting Vice President, Secretary of State, and Senator, and by a retired General of the Army,[2] with the most recent of these acceptances having occurred in 1973. Throughout this history, we have found no indication that either the Executive or the Legislative Branch thought congressional approval was necessary.

The first instance of the Nobel Committee awarding the Peace Prize to a sitting officer occurred only five years after the Committee began awarding the Prize. In 1906, President Theodore Roosevelt received the Peace Prize.[3] On December 10 of that year, United States Minister to Norway Herbert H.D. Pierce accepted the "diploma, medal, and order upon the Nobel trustees [of the Nobel Foundation] for the amount of the prize" on Roosevelt's behalf. *See "Emperor Dead" and Other Historic American Diplomatic Dispatches* 336-37 (dispatch from Pierce to Secretary of State Elihu Root) (Peter D. Eicher ed., 1997) ("Pierce Dispatch"). Not only did Roosevelt accept the Peace Prize while President, he also chose as President to use the award money (roughly $37,000) to establish a foundation for the promotion of "industrial peace." *See* Oscar S. Straus, *Under Four Administrations: from Cleveland to Taft* 239-40 (1922) (noting that Roosevelt transferred the draft of the monetary award to Chief Justice Fuller in January of 1907 to initiate efforts to establish the Foundation).

---

[2] *See* Memorandum to File from Richard L. Shiffrin, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Proposed Award of Honorary British Knighthood to Retiring Military Officer* (Aug. 27, 1996) (retired military officers continue to "hold[] [an] Office of Profit or Trust" under the United States and hence remain subject to the Emoluments Clause); *see also* 53 Comp. Gen. 753 (1974) (same).

[3] *See* List of Nobel Peace Prize Laureates, *available at* http://nobelprize.org/nobel_prizes/peace/laureates (last visited Nov. 19, 2009).

*Applicability of the Emoluments Clause and the Foreign Gifts and Decorations Act to the President's Receipt of the Nobel Peace Prize*

We have found no indication that the President or Congress believed that receipt of the Prize, including its award money, required legislative approval.  Although Congress passed legislation to establish Roosevelt's foundation, *see* Act of Mar. 2, 1907, ch. 2558, 34 Stat. 1241 (1907), it did so some months *after* he accepted the Peace Prize, and we think it clear that neither the President nor Congress thought this law necessary to satisfy the Emoluments Clause.[4]  The bill that established the trust said nothing about consent even though Congress assuredly knew how to express such legislative approval for Emoluments Clause purposes.  For instance, the same Congress that established the foundation at Roosevelt's request also "authorized [Professor Simon Newcomb, a retired Naval Officer] to accept the decoration of the order 'Pour le Mérite, für Wissenschaftern und Kunste,' conferred upon him by the German Emperor," Act of Mar. 30, 1906, ch. 1353, 34 Stat. 1713, and granted "[p]ermission . . . to [a Navy Rear-Admiral] . . . to accept the China war medal, with Pekin clasp, tendered to him by the King of Great Britain, and the Order of the Red Eagle, with swords, tendered to him by the Emperor of Germany," S.J. Res. 98, 59th Cong., 34 Stat. 2825 (1907).[5]

Perhaps most importantly, the statute that established the foundation to administer the prize money that Roosevelt had accepted does not address at all Roosevelt's receipt of the gold medal and diploma.  Yet the medal and the diploma have always constituted elements of the Peace Prize, *see* Pierce Dispatch at 337 (noting receipt of Nobel medal); *see also* Nobel Lecture of President Roosevelt (May 5, 1910), *available at* http://nobelprize.org/nobel_prizes/peace/laureates/1906/roosevelt-lecture.html (last visited Nov. 23, 2009) ("The gold medal which formed part of the prize I shall always keep, and I shall hand it on to my children as a precious heirloom."), and they constitute a "present" or "Emolument . . . of any kind whatever" within the meaning of the Emoluments Clause.  Thus, if the law establishing the trust to be funded by the award money had been intended to provide congressional consent for President Roosevelt's receipt of the Prize, it would presumably have encompassed these elements of the Prize as well.

_____

[4]  Consistent with this understanding of the congressional action, the bill establishing the foundation was modeled after documents creating trusts, *see* Straus, *supra*, at 239, and not statutes conferring legislative consent to officers' receipt of gifts from foreign states.  Further, the statute's legislative history contains no indication that the bill was intended to ratify Roosevelt's acceptance of a gift from a foreign power; nor does it indicate that his acceptance of the Prize without congressional consent was inappropriate.  *See* S. Rep. No. 59-7283 (1907); *see also* 41 Cong. Rec. 4113 (1907) ("There can be no possible objection [to the bill].  It establishes trustees, who are to receive from the President the Nobel prize for the foundation of a society for the promotion of industrial peace." (statement of Sen. Lodge)).  Ultimately, the Foundation never expended any funds, and in July of 1917, Congress dissolved the trust.  *See* H.J. Res. 313, 65th Cong., 40 Stat. 899 (1918) ("Joint Resolution Providing for the disposition of moneys represented in the Alfred Bernard Nobel peace prize, awarded in nineteen hundred and six").  Roosevelt then distributed the Nobel Prize money, along with the interest it had accrued, to various charities in the United States and Europe.  *See* Straus, *supra*, at 241.

[5]  *See also, e.g.*, J. Res. 39, 54th Cong., 29 Stat. 759 (1896) ("authoriz[ing]" President Harrison "to accept certain medals presented to him by the Governments of Brazil and Spain during the term of his service as President of the United States"); J. Res. 4, 42d Cong., 17 Stat. 643 (1871) ("[C]onsent of Congress is hereby given to . . . [the] secretary of the Smithsonian Institution, to accept the title and regalia of a commander of the Royal Norwegian Order of St. Olaf, conferred upon him for his distinguished scientific service and character by the King of Sweden and Norway"); J. Res. 39, 38th Cong., 13 Stat. 604 (1865) (Navy Captain "authorized to accept the sword of honor recently presented to him by the government of Great Britain"); J. Res. 14, 33d Cong., 10 Stat. 830 (1854) ("authoriz[ing] . . . accept[ance of ] a gold medal recently presented . . . by His Majesty the King of Sweden").

The example more than a decade later of President Wilson also clearly reflects an understanding by the political branches that receipt of the Peace Prize does not implicate the Emoluments Clause. When, in December of 1920, President Wilson received the Peace Prize, he, unlike President Roosevelt, did not seek to donate the Prize proceeds to a charitable cause or enlist Congress's aid in accomplishing such a charitable purpose. Instead, he simply accepted the Prize and deposited the award money in a personal account in a Swedish bank, apparently hoping for a favorable movement in the Kroner/dollar exchange rate. *See* 67 *The Papers of Woodrow Wilson* 51-52 (Arthur S. Link ed., 1992) (diary of Charles Lee Swem). President Wilson does not appear to have sought congressional approval for his acceptance, nor does it appear that Congress thought its consent was required.

These Presidents are not, as indicated above, the only federal officers who have received the Peace Prize. Senator Elihu Root in 1913, Vice President Charles Dawes in 1926, retired General of the Army George Marshall in 1953, and Secretary of State Henry Kissinger in 1973 each received the Nobel Peace Prize. *See* List of Nobel Peace Prize Laureates, *supra*. As was the case with Presidents Roosevelt and Wilson, none of these recipients, as far as we are aware, received congressional consent prior to accepting the Prize or congressional ratification of such receipt at any time thereafter.

This longstanding treatment of the Nobel Peace Prize is particularly significant to our analysis because several of the Prizes were awarded when the Nobel Committee—then known as the Nobel Committee of the Norwegian Storting—lacked some of the structural barriers to governmental control that are present today, such as rules generally barring government ministers and legislators from serving on the Committee. If anything, then, these prior cases arguably would cause more reason for concern than would be present today, and yet the historical record reveals no indication that either the Congress or the Executive believed receipt of the Prize implicated the Emoluments Clause at all. The absence of such evidence is particularly noteworthy since the Clause was recognized as a bar to gifts by foreign states without congressional consent throughout this same period of time, such that the Attorney General and this Office advised that various gifts from foreign states could not be accepted, *see*, *e.g.*, *Gifts from Foreign Prince*, 24 Op. Att'y Gen. 116, 118 (1902), and Congress passed legislation specifically manifesting its consent to some gifts bestowed by foreign states on individuals covered by the Clause. *See supra* n.5. To be sure, this long, unbroken practice of high federal officials accepting the Nobel Peace Prize without congressional consent cannot dictate the outcome of our constitutional analysis. But we do think such practice strongly supports the conclusion that the President's receipt of the Nobel Peace Prize would not conflict with the Emoluments Clause, as it may fairly be said to reflect an established understanding of what constitutes a gift from a "foreign State" that would trigger application of the Clause's prohibition. *Cf. American Ins. Ass'n v. Garamendi*, 539 U.S. 396, 415 (2003) (analyzing President's foreign affairs power under the Constitution in light of "longstanding practice" in Executive Branch and congressional silence); *Dames & Moore v. Regan*, 453 U.S. 654, 686 (1981) (noting that a "'systematic, unbroken, executive practice, long pursued to the knowledge of the Congress and never before questioned . . . may be treated as a gloss on'" the Constitution); *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 610-11 (1952) (Frankfurter, J., concurring) ("Deeply embedded traditional ways of conducting government cannot supplant the

*Applicability of the Emoluments Clause and the Foreign Gifts and Decorations Act to the President's Receipt of the Nobel Peace Prize*

Constitution or legislation, but they give meaning to the words of a text or supply them.");
*McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 315, 401 (1819) (where "the great principles of liberty are not concerned . . . [a doubtful question,] if not put at rest by the practice of the government, ought to receive a considerable impression from that practice").

**B.**

The precedents of our Office reinforce the constitutional conclusion that the historical practice recounted above strongly suggests. Indeed, our Office's numerous opinions on the Emoluments Clause have never adverted to the receipt of the Peace Prize by government officials and certainly have never suggested that the numerous acceptances of the Prize were contrary to the Clause. That is not surprising. Under these same opinions, it is clear that, due to the unique organization of the Nobel Committee (including its reliance on the privately endowed Nobel Foundation), Nobel Peace Prize recipients do not receive presents or emoluments from a "foreign State" for purposes of the Emoluments Clause.

The precedents of the Office do establish that the Emoluments Clause reaches not only "foreign State[s]" as such but also their instrumentalities. *ACUS*, 17 Op. O.L.C. at 122; *Applicability of Emoluments Clause to Employment of Government Employees by Foreign Public Universities*, 18 Op. O.L.C. 13, 18 (1994) ("*Public Univ.*"). Quite clearly, the Nobel Committee is not itself a foreign state in any traditional sense. The issue, therefore, is whether the Committee has the kind of ties to a foreign government that would make it, and by extension the Nobel Foundation in financing the Prize, an instrumentality of a foreign state under our precedents. Our past opinions make clear that an entity need not engage specifically in "political, military, or diplomatic functions" to be deemed an instrumentality of a foreign state.[6] *See Public Univ.*, 18 Op. O.L.C. at 19; *see also ACUS*, 17 Op. O.L.C. at 122 ("[T]he language of the Emoluments Clause does not warrant any distinction between the various capacities in which a foreign State may act."). Thus, for example, we have determined that entities such as corporations owned or controlled by a foreign government and foreign public universities may fall within the prohibition of the Clause. *ACUS*, 17 Op. O.L.C. at 121-22.

To determine whether a particular case involves receipt of a present or emolument from a foreign state, however, our Office has closely examined the particular facts at hand. Specifically, we have sought to determine from those facts whether the entity in question is sufficiently independent of the foreign government to which it is arguably tied—specifically with respect to the conferral of the emolument or present at issue, e.g., hiring an employee or bestowing an award, *Public Univ.*, 18 Op. O.L.C. at 20—that its actions cannot be deemed to be those of that

---

[6] Accordingly, we have explained that corporations owned or controlled by a foreign government are presumptively foreign states under the Emoluments Clause, even though the Act of State doctrine suggests that "when foreign governments act in their commercial capacities, they do not exercise powers peculiar to sovereigns," and thus are not entitled to the immunity from suit that might be available. *ACUS*, 17 Op. O.L.C. at 120 ("[N]othing in the text of the Emoluments Clause limits its application solely to foreign governments acting *as sovereigns*.").

7

*Opinions of the Office of Legal Counsel in Volume 33*

foreign state. In short, our opinions reflect a consistent focus on whether an entity's decision to confer a particular present or emolument is subject to governmental control or influence.[7]

The factors we have considered include whether a government is the substantial source of funding for the entity, *e.g.*, *Applicability of Emoluments Clause to Proposed Service of Government Employee on Commission of International Historians*, 11 Op. O.L.C. 89, 90 (1987) ("*International Historians*"); whether a government, as opposed to a private intermediary, makes the ultimate decision regarding the gift or emolument, *e.g.*, Memorandum for John G. Gaine, General Counsel, Commodity Futures Trading Commission, from Leon Ulman, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Expense Reimbursement in Connection with Trip to Indonesia* (Aug. 11, 1980) ("Indonesia Op."); and whether a government has an active role in the management of the entity, such as through having government officials serve on an entity's board of directors, *e.g.*, *Public Univ.*, 18 Op. O.L.C. at 15. No one of these factors has proven dispositive in our prior consideration of Emoluments Clause issues. Rather, we have looked to them in combination to assess the status of the entity for purposes of the Clause, keeping in mind at all times the underlying purpose that the Clause is intended to serve. *See*, *e.g.*, Memorandum for H. Gerald Staub, Office of Chief Counsel, NASA, from Samuel A. Alito, Jr., Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Emoluments Clause Questions raised by NASA Scientist's Proposed Consulting Arrangement with the University of New South Wales* (May 23, 1986) ("given [foreign public university's] functional and operational separation and independence from the government of Australia and state political instrumentalities . . . . [t]he answer to the Emoluments Clause question . . . must depend [on] whether the consultancy would raise the kind of concern (viz., the potential for 'corruption and foreign influence') that motivated the Framers in enacting the constitutional prohibition").

Consistent with this analysis, we have concluded in the past that Emoluments Clause concerns are raised where the "ultimate control" over the decision at issue—e.g., an employment decision or a decision to bestow an award—resides with the foreign government. For instance, an employee of the Nuclear Regulatory Commission ("NRC") sought authorization to work for a consulting firm that was retained by the Mexican government. *Application of the Emoluments Clause of the Constitution and the Foreign Gifts and Decorations Act*, 6 Op. O.L.C. 156, 158 (1982). Because we concluded that the "ultimate control, including selection of personnel, remains with the Mexican government," *id.* ("the retention of the NRC employee by the consulting firm appears to be the principal reason for selection of the consulting firm by the Mexican government"), we determined that the Emoluments Clause barred the arrangement. Similarly, we concluded that an invitation to join a commission of international historians that was established and funded entirely by the Austrian government constituted an invitation from the Austrian government itself. *International Historians*, 11 Op. O.L.C. at 90.

By contrast, although we have previously opined that foreign public universities are presumptively instrumentalities of a foreign state for the purposes the Emoluments Clause, we determined that two NASA scientists on leave without pay could be employed by the University

---

[7] Where a foreign state indisputably and directly confers a present or emolument, such considerations of autonomy and control may be relevant, but not decisive. *See ACUS*, 17 Op. O.L.C. at 119. Here, however, the critical issue is whether the Nobel Committee, and by extension the Nobel Foundation, is an instrumentality of a foreign government for purposes of awarding the privately endowed Peace Prize.

*Applicability of the Emoluments Clause and the Foreign Gifts and Decorations Act to the President's Receipt of the Nobel Peace Prize*

of Victoria in British Columbia, Canada, without triggering that constitutional restraint. *Public Univ.*, 18 Op. O.L.C. at 13. We came to this conclusion because the evidence demonstrated that the University acted independently of the Canadian (or the British Columbian) government when making faculty employment decisions. *Id.* at 15 ("[T]he University of Victoria should not be considered a foreign state."). To be sure, as we acknowledged, the University was under the formal control of the British Columbia government. *Id.* at 20 (noting that the government had "ultimate" control of the University); *see also id.* at 15 (noting that the faculty was "constituted" by the University's Board of Governors, the majority of whom were appointed by the provincial government). Nevertheless, it was critical to our analysis that the specific conduct at issue—the University's selection of faculty—was not made by the University "under statutory compulsion" or pursuant to the "dictates of the government." *Id.* at 20-21 (quoting *McKinney v. University of Guelph*, [1990] 3 S.C.R. 229, 269 (Can.) (plurality op.)).

Similar considerations of autonomy informed our view that a federal officer could serve as a consultant to Harvard University on a project funded by the government of Indonesia. *See* Indonesia Op. at 5. Although the consulting services were to be rendered for the benefit of Indonesia and the individual consultant's expenses were to be reimbursed by Harvard from funds paid by Indonesia, we identified no violation of the Emoluments Clause. We reached this conclusion in significant part because, under the consulting arrangement, Harvard had the sole discretion over the consultants it chose, and Indonesia had no veto power over those choices. *Id.* ("Since . . . the foreign government neither controls nor even influences the selection and payment of consultants, the Emoluments Clause is not implicated.").

In light of these precedents, we believe that it is significant that the Nobel Committee's selection of the Peace Prize recipient is independent of the dictate or influence of the Norwegian government. As far as we are aware, the Norwegian government has no authority to compel the Committee to choose the Prize recipient; nor does it have any veto authority with respect to the selection by the Committee members, who, in any event, are not appointed by a single official to whom they are accountable, but are instead elected by the multimember Storting. *See* Nobel Foundation Statutes § 1. To be sure, Norwegian government officials may submit nominations to the Committee, but that opportunity is shared by any "[m]embers of national assemblies and governments of states," along with "University rectors" and "professors of social sciences, history, philosophy, law and theology." Nobel Peace Prize Regulations § 3. Indeed, the formal process of nomination and selection of a Prize recipient is not guided by the government, but by the private, Sweden-based Nobel Foundation and the Nobel Committee.[8] For example, pursuant to the Foundation's rules, no prize-awarding body, including the Peace Prize Committee, may reveal the details of its deliberations "until at least 50 years have elapsed after the date on which the decision in question was made." Nobel Foundation Statutes § 10. We have found no

---

[8]  The Storting appears to have the limited authority only to approve "[i]nstructions concerning the election of members of the Nobel Committee" itself. *See* Nobel Foundation Regulations § 9. Any other amendments to the Committee's rules of operation, including its award selection guidelines, are decided upon by the Committee itself, after views are solicited from the Nobel Foundation. *Id.* ("Proposals for amendments to other provisions of these regulations may be put forward by members of the Norwegian Nobel Committee or by members of the Board of Directors of the Nobel Foundation. Before the Norwegian Nobel Committee makes a decision concerning the proposal, it shall be submitted to the Board of Directors of the Nobel Foundation for an opinion.").

indication that the Norwegian government or its officials, if requesting such information, would be exempt from this restraint on disclosure.  Other aspects of the selection process, including guidelines on nominations and supporting materials, are either provided in the private Foundation's statutes or delegated by the Foundation—not by the Norwegian government— to the prize-awarding bodies, including the Peace Prize Committee.  *E.g.*, *id.* § 7 ("To be considered eligible for an award, it is necessary to be nominated in writing by a person competent to make such a nomination.").  These formal limits on the capacity of the Norwegian government to influence, let alone control, the Committee's decision, are consistent with the Committee's own repeated assertions of its independence.  *See* Tønnesson, *supra*.

The Government of Norway's financial connection to the Nobel Committee is even more attenuated.  It appears that the members of the Nobel Committee are compensated for their services by the privately funded Nobel Foundation, *see* E-mail to Barron, and the precise amount of the remuneration is set by the Nobel Committee, not the Norwegian government.  *See* Nobel Foundation Statutes § 6.  The Peace Prize itself, including its cash award and other elements, is funded by the Nobel Foundation, which alone is responsible for ensuring that all of the Nobel prize-awarding bodies can accomplish their purposes and which is itself financed by private investments and not government funding.  *Id.* § 14 ("The Board [of the Foundation] shall administer the property of the Foundation for the purposes of maintaining good long-term prize-awarding capacity and safeguarding the value of the Foundation's assets in real terms."); *see also* The Nobel Foundation's Income Statement (2008), *available at* http://nobelprize.org/ nobelfoundation/incomes.html (last visited Dec. 7, 2009); Lemmel, *supra* (describing Nobel Foundation's investment strategies to ensure financial base of Nobel Prizes).

Thus, in our view, the only potentially relevant tie to the Norwegian government is that, in accordance with Alfred Nobel's will, the Storting elects the Nobel Committee's five members.  Further, we are aware that, notwithstanding the rules generally barring sitting members of the Storting from the Nobel Committee, two members of the Storting served on the Committee for several months before leaving their parliamentary seats.  However, in light of the strong basis for the Committee's autonomy, both as to the decision it makes and the finances upon which it draws, we do not view the Storting's appointment authority, or a minority of the Committee members' short-term overlap with parliamentary service, as having dispositive significance.

Nor has our Office done so in the past in analogous cases.  In determining that an award to a Navy scientist from the Alexander von Humboldt Foundation was from the German government for the purposes of the Emoluments Clause, for example, we noted that the "awards are made by a 'Special Committee,' on which the Federal Ministries for Foreign Affairs and Research and Technology are represented."  *See* Letter for Walter T. Skallerup, Jr., General Counsel, Department of the Navy, from Robert B. Shanks, Deputy Assistant Attorney General, Office of Legal Counsel at 2 (Mar. 17, 1983).  But we did not indicate that the presence of the government ministers on the award committee was the decisive factor in our analysis.  Instead, we also noted that the Foundation was reestablished (because it had once been dissolved) by the Federal Republic of Germany, specifically by its Ministry of Foreign Affairs.  In addition, we noted that the Foundation that administered the award was financed mainly through annual payments from the West German government.  *See id.*  By contrast, the Nobel Committee is financed by the private Nobel Foundation, and although the Norwegian government may have

10

*Applicability of the Emoluments Clause and the Foreign Gifts and Decorations Act to the President's Receipt of the Nobel Peace Prize*

formally established the Committee (as the "Nobel Committee of the Norwegian Storting"), it did so pursuant to a private individual's will, which assigned the Storting the limited role of electing the Committee's members, who would be charged with exercising their independent judgments.

Likewise, we concluded that the University of British Columbia in hiring faculty was not acting as a foreign state for the purposes of the Emoluments Clause—notwithstanding the provincial government's power to appoint a majority of the members of the University's board of governors. *Public Univ.*, 18 Op. O.L.C. at 14, 22 (citing *Harrison v. University of British Columbia*, [1990] 3 S.C.R. 451, 459 (Can.) (plurality op.)). We also determined that the Prince Mahidol Foundation was not an instrumentality of the Government of Thailand for the purposes of the Emoluments Clause, although several officials of the Thai government and the Royal Princess of Thailand sat on the Foundation's board. Memorandum to File from Daniel L. Koffsky, *Re: Application of the Emoluments Clause to a U.S. Government Employee Who Performs Services for the Prince Mahidol Foundation* (Nov. 19, 2002) ("Mahidol Op.").[9] In each case, we found countervailing indications of autonomy to be more significant. As noted above, we concluded that the University of British Columbia's faculty decisions, including contract negotiations and collective bargaining, were not subject to governmental compulsion. *Public Univ.*, 18 Op. O.L.C. at 20-21 (noting University's "'legal autonomy'"). And despite the presence of the Thai government and royalty, we determined that the decision-making process of the Prince Mahidol Foundation's Board evidenced "independent judgment." Mahidol Op. at 4 (also noting that "most of the funds for the Foundation do not come from the [Thai] government"). These same considerations concerning the exercise of independent judgment and financial autonomy are at least as present here.

In sum, determining whether an entity is an instrumentality of a foreign government is necessarily a fact-bound inquiry, *see Application of the Emoluments Clause of the Constitution and the Foreign Gifts and Decorations Act*, 6 Op. O.L.C. 156, 158 (1982) ("Each situation must . . . be judged on its facts."), and the weight of the evidence in light of this Office's consistent precedents—and as reinforced by the substantial historical practice—demonstrates that the awarding of the privately financed Peace Prize through the Nobel Committee does not constitute the conferral of a present or emolument by a "foreign State" for the purposes of the Emoluments Clause.

---

[9] Similarly, the Supreme Court has indicated that a government's appointment authority is not given dispositive weight in determining whether a nominally private entity is, in fact, "what the Constitution regards as the Government." *See Lebron v. National R.R. Passenger Corp.*, 513 U.S. 374, 392 (1995) (holding that Amtrak was a state actor subject to the First Amendment). That the federal government appointed a majority of Amtrak's directors was not considered to be of controlling importance. As the *Lebron* Court observed, the Consolidated Rail Corporation ("Conrail") was held "not to be a federal instrumentality, despite the President's power to appoint, directly or indirectly, 8 of its 15 directors." *Id.* at 399; *see also Regional Rail Reorganization Act Cases*, 419 U.S. 102, 152 (1974) ("Conrail is not a federal instrumentality by reason of the federal representation on its board of directors.").

*Opinions of the Office of Legal Counsel in Volume 33*

### III.

Our reasoning regarding the Emoluments Clause is equally applicable to the Foreign Gifts and Decorations Act. The Act provides express consent for officials to accept "gifts and decorations" from "foreign government[s]" under certain limited circumstances not present here. *See* 5 U.S.C. § 7342(b) (2006) ("An employee may not . . . accept a gift or decoration, other than in accordance with the provisions of" the Act); *see also id.* § 7342(a)(1)(E) (providing that the President is subject to the Act). Section 7342(a)(2) defines the term "foreign government" as follows:

> "foreign government" means –
>    (A) any unit of foreign governmental authority, including any foreign national, State, local, and municipal government;
>    (B) any international or multinational organization whose membership is composed of any unit of foreign government described in subparagraph (A); and
>    (C) any agent or representative of any such unit or such organization, while acting as such.

While we do not necessarily assume that Congress intended the meaning of "foreign government" to be coextensive with the constitutional term "foreign State," we have recognized that the Act's reference to "any unit of foreign governmental authority" is likely narrower in scope than the Emoluments Clause. *See ACUS*, 17 Op. O.L.C. at 121 (recognizing that corporations owned or controlled by foreign States are arguably not "units of foreign governmental authority," although they are presumptively subject to the Emoluments Clause); *cf.* S. Rep. No. 95-194, at 29 (1977) (definition of "foreign government" intended to reach "foreign governmental subdivision(s)" and "quasi-government organizations"). For the reasons discussed in detail above, the Nobel Committee in choosing the recipients of the Peace Prize, like the Nobel Foundation in financing the Prize, operates as a private non-governmental organization and not as a "unit" of a foreign government. Moreover, given the Foundation's private nature and the facts that the Committee acts independently of any government and is not required to include any government officials on it, *see The Norwegian Nobel Committee, available at* http://nobelprize.org/prize_awarders/peace/committee.html (last visited Nov. 23, 2009) ("Although this is not a requirement, all committee members have been Norwegian nationals."), we conclude that neither is an "international or multinational organization" because neither is "composed of any unit of foreign government," let alone composed of units of more than one foreign government. 5 U.S.C. § 7342(a)(2)(B); *see also* Memorandum to the General Counsel, The Smithsonian Institution, from Daniel L. Koffsky, Acting Assistant Attorney General, *Re: Emoluments Clause and World Bank* (May 24, 2001), *available at* www.usdoj.gov/olc/opinions.htm (concluding that international organizations of which the United States is a member are not generally subject to the Emoluments Clause and observing that the Act's coverage of international organizations was likely "motivated by policy concerns as opposed to constitutional ones"). Nor is the Committee as a whole, or, by extension, the Nobel Foundation in financing the Prize, an "agent or representative" of any unit of a foreign government or any international organization for purposes of the Act. Although two members of the Committee continued to serve in the Storting before leaving their parliamentary seats,

*Applicability of the Emoluments Clause and the Foreign Gifts and Decorations Act to the President's*
*Receipt of the Nobel Peace Prize*

we do not believe this limited tie between the Government of Norway and the Committee, affecting a minority of the Committee's members, transformed the Nobel Committee into an agent or representative of the Norwegian government.  *Id.* § 7342(a)(2)(C).  The countervailing indications of autonomy described above support that conclusion.  Consequently, the Foreign Gifts and Decorations Act poses no bar to the President's receipt of the Peace Prize.

## IV.

For the reasons given above, we conclude that neither the Emoluments Clause nor the Foreign Gifts and Decorations Act prohibits the President from receiving the Nobel Peace Prize without congressional consent.

Please let us know if we may be of further assistance.

/s/


DAVID J. BARRON
Acting Assistant Attorney General

**Complaint**

**Exhibit H**

# Whether the Defense of Marriage Act Precludes the Nonbiological Child of a Member of a Vermont Civil Union From Qualifying for Child's Insurance Benefits Under the Social Security Act

The Defense of Marriage Act would not prevent the non-biological child of a partner in a Vermont civil union from receiving child's insurance benefits under the Social Security Act.

October 16, 2007

MEMORANDUM OPINION FOR THE ACTING GENERAL COUNSEL
SOCIAL SECURITY ADMINISTRATION

The Social Security Act defines a "child" for the purpose of determining eligibility for child's insurance benefits ("CIB") by reference to the inheritance law in the relevant state. 42 U.S.C. § 416(h)(2) (2000). The law provides that a child shall receive CIB on account of a disabled parent when the child would inherit as a son or daughter if the parent were to die intestate. *Id.* Vermont law provides that the parties to a same-sex civil union enjoy the same benefits of parentage laws that would apply to a married couple, and so the natural child of one member of the union may be deemed to be the child of the other member for purposes of intestacy under Vermont law. Vt. Stat. Ann. tit. 15, § 1204; *see also Miller-Jenkins v. Miller-Jenkins*, 912 A.2d 951, 970 (Vt. 2006).

You have asked whether the Defense of Marriage Act ("DOMA"), Pub. L. No. 104-199, 110 Stat. 2419 (1996), would prevent the Commissioner of Social Security (the "Commissioner") from providing the non-biological child of one member of a Vermont civil union with social security benefits on account of that individual's relationship with the child.[1] We conclude that it would not. Although DOMA limits the definition of "marriage" and "spouse" for purposes of federal law, the Social Security Act does not condition eligibility for CIB on the existence of a marriage or on the federal rights of a spouse in the circumstances of this case; rather, eligibility turns upon the state's recognition of a parent-child relationship, and specifically, the right to inherit as a child under state law. A child's inheritance rights under state law may be independent of the existence of a marriage or spousal relationship, and that is indeed the case in Vermont. Accordingly, we conclude that nothing in DOMA would prevent the non-biological child of a

---

[1] *See* Letter for Steven G. Bradbury, Principal Deputy Assistant Attorney General, Office of Legal Counsel, from Thomas W. Crawley, Acting General Counsel, Social Security Administration (June 6, 2007) ("SSA Letter"). We are informed that the Commissioner has agreed to be bound by the opinion of this Office. *See* E-mail for John P. Elwood, Deputy Assistant Attorney General, Office of Legal Counsel, from Thomas W. Crawley, Acting General Counsel, Social Security Administration (June 29, 2007, 12:16 EST).

partner in a Vermont civil union from receiving CIB under the Social Security Act.

## I.

Two women, Karen and Monique, entered into a civil union under Vermont law in 2002, and Monique gave birth to a son, Elijah, in 2003. Karen did not formally adopt Elijah, but she appears on the birth certificate as his "2nd parent" and on other documents as his "civil union parent." *See* SSA Letter at 1. In 2005, the Commissioner found Karen to be eligible for disability benefits, and she then filed an application for CIB on behalf of Elijah. *Id*. At the time of the application, Karen was domiciled in Vermont. *Id*. at 2. In order to determine whether federal law would allow Elijah to qualify as Karen's "child" on account of her civil union with Elijah's natural mother, we first consider whether Elijah would qualify as Karen's "child" under 42 U.S.C. § 416(e)(1). We then consider whether the interpretive principle mandated by DOMA affects Elijah's status under the Social Security Act.

The Social Security Act provides that an applicant may be eligible for CIB if he is the dependent "child" of an individual entitled to disability benefits. 42 U.S.C. § 402(d) (2000). The Act defines "child" to include "the child or legally adopted child of an individual," as well as stepchildren and, in some cases, grandchildren. *Id*. § 416(e)(1). In many, if not most, cases the existence of a parent-child relationship must be established under the provisions of section 416(h) that further define the relationship for CIB purposes.

With respect to Elijah's relationship to Karen, the Act directs the Commissioner to look to how the relevant state would define the parent-child relationship for purposes of inheritance law. Specifically, the Act provides:

> [T]he Commissioner of Social Security shall apply such law as would be applied in determining the devolution of intestate personal property by the courts of the State in which such insured individual is domiciled at the time such applicant files application . . . . Applicants who according to such law would have the same status relative to taking intestate personal property as a child . . . shall be deemed such.

42 U.S.C. § 416(h)(2)(A). The Commissioner has issued regulations tracking this statutory provision, and they provide, in relevant part, that a "natural child" shall be defined based on "the law on inheritance rights that the State courts would use to decide whether [the individual] could inherit a child's share of the insured's personal property if the insured were to die without leaving a will." 20 C.F.R. § 404.355(b)(1) (2007). Where, as here, the insured is living, the Commissioner

*Nonbiological Child of a Member of a Vermont Civil Union*

"look[s] to the laws of the State where the insured has his or her permanent home." *Id.*

Because Karen was domiciled in Vermont at the time of Elijah's application, we look to Vermont law for guidance. The Vermont statute addressing intestate succession provides that the "estate of a decedent, not devised nor bequeathed and not otherwise appropriated and distributed in pursuance of law, shall descend" in the first instance "to the children of such decedent or the legal representatives of deceased children," but the statute does not otherwise define "children." Vt. Stat. Ann. tit. 14, § 551(1); *see also Miller-Jenkins v. Miller-Jenkins*, 912 A.2d 951, 969 (Vt. 2006) (recognizing that under Vermont law, "the term 'parent' is specific to the context of the family involved" and has been principally defined through judicial precedent). The civil union statute provides broadly that parties to a civil union shall have "all the same benefits, protections and responsibilities under law . . . as are granted to spouses in a marriage," Vt. Stat. Ann. tit. 15, § 1204(a), including "laws relating to . . . intestate succession," *id.* § 1204(e)(1). The statute further provides that parties to a civil union shall enjoy the same rights, "with respect to a child of whom either becomes the natural parent during the term of the civil union," as "those of a married couple." *Id.* § 1204(f).

The Vermont Supreme Court recently relied upon these provisions to hold that a child, like Elijah, who is born to one partner of a civil union during the existence of the civil union, should be deemed the child of the other partner under Vermont law for purposes of determining custodial rights following the dissolution of the civil union. *Miller-Jenkins*, 912 A.2d at 969–70.[2] The court reasoned that in the context of marriage, courts have regularly found that a child born by artificial insemination should be deemed to be the child of the husband, even if there is no biological connection. Such holdings followed the intent of the spouses in the marriage, ensured that the child would have two parents, and avoided the need for requiring adoption proceedings in every case. *Id.* Because section 1204 requires equal treatment of partners in civil unions, the court held that the same result should apply to the non-biological partner in a civil union. *Id.* at 970–71.

Although *Miller-Jenkins* recognized the parent-child relationship in the context of custodial rights, we see no reason why Vermont courts would reach a different result when considering who would constitute a child for purposes of inheritance. The Vermont civil union statute makes clear that a partner in a civil union shall enjoy not merely the "rights" that a married person would enjoy, but more broadly all "benefits, protections and responsibilities under law." Vt. Stat. Ann. tit. 15,

---

[2] In addition, the Vermont Supreme Court identified certain factors to support its conclusion, including the following: the parties to the civil union expected and intended for the non-biological parent to be the child's parent, the non-biological partner participated in the artificial insemination decision, and no other individual had a claim to be the child's parent. *Id.* at 970. In Elijah's case, it is apparent from the birth certificate and other documents that the partners to the civil union intended for Karen to be his parent. *See* SSA Letter at 1.

§ 1204(a). With respect to civil union partners, these "benefits, protections and responsibilities" specifically include both bequeathing and inheriting property, should one partner die intestate. *Id*. § 1204(e)(1). Insofar as Vermont law further seeks to place partners in a civil union on equal footing with married couples with respect to children, *see id*. § 1204(f), we believe that Vermont courts similarly would conclude that the property of a partner in a civil union who dies intestate would descend on the same terms as it would for a married person, and in particular, would go to those who would be recognized as his or her children under Vermont law. Accordingly, as applied here, we conclude that Vermont law would recognize Elijah as Karen's child for purposes of his right to inherit, should she die intestate.

## II.

The question remains whether DOMA would prevent the Commissioner from otherwise recognizing Elijah as a beneficiary under the Social Security Act. Congress enacted DOMA in response to the decision of the Hawaii Supreme Court in *Baehr v. Lewin*, 852 P.2d 44 (Haw. 1993), which held that the equal protection guarantee of that state's constitution required the recognition of same-sex marriage. *See* H.R. Rep. No. 104-664, at 3–4 (1996) ("House Report"). DOMA seeks to ensure that neither the federal government nor individual states are forced to give legal effect to same-sex marriages, either on account of one state's recognizing such a marriage or by the judicial interpretation of existing law. *See id*. at 2. At the same time, DOMA respects states' traditional rights in the arena of domestic relations, allowing them to establish their own public policies with respect to same-sex unions. *See id*.[3]

DOMA contains two operative provisions. The first provision, codified at 28 U.S.C. § 1738C (2000), provides that a state need not give full faith and credit to "a relationship between persons of the same sex that is treated as a marriage" under the laws of another state. That provision, which provides that each state may adopt its own public policy with respect to same-sex marriage, is not implicated here. It is the second provision of DOMA, codified at 1 U.S.C. § 7, that arguably might bear upon Elijah's entitlement to CIB under the Social Security Act. This section, 1 U.S.C. § 7, was added to the Dictionary Act, 1 U.S.C. §§ 1 *et seq.*, to

---

[3] The House Report described DOMA as having "two primary purposes":

The first is to defend the institution of traditional heterosexual marriage. The second is to protect the right of the States to formulate their own public policy regarding the legal recognition of same-sex unions, free from any federal constitutional implications that might attend the recognition by one State of the right for homosexual couples to acquire marriage licenses.

*Id.* at 2.

*Nonbiological Child of a Member of a Vermont Civil Union*

define "marriage" and "spouse" for purposes of federal statutes and regulations as follows:

> In determining the meaning of any Act of Congress, or of any rul-
> ing, regulation, or interpretation of the various administrative bu-
> reaus and agencies of the United States, the word "marriage" means
> *only a legal union between one man and one woman as husband and*
> wife, and the word "spouse" refers only to a person of the opposite
> sex who is a husband or a wife.

1 U.S.C. § 7. This section reflects a federal policy against interpreting any federal law, regulation, or other administrative act so as to afford legal consequence to same-sex marriages. The provision defines "marriage" and "spouse" for those purposes so as to exclude reading those terms to extend to same-sex relationships.

By its terms, 1 U.S.C. § 7 does not apply to Elijah's eligibility for CIB under the Social Security Act. As discussed, Elijah's eligibility arises out of his status as Karen's "child" under section 416, and the law provides that he "shall be deemed such" simply because he "would have the same status relative to taking intestate personal property as a child" under Vermont law. 42 U.S.C. § 416(h)(2)(A). That analysis does not require any interpretation of the words "marriage" or "spouse" under the Social Security Act or any other provision of federal law. Nor does the analysis even require interpreting those terms under Vermont law in a way that might have consequence for the administration of federal benefits. An individual may qualify as a "child" under section 416 wholly apart from the existence of any marriage at all, as would be the case of a natural-born child of an unmarried couple, or, as is the case here, where Vermont recognizes a parent-child relation-ship outside the context of marriage. The fact that Elijah's right of inheritance ultimately derives from Vermont's recognition of a same-sex civil union is simply immaterial under DOMA. Accordingly, DOMA would not preclude Elijah from qualifying for CIB as a child of Karen under the Social Security Act.

STEVEN A. ENGEL
*Deputy Assistant Attorney General*
*Office of Legal Counsel*

# Complaint

# Exhibit I





**U.S. Department of Justice**

Office of Legal Counsel

---

Office of the
Deputy Assistant Attorney General

*Washington, D.C. 20530*

JAN 1 2 1987

Memorandum for the Solicitor of the Interior

Re: <u>Scope of the Term "Particular Matter" Under
18 U.S.C. 208</u>

This responds to your request for our opinion on the scope
of the term "particular matter" in 18 U.S.C. 208(a).  Your letter
asked whether and, if so, to what extent that term includes
"general rulemaking and the formulation of general policy
decisions," so as to bar a government official's participation in
any such activity if he or an entity with which he is associated
has a "financial interest" that would be affected by it.[1]  You
stated that it has been the understanding of the Department of
the Interior that section 208 generally does not apply in
situations where a governmental activity affects large numbers of
private parties and has more or less the same impact on all

---

[1] Section 208(a) reads in full as follows:

Except as permitted by subsection (b) hereof,
whoever, being an officer or employee of the executive
branch of the United States Government, of any
independent agency of the United States, a Federal
Reserve bank director, officer, or employee, or of the
District of Columbia, including a special Government
employee, participates personally and substantially as a
Government officer or employee, through decision,
approval, disapproval, recommendation, the rendering of
advice, investigation, or otherwise, in a judicial or
other proceeding, application, request for a ruling or
other determination, contract, claim, controversy,
charge, accusation, arrest, or other particular matter
in which, to his knowledge, he, his spouse, minor child,
partner, organization in which he is serving as officer,
director, trustee, partner or employee, or any person or
organization with whom he is negotiating or has any
arrangement concerning prospective employment, has a
financial interest--

Shall be fined not more than $10,000, or
imprisoned not more than two years, or both.

similarly situated parties.[2]

        According to your letter, your present inquiry is occasioned
by advice received from the Office of Government Ethics (OGE) to
the effect that section 208(a) bars an employee's participation
in any sort of governmental activity, including rulemaking and
general policy deliberations, that would have a "direct and
predictable effect" on the employee's financial interest.  You
referred to a published opinion of this Office, 2 Op. O.L.C. 151
(1978)("1978 OLC opinion") as a possible source of OGE's
interpretation.  This opinion concluded that section 208(a)
"applies to any discrete or identifiable decision,
recommendation, or other matter even though its outcome may have
a rather broad impact," including "rule-making proceedings or
advisory committee deliberations of general applicability."  2
Op. O.L.C. at 155.[3]   Your letter asked that we "review and
clarify" the conclusion of the 1978 opinion on the applicability
of section 208 to "general rulemakings, legislation, and general
policy."

        We have carefully reviewed the text and legislative history
of section 208 in light of the concerns expressed in your letter.
For reasons set forth more fully below, we endorse the general
legal conclusion of the 1978 OLC opinion respecting the potential
applicability of section 208 to rulemaking and other governmental
actions of general applicability.  We note, however, that the
effects of this interpretation are tempered by the "direct and
predictable effect" requirement that has been read into section
208(a) from the time of its enactment.  The availability of an
exemption from the disqualification requirement under section
208(b) further mitigates the statute's potentially far-reaching
impact.

_____

[2] It is not entirely clear from your letter whether your agency's
position is that section 208 is never applicable in the context
of rulemaking and other such "general" governmental activities,
or that its applicability is determined on a case-by-case basis.
The hypothetical examples cited on page 2 of your letter suggest
that you believe that section 208 may be applicable where a
rulemaking will "immediately" and "uniquely" affect only a few
private parties.

[3] This opinion, dated June 29, 1978, was prepared in response to
an inquiry from the Chief Counsel of the Food and Drug
Administration regarding the scope of the term "particular
matter" in connection with the activities of persons from the
private sector on advisory committees of the FDA.  Some members
of the advisory committees were employed by pharmaceutical
companies, or by universities engaged in research for such
companies.  The committees were employed by the FDA to advise in
matters that involved segments of the regulated industry as a
whole rather than particular products or companies.

I.  Scope of the Term "Particular Matter"

   A. Section 208 and its Legislative History

        Under section 208(a), a government official must disqualify
   himself from acting in any "judicial or other proceeding,
   application, request for a ruling or other determination,
   contract, claim, controversy, charge, accusation, arrest or
   other particular matter" that might affect his private financial
   interest.  Focusing on the words of the statutory text alone, it
   is not clear exactly how far Congress meant the term "particular
   matter" to extend.  While the plain meaning of the phrase
   "particular matter" may easily embrace rulemaking and general
   policy making, it is true that the specific proceedings
   enumerated in section 208(a) all suggest the likely involvement
   of a numerically limited class of affected interests.  This does
   not, however, necessarily decide the scope of the catch-all
   final category of "other particular matter[s]."

        Turning to the legislative history, it becomes apparent that
   the adjective "particular" was not intended to limit the
   statute's reach in terms of the number of parties or entities
   that might be affected by a matter, or the peculiarity of the
   matter's effect on particular parties.  Nor was this term
   otherwise intended to preclude or limit application of the
   statute to certain kinds of governmental proceedings.  On the
   contrary, the legislative history indicates that Congress
   intended the disqualification requirement in section 208 to
   apply to all governmental proceedings and actions.

        The prohibition on government officials' acting in matters
   affecting a personal financial interest was enacted in its
   present form as part of the general restructuring of the conflict
   of interest laws that took effect in January 1963.  See Pub. L.
   No. 87-849, 76 Stat. 1119 (1962).  Prior to that time, the
   prohibition was limited to "the transaction of business with" a
   nongovernmental business entity in which the official had a
   pecuniary interest.  See 18 U.S.C. 434 (1958 ed.).[4]  This
   prohibition was originally enacted in 1863 in an environment of

---

[4] Section 434 provided:

            Whoever, being an officer, agent or member
        of, or directly or indirectly interested in
        the pecuniary profits or contracts of any
        corporation, joint-stock company, or associa-
        tion, or of any firm or partnership, or other
        business entity, is employed or acts as an
        officer or agent of the United States for the
        transaction of business with such business
        entity, shall be fined not more than $2,000 or
        imprisoned not more than two years, or both.

- 3 -

wartime procurement frauds, and was intended to curb government officials' transacting business on behalf of the United States with any business entity in which they had a financial interest. See Manning, Federal Conflict of Interest Law 110 (1964).

The prohibition enacted in section 208 was much broader than that contained in section 434.  The legislative history indicates that Congress intended to "abandon[] the limiting concept of the 'transaction of business'" and to expand the statute to "embrace[] any participation on behalf of the Government in a matter in which the employee has an outside financial interest . . . . "  S. Rep. No. 2213, 87th Cong., 2d Sess. 13 (1962).  See also H.R. Rep. No. 748, 87th Cong., 1st Sess. 13 (1961).

In the conflict of interest legislation originally intro-duced in April 1961 by the Kennedy administration, the re-quirement of disqualification in the event of a financial interest was to apply in connection with "a transaction involving the Government."  See 107 Cong. Rec. 6835, 6839 (1961).  This phrase was defined elsewhere in the administration's bill to include "any proceeding, application, request for a ruling or other determination, contract, claim, case or other particular matter."  Id.

The phrase "transaction involving the government" and its definition were borrowed from model legislation prepared by the Association of the Bar of the City of New York, whose 1960 Report, "Conflict of Interest and Federal Service," was acknowledged as one of the most important influences in the recodification of the federal conflict of interest laws.  This Report made clear that the phrase "transaction involving the government" was intended to comprehend "all federal executive action."[5]

In the bill reported out of the House Judiciary Committee, the phrase "transaction involving the government" was replaced by the enumeration of proceedings originally contained in the defi-nition section of the administration's bill.  According to the administration's analysis of the House bill, this enumeration was intended to be "comprehensive of all matters that come before

---

[5]  See Report of the Association of the Bar of the City of New York at 198-99 (1960)(hereinafter, New York City Bar Report):

> An effective conflict of interest rule on disquali-fication must reach out to compel disqualification of the interested official not only in respect of business transactions with business entities, but in respect of all federal executive action that substantially affects his personal economic interests . . . .

- 4 -

a Federal department or agency." <u>Hearings on Federal Conflict
of Interest Legislation before the Antitrust Subcommittee of the
House Judiciary Committee</u>, 87th Cong., 1st Sess. 38 (1961)
(analysis submitted by Assistant Attorney General Katzenbach,
Office of Legal Counsel).  The administration's analysis noted
that the word "particular" was included as a modifier of "matter"
to "emphasize that the restriction applies to a specific case or
matter and not to a general area of activity."  <u>Id</u>.  Section
208(a) was described as barring "almost any type of significant
participation in Government action in the consequences of which
[an official] has a substantial economic interest."  <u>Id</u>. at 41.


B.   <u>The Term "Particular Matter" in the Statutory Scheme</u>

     When the term "particular matter" in section 208 is examined
in the context of the statutory scheme of the conflict of inter-
est laws as a whole, it becomes even clearer that Congress did
not intend to confine its scope to matters affecting only a few
parties, or to somehow exclude from section 208's disquali-
fication requirement government actions that have a similar
impact on similarly situated parties.

     The term "particular matter" is used in five other
provisions of the conflicts laws.  In two of these, 18 U.S.C.
203(a) and the first paragraph of 18 U.S.C. 205, it appears at
the end of a long list of governmental proceedings in which
government officials are barred in representing private parties.
This list is identical in all relevant respects[6] to that in
section 208(a).  To our knowledge, no question has ever been
raised as to the comprehensive scope of the proceedings named in
those statutes.  Indeed, we think it would be very difficult to
argue that a government employee could be paid to represent a
private party before an executive agency in <u>any</u> connection,
without raising a question under both of these sections.

     The term "particular matter" also appears in 18 U.S.C.
203(c), the second paragraph of 18 U.S.C. 205, and 18 U.S.C.
207.  But in these three provisions the term is modified by the
phrase "involving a specific party or parties."  In contrast to
section 203(a) and the first paragraph of section 205, the term,
thus modified has generally been understood not to include
"general rule-making, formulation of general policy or stan-
dards, other similar administrative matters, and legislative
activities -- none of which typically involve specific
parties . . . ."  S. Rep. No. 170, 95th Cong., 1st Sess. 48
(1977).  See also Memorandum of the Attorney General Regarding

---

[6] The list of proceedings in sections 203(a) and 205 does not
include the introductory words "judicial or other" that appear in
section 208.

Conflict of Interest Provisions of Public Law 87-849, 18 U.S.C. 201, Note.[7]

We think that the presence or absence of the qualifying phrase "involving a specific party or parties" in the conflicts laws is an important indicator of the intended scope of any of these provisions, and are inclined to agree with the statement in the 1978 OLC opinion that "[t]he clear implication is that general rulemaking and the formulation of general policy would be covered in the absence of the reference to specific parties." 1978 OLC opinion at 154.[8]  We note that this conclusion appears to be consistent with the longstanding administrative

_____

[7] The cited Attorney General's interpretive memorandum, prepared contemporaneously with the passage of the conflicts laws in 1963, stated with respect to the postemployment prohibitions of section 207 that "past participation in an official responsibility for a matter of this kind on behalf of the government does not disqualify a former employee from [subsequently] representing another person in a proceeding which is governed by the rule or other result of the matter."  See also Letter from Assistant Attorney General Rehnquist to the Secretary of the Interior, July 14, 1969 (former Interior Department official may represent the Alaskan Federation of Natives before Congress on the general subject of Alaskan native land claims, even though he partici- pated in specific land claim matters while in government service); letter from Deputy Assistant Attorney General Lawton to the Chairman of the Judiciary Committee, Council of the District of Columbia, May 18, 1979 (legislative activities generally will not involve "a specific party or parties" so as to prohibit postemployment representation in connection with the same subject matter).

[8] One of the most authoritative commentators on the 1963 conflicts laws has stated:

The significance of the phrase 'involving a specific party or parties' must not be dismissed lightly or underestimated.  Law 87-849 discriminates with great care in its use of this phrase.  Wherever the phrase does appear in the new statute it will be found to reflect a deliberate effort to impose a more limited ban and to narrow the circumstances in which the ban is to operate.

Manning, supra, at 204.

- 6 -

interpretation of the term "particular matter" in section 208.[10]

This is not to say that the word "particular" does not introduce some limiting principle into the statute's coverage. As Assistant Attorney General Katzenbach suggested in his comments on the provisions in the House bill that were eventually enacted, the term was intended to signify that an official need not be disqualified from participating in a "general area of activity" just because he has a financial interest that would be affected by a "specific" matter.  See House Hearings at 38, supra.[11]  This suggests that section 208's disqualification requirement should be limited, in the phraseology of the 1978 OLC opinion, to the "discrete and indentifible" matter that affects an official's financial interest, and not extended to related matters that do not have this effect.  But this does not mean that the word "particular" categorically excludes certain types of governmental actions from the reach of the statute's disqualification requirement.

II.  Scope of the Term "Financial Interest"

Support for the conclusion that Congress did not intend to exclude whole categories of governmental activities from the prohibition in section 208(a) is found in the legislative history in connection with the definition of a disqualifying "financial interest."

The draft legislation of the Association of the Bar of the city of New York, which as previously noted served in many

----

[10]  A Presidential Memorandum dated May 2, 1963, entitled "Preventing Conflicts of Interest on the Part of Special Government Employees" explained the scope of section 208(a) as "not limited to those involving a specific party or parties," but extending to "a matter of any type the outcome of which will have a direct and predictable effect upon the financial interests covered by the section," (emphasis supplied).  This memorandum was drafted in this Office, and its substance has now been incorporated at p. 4 of Appendix C, Chapter 735 of the Federal Personnel Manual.

[11]  This Office has never had the occasion to consider whether a matter related to one in which the official concededly has a financial interest constitutes the same "particular matter" for purposes of section 208(a).  The question of what constitutes the same "particular matter" has, however, been addressed on numerous occasions over the years in the context of the postemployment restrictions of 18 U.S.C. 207(a).  See, e.g., Memorandum from Deputy Assistant Attorney General Ulman, to Assistant Attorney General Kauper, April 6, 1976.  See also ABA Formal Opinion No. 342 (1975).  The resolution of the question in this context depends in large part upon the facts in a given situation.

- 7 -

respects as a model for the bill introduced in the spring of
1961, provided that disqualification should be mandatory in the
event that a government official had a "direct and substantial
economic interest" in a matter.  New York City Bar Report at 279.
The term "substantial economic interest" was defined to
incorporate two specific exceptions: first, an exception for any
financial interest of a government employee derived exclusively
from his or her government employment; and, second, an exception
for the interest of a government employee "solely as a member of
the general public, or of any significant economic or other
segment of the general public."  See New York City Bar Report at
281-82.  In any case in which these exceptions did not apply, the
only avenue for exemption from the disqualification requirement
was a presidential order suspending operation of the statute
based on a presidential determination that the national interest
in the individual's service outweighed the public interest in
disqualification.  Id. at 282.

The analogous provisions of the bill introduced by the
administration and ultimately enacted into law contained a
stricter disqualification requirement, but a more flexible waiver
provision.  Section 208(a) required disqualification in the
event of a "financial interest," a term qualified neither by the
word "substantial" nor by any exceptions.  Some relief was intro-
duced through the waiver provisions of section 208(b).  Under
this section, an appointing official could exempt an individual
if he determined that the financial interest involved was "not so
substantial as to affect the integrity of the services which the
Government may expect" from the employee; alternatively, a
general exemption might be promulgated by an agency rule in cases
where the particular financial interest involved was considered
"too remote or too inconsequential to affect the integrity" of

- 8 -

officials' services.[12]   These provisions were described in the
legislative history as allowing exemption on a case-by-case or
class-wide basis in the event that a financial interest was "de
minimis."  See S. Rep. No. 2213, 87th Cong., 2d Sess. 14 (1962).

It would appear from this legislative history that Congress
did not intend the term "financial interest" to be qualified by a
substantiality test.  It also seems fair to infer that Congress
did not intend to exclude financial interests arising from
federal service and financial interests shared with many others,
as had been proposed in the New York City Bar's draft
legislation.[13]   Instead, the rigor of section 208(a)'s
disqualification requirement was to be tempered primarily

_____

[12] Section 208(b) provides in pertinent part as follows:

> Subsection (a) hereof shall not apply (1)
> if the officer or employee first advises the
> Government official responsible for appoint-
> ment to his position of the nature and
> circumstances of the judicial or other
> proceeding, application, request for a ruling
> or other determination, contract, claim,
> controversy, charge, accusation, arrest, or
> other particular matter and makes full
> disclosure of the financial interest and
> receives in advance a written determination
> made by such official that the interest is not
> so substantial as to be deemed likely to
> affect the integrity of the services which the
> Government may expect from such officer or
> employee, or (2) if, by general rule or
> regulation published in the Federal Register,
> the financial interest has been exempted from
> the requirements of clause (1) hereof as being
> too remote or too inconsequential to affect
> the integrity of Government officers' or
> employees' services. . . .

[13] This Office has had occasion in the recent past to consider
whether interests arising from federal employment constitute
financial interests under section 208.  See memorandum from
Charles J. Cooper, Assistant Attorney General, Office of Legal
Counsel, to Richard Willard, Assistant Attorney General, Civil
Division, "18 U.S.C. 208 and Participation of Departmental
Attorneys in Debt Ceiling Litigation," December 6, 1985.  While
the situation at issue there did not in the end require
resolution of this question, we expressed "doubt" as to the
correctness of the conclusion in a prior opinion of this Office
that section 208 did not extend to financial interests derived
from federal employment, in light of the "plain language" of the
statute.

- 9 -

through operation of section 208(b)'s discretionary waiver
provision.

Of course, even though Congress did not intend any
categorical exceptions to section 208's disqualification
requirement, it is still necessary to determine the existence of
a disqualifying "financial interest" on a case-by-case basis in
light of the all the circumstances.  In most situations, this
will depend upon the test of proximity reflected in the concept
of "direct and predictable effect" that has been read into the
statute from the time of its enactment.[14]  But this determina-
tion does not depend upon the size of the financial interest at
stake or the fact that a particular financial interest is one
shared generally with many others.  While such considerations may
be grounds for granting a waiver, under either section 208(b)(1)
or section 208(b)(2), they do not determine the statute's
applicability in the first instance.

----

[14]  The "direct and predictable effect" test for determining when
a financial interest should give rise to disqualification was
announced contemporaneously with the enactment of section 208 in
1963, see Presidential Memorandum "Preventing Conflicts of
Interest on the Part of Special Government Employees," May 2,
1963, and has been followed consistently over the ensuing 20
years of administrative interpretation.  See, e.g., Memorandum
from Assistant Attorney General Rehnquist, Office of Legal
Counsel, to the Counsel to the President, December 10, 1970
("Continued Service as Commissioner of the Federal Power
Commission until February 1, 1971").  During this period it has
only once been suggested that the term "particular matter" might
be similarly limited in scope.  In a Memorandum to the Files
dated July 28, 1969, then-Assistant Attorney General Rehnquist
stated that while there are "obvious limits" to the term
"particular matter," the "line marking those limits ought not to
be drawn between a matter for adjudication, on the one hand, and
a matter relating to rule-making, on the other."  The memorandum
went on to suggest that

[i]f a sufficiently small and discreet enough group of persons
or entities would be affected by the proposed rule-making,
such a proceeding could very well be encompassed within
the provisions of section 208.  Were the affected groups
sufficiently large, the limits of the requirement that
the entity have a "financial interest" in the proceeding
as well as the limits of the term "particular matter,"
would doubtless somewhere be reached.

We believe this passage can best be understood as a helpful gloss
on the scope of the statutory term "financial interest," rather
than as an invitation to introduce flexibility into the
definition of a "particular matter."

- 10 -

## III. Conclusion

We believe that the term "particular matter" in section 208(a) extends to rulemaking and general policy matters, as well as matters such as adjudications that affect only a limited number of private parties.  The language and legislative history of section 208, as well as other provisions of the conflict of interest laws, support an interpretation under which the statutory disqualification requirement extends to all discrete matters that are the subject of agency action, no matter how general their effect.  Whatever flexibility there is in applying section 208(a) in the context of such a discrete matter must be introduced in connection with determining whether, in light of all the facts, the matter is likely to have a direct and predictable effect on an official's private financial interest. If section 208(a) does apply, then an official may participate in that matter only if granted a waiver by the appointing official under section 208(b).

In the final paragraph of your letter, you ask us generally to address the situation of employees of the Department of the Interior who may in the past have participated in certain rulemaking and other "general" departmental matters on the assumption that section 208 had no applicability at all to such activities.  Even if we had the factual information needed to assess the propriety of an individual's participation in a specific context, we believe that it would be inappropriate for us to do so after the fact.  We can say, however, that if an employee participated in a matter in good faith reliance on advice from an appropriate source concerning the scope of section 208, it is unlikely that such an employee would be held accountable for a violation of that provision.

Samuel A. Alito, Jr.
Deputy Assistant Attorney General
Office of Legal Counsel

**Complaint**

**Exhibit J**

# Responsibility of Agencies to Pay Attorney's Fee Awards Under the Equal Access to Justice Act

The judgment of attorney's fees and expenses entered against the United States in *Cienega Gardens v. United States* cannot be paid out of the Judgment Fund because the Equal Access to Justice Act provides for payment.

Pursuant to EAJA, the Department of Housing and Urban Development must pay the award. HUD would be the "agency over which the [plaintiffs] prevail[ed]" under EAJA because it administered the federal program that was the subject of the litigation.

October 16, 2007

MEMORANDUM OPINION FOR THE ASSISTANT ATTORNEY GENERAL
CIVIL DIVISION

You have asked for our opinion on which agency, if any, must pay the judgment of attorney's fees and expenses entered against the United States in *Cienega Gardens v. United States*, No. 02-5050 (Fed. Cir. Mar. 5, 2004). In particular, you have asked whether the award may be paid out of the Judgment Fund, under 31 U.S.C. § 1304 (2000), or whether it must be paid out of the appropriations of an agency responsible for the award under the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412 (2000).

On December 9, 2005, we advised that the award could not be paid out of the Judgment Fund, because the Judgment Fund is available only when "payment is not otherwise provided for." 31 U.S.C. § 1304(a)(1). EAJA provides for payment, by directing that a fee award "be paid by any agency over which the party prevails from any funds made available to the agency by appropriation or otherwise." 28 U.S.C. § 2412(d)(4). We further advised that the Department of Housing and Urban Development ("HUD") would be the "agency over which the [plaintiffs] prevail[ed]" under EAJA, because HUD administered the federal program that was the subject of the litigation. This opinion confirms our previous advice and provides additional analysis of these questions.

## I.

The Federal Circuit imposed the fee award in *Cienega Gardens* at the close of a protracted lawsuit challenging amendments to a HUD program designed to subsidize low- and moderate-income multifamily housing. After almost a decade of litigation and three rounds of appeals, the United States Court of Appeals for the Federal Circuit ruled that the amendments constituted a regulatory taking of the plaintiffs' property and ordered the United States to pay just compensation. The court of appeals further ordered that the United States pay the plaintiffs the attorney's fees and expenses incurred during their third appeal, the stage of the litigation during which the plaintiffs prevailed on their takings claims. Before

229

considering which instrumentality of the federal government must pay this fee award, we discuss the relevant events in the *Cienega Gardens* litigation.

## A.

The plaintiffs in *Cienega Gardens* were the owners of housing constructed in the 1970s under the National Housing Act, Pub. L. No. 73-479, 48 Stat. 1246 (1934) (codified as amended at 12 U.S.C. §§ 1701–1750g (2000 & Supp. V. 2005)), and financed with HUD-insured low-interest mortgages. As a condition of receiving the HUD-insured mortgages, the plaintiffs incorporated into their mortgage contracts with private lenders a variety of restrictions on the properties, including restrictions on income levels of tenants, allowable rental rates, and the rate of return on initial equity that the owners could receive. By their terms, these restrictions remained in effect for the duration of the mortgage contracts. Under HUD regulations then in effect, developers retained the right to prepay their loans and satisfy their mortgage obligations after twenty years. 24 C.F.R. §§ 221.524(a), 236.30(a) (1970). Owners who prepaid the mortgages would be released from the regulatory restrictions.

As the twenty-year mark for many HUD-insured mortgages approached, Congress became concerned that large numbers of owners would exercise their prepayment rights and remove their properties from the low-income housing pool. Congress found that such an event "would precipitate a grave national crisis in the supply of low income housing that was neither anticipated nor intended when contracts for these units were entered into." Emergency Low Income Housing Preservation Act of 1987, Pub. L. No. 100-242, tit. II, § 202(a)(4), 101 Stat. 1877, 1877 (1988) ("ELIHPA"); *see also* S. Rep. No. 101-316, at 105 (1990).

Congress chose to forestall such an outcome by enacting ELIHPA, which blocked the owners from exercising their prepayment rights without first obtaining HUD approval. In order to obtain that approval, the owners were required to submit a "plan of action" informing HUD of how the developers would use the property following prepayment. ELIHPA § 223, 101 Stat. at 1879. HUD could only approve prepayment upon finding that the plan would "not materially increase economic hardship for current tenants or involuntarily displace current tenants (except for good cause) where comparable and affordable housing is not readily available." *Id.* § 225(a)(1), 101 Stat. at 1880. In 1988, HUD issued an interim rule implementing these prepayment restrictions, 53 Fed. Reg. 11,224 (Apr. 5, 1988) (codified at 24 C.F.R. pt. 248 (1989)), and issued instructions to its field offices detailing the procedures for filing and reviewing plans of action. In 1990, HUD issued a final rule implementing the prepayment restrictions imposed under the interim rule. 55 Fed. Reg. 38,944 (Sept. 21, 1990) (codified at 24 C.F.R. pt. 248 (1991)).

The ELIHPA restrictions would have expired after two years, but Congress extended them before their expiration, Pub. L. No. 101-494, 104 Stat. 1185 (1990),

*Responsibility of Agencies to Pay Attorney's Fee Awards Under EAJA*

and then made them permanent under the Low-Income Housing Preservation and Resident Homeownership Act of 1990, Pub. L. No. 101-625, tit. VI, 104 Stat. 4249 ("LIHPRHA"). HUD continued to issue regulations implementing ELIHPA and LIHPRHA.[1] The plaintiffs were effectively prohibited from prepaying their mortgages until Congress enacted the Housing Opportunity Program Extension Act of 1996, which permitted owners to exercise their prepayment rights and be free from the affordability restrictions if they agreed not to increase their rents until sixty days after prepayment. *See* Pub. L. No. 104-120, § 2(b), 110 Stat. 834, 834.

### B.

In 1994, the *Cienega Gardens* plaintiffs brought suit in the Court of Federal Claims challenging their inability to prepay the HUD-insured mortgages under ELIHPA and LIHPRHA. *Cienega Gardens v. United States*, 33 Fed. Cl. 196 (1995). Throughout the litigation, the United States was represented by attorneys from the Civil Division of the Department of Justice ("DOJ"), with attorneys from HUD appearing on the briefs as "of counsel." We understand that the Civil Division and HUD had no significant disagreement over the positions asserted during the course of the litigation.

Pursuant to the Tucker Act, 28 U.S.C. § 1491(a)(1) (2000), the plaintiffs named the United States as the only defendant. Plaintiffs' complaint charged that the government had violated several duties allegedly owed to the plaintiffs by implementing the prepayment restrictions that Congress had imposed through ELIHPA and LIHPRHA. First, plaintiffs claimed that the government had breached express contracts with the plaintiffs in the form of the regulatory agreements that incorporated the prepayment right. Second, plaintiffs claimed that the government had violated certain statutory directives in the manner in which it had administered the programs under sections 221(d)(3) and 236 of the National Housing Act. Finally, plaintiffs claimed that the government had taken their

---

[1] *See* Prepayment of a HUD-Insured Mortgage by an Owner of Low Income Housing, 56 Fed. Reg. 20,262 (May 2, 1991) (proposed rule); Guidelines for Determining Appraisals of Preservation Value Under the Low-Income Housing Preservation and Resident Homeownership Act of 1990, 56 Fed. Reg. 64,932 (Dec. 12, 1991) (notice and request for public comment); Prepayment of a HUD-Insured Mortgage by an Owner of Low Income Housing, 57 Fed. Reg. 11,992 (Apr. 8, 1992) (interim rule); Preservation of Multifamily Assisted Rental Housing: Interim Guidelines for the Section 222(e) Windfall Profits Test, 57 Fed. Reg. 12,064 (Apr. 8, 1992) (notice of interim guidelines and request for public comment); Final Guidelines for Determining Appraisals of Preservation Value Under the Low-Income Housing Preservation and Resident Homeownership Act of 1990, 57 Fed. Reg. 19,970 (May 8, 1992) (notice); Delegation of Authority for the Emergency Low Income Housing Preservation Act of 1987, as Amended by the Low Income Housing Preservation and Resident Homeownership Act of 1990, and as Further Amended by the Housing and Community Development Act of 1992, 58 Fed. Reg. 63,384 (Dec. 1, 1993) (notice of delegation of authority).

property without just compensation, in violation of the Fifth Amendment, by denying them the right to put their property to a more profitable use after twenty years.

In the initial round of litigation, the Court of Federal Claims granted summary judgment in the plaintiffs' favor on the contract claim, held that plaintiffs could maintain a claim for a regulatory taking, and ruled in the government's favor on all other claims. *Cienega Gardens v. United States*, 33 Fed. Cl. 196 (1995). The court then held a trial to determine contract damages for four model plaintiffs. *Cienega Gardens v. United States*, 38 Fed. Cl. 64 (1997). On appeal, the Federal Circuit upheld the rulings in the government's favor but reversed on the contract claim, holding that HUD was not in privity with plaintiffs under the regulatory agreements. *Cienega Gardens v. United States*, 194 F.3d 1231 (Fed. Cir. 1998).

The case returned to the Court of Federal Claims to address plaintiffs' remaining claim for a regulatory taking. The trial court dismissed that claim on the ground that plaintiffs had failed to exhaust their administrative remedies by not filing a plan of action with HUD seeking a release from the affordability restrictions. The Federal Circuit reversed on appeal, however, holding that the plaintiffs had "set forth uncontested facts demonstrating that it would be futile for them to file prepayment requests with HUD." *Cienega Gardens v. United States*, 265 F.3d 1237, 1248 (Fed. Cir. 2001).

Following another remand, the trial court rejected the regulatory taking claim on the merits. The plaintiffs filed a third appeal, and the Federal Circuit again reversed, ruling that the four model plaintiffs had suffered a regulatory taking and that the other plaintiffs should be given the opportunity to prove the facts underlying their claims before the trial court. *Cienega Gardens v. United States*, 331 F.3d 1319 (Fed. Cir. 2003).[2]

### C.

Following their success on the third appeal, the plaintiffs moved for an award of attorney's fees and expenses from the United States under EAJA, 28 U.S.C. § 2412(d). In relevant part, section 2412(d)(1)(A) provides:

> Except as otherwise specifically provided by statute, a court shall award to a prevailing party . . . fees and other expenses . . . incurred by that party in any civil action (other than cases sounding in tort) . . . brought by or against the United States . . . , unless the court

---

[2] The *Cienega Gardens* litigation has continued, although the subsequent developments are not relevant to the issues addressed in this opinion. *See, e.g.*, *Cienega Gardens v. United States*, 503 F.3d 1266 (Fed. Cir. 2007); *Independence Park Apts. v. United States*, 449 F.3d 1235, *on reconsideration*, 465 F.3d 1308 (Fed. Cir. 2006).

*Responsibility of Agencies to Pay Attorney's Fee Awards Under EAJA*

> finds that the position of the United States was substantially justified
> or that special circumstances make an award unjust.

28 U.S.C. § 2412(d)(1)(A). In a brief order, the Federal Circuit granted the motion for fees and expenses under section 2412(d), but limited the award to those incurred during the plaintiffs' third appeal, when the court of appeals reversed the trial court's denial of the regulatory taking claim:

> The application is granted in part. The court allows reasonable attor-
> ney fees and expenses pursuant to the EAJA for *Cienega III*, in the
> amount of $147,373.24 as reasonable attorney fees and $9,386.16 in
> expenses, for a total of $156,759.40.

Order, *Cienega Gardens v. United States*, No. 02-5050, at 2 (Mar. 5, 2004). To award fees under this provision, the Federal Circuit was obliged to find that the efforts of the United States to defend the Court of Federal Claims' ruling on the regulatory takings question in the third appeal were not "substantially justified" and that no "special circumstances" made the award of fees unjust. The Federal Circuit's conclusion provided no explanation for why the United States was not justified in seeking to defend the trial court decision, and on its face, such a ruling would appear questionable. The United States did not seek further review of that decision, however.

## II.

In light of the Federal Circuit's judgment, you have asked which federal agency, if any, bears responsibility under EAJA to pay the award of attorney's fees and expenses in the *Cienega Gardens* case. EAJA provides that "[f]ees and other expenses awarded under this subsection to a party shall be paid by any agency over which the party prevails from any funds made available to the agency by appropriation or otherwise." 28 U.S.C. § 2412(d)(4). In most cases, which federal agency must pay the award is not likely to be an issue. The defendant in the case will be a federal agency or an officer acting on behalf of a federal agency, and the plaintiff's suit will directly challenge the action or inaction of the government defendant. In such a case, the "agency over which the party prevails" would be clearly identified.

The circumstances of this case, however, have engendered some disagreement over which agency, or whether in fact any agency, should be responsible for the award of attorney's fees and expenses. The plaintiffs did not sue any one agency but rather brought suit against the United States. Furthermore, the primary issue in the litigation was whether two statutes enacted by Congress, ELIHPA and LIHPRHA, had effected an uncompensated taking of plaintiffs' property. You and HUD therefore have expressed the view that *Cienega Gardens* constitutes the rare case in which no agency bears responsibility for the fee award and in which

payment should be made out of the Judgment Fund, 31 U.S.C. § 1304, which Congress established to cover judgments against the United States for which no appropriation is otherwise available. *See* Letter for Debra Diener, Chief Counsel, Financial Management Service, Department of the Treasury, from Carole W. Wilson, Associate General Counsel for Litigation, Department of Housing and Urban Development, *Re: Cienega Gardens, et al. v. United States, United States Court of Appeals for the Federal Circuit, Award of Attorneys' Fees* (May 12, 2004) ("HUD Letter"), and attached Memorandum of Law (May 11, 2004) ("HUD Memo"); Memorandum for Steven Bradbury, Principal Deputy Assistant Attorney General, Office of Legal Counsel, from Peter D. Keisler, Assistant Attorney General, Civil Division, *Re: Request for New Opinion Concerning Payment of Judgments under the Equal Access to Justice Act* at 10-12 (May 4, 2005) ("DOJ Letter").

The Department of the Treasury, which administers the Judgment Fund, disagrees. Treasury notes that the Judgment Fund is available only when "payment is not otherwise provided for" by federal law, 31 U.S.C. § 1304(a)(1). Letter for Stuart E. Schiffer, Deputy Assistant Attorney General, Civil Division, Department of Justice, from Margaret Marquette, Chief Counsel, Financial Management Service, Department of the Treasury, *Re: Cienega Gardens, et al. v. United States, No. 02-5050 (Fed. Cir.)* at 2 (Feb. 1, 2005). Treasury contends that EAJA does provide for payment of "fees and other expenses" by "any agency over which the party prevails" and that HUD is the responsible agency under the statute. Treasury notes that "the cause of action was based upon a statute within HUD's purview (12 U.S.C. § 4122), DOJ consulted with HUD as the client agency, and HUD attorneys were listed on the court briefs as 'of counsel.'" *Id.* Based on this understanding, Treasury has declined payment absent an opinion to the contrary from this office.

Accordingly, you have asked for this office's view as to whether the Judgment Fund is authorized to pay EAJA judgments entered against the United States, when no agency has been named as a defendant in the litigation. As both Treasury's response and your memorandum suggest, this question also requires consideration of whether Congress deemed a particular agency to be responsible under EAJA for the fee award. For the reasons discussed below, we conclude that the Judgment Fund is not available to satisfy the fee award, because HUD constitutes the "agency over which the party prevail[ed]" under EAJA.

## A.

The Judgment Fund is available "to pay final judgments, awards, compromise settlements, and interest and costs specified in the judgments" against the United States only when "payment is not otherwise provided for." 31 U.S.C. § 1304(a)(1). If Congress has made an appropriation that is reasonably interpreted to cover a liability incurred by the government, the liability must be satisfied out of that

*Responsibility of Agencies to Pay Attorney's Fee Awards Under EAJA*

appropriation. "The fact that it might be necessary to do some statutory interpretation to determine if a particular appropriation is available to pay a judgment or compromise settlement does not preclude use of that appropriation." *Matter of: S.S. Silberblatt, Inc. v. East Harlem Pilot Block—Payment of Judgment*, 62 Comp. Gen. 12, 16 (1982) (rejecting HUD's argument that a settlement should be paid out of the Judgment Fund).[3]

Here, Congress did provide a statutory mechanism for the payment of EAJA awards by specifically providing that fee awards "shall be paid by any agency over which the party prevails from any funds made available to the agency by appropriation or otherwise." 28 U.S.C. § 2412(d)(4). Congress, in other words, intended to ensure that, to the extent possible, fee awards should be paid by whichever agency, or agencies, may be described as having been prevailed over in an action against the United States. Congress did not intend for agencies to turn to the Judgment Fund to pay a fee award under EAJA, unless it can be said that the plaintiffs did not prevail over "any agency."

The history of EAJA confirms this interpretation. The original version of the statute provided:

> Fees and other expenses awarded under this subsection *may* be paid by any agency over which the party prevails from any funds made available to the agency, by appropriation or otherwise, for such purpose. If not paid by any agency, the fees and other expenses shall be paid in the same manner as the payment of final judgments is made in accordance with sections 2414 and 2517, of this title.

Pub. L. No. 96-481, tit. II, § 204(a), 94 Stat. 2325, 2329 (1980) (emphasis added) (codified at 28 U.S.C. § 2412(d)(4)(A) (Supp. V 1981)).[4] In 1982, this office opined that Congress had not intended to give the losing agency unfettered discretion to seek payment from the Judgment Fund, but rather "a reasonable amount from the unrestricted appropriations of an agency *must* be allocated to the payment of awards for fees and expenses" under EAJA. *Funding of Attorney Fee Awards Under the Equal Access to Justice Act*, 6 Op. O.L.C. 204, 205 (1982). We concluded that an agency could seek payment from the Judgment Fund "only when making an award out of agency funds would be a very heavy financial blow to the agency[.]" *Id.* at 211. This office therefore recognized that the previous

---

[3] Although the Executive Branch is not bound by the legal opinions of the Comptroller General, in resolving appropriation issues we consider them for what persuasive value they may have. *See, e.g.*, *Submission of Aviation Insurance Program Claims to Binding Arbitration*, 20 Op. O.L.C. 341, 343 n.3 (1996).

[4] Sections 2414 and 2517(a) of title 28 set forth the standard procedures for obtaining disbursements from the Treasury to satisfy a judgment against the United States.

version of EAJA would permit an agency to turn to the Judgment Fund for the payment of fee awards only under very narrow circumstances.

Congress eliminated even this narrow agency discretion by amending EAJA in 1985. Rather than providing that an agency "may" pay a fee award from available funds, Congress declared that the agency "shall" pay the award from agency funds. Pub. L. No. 99-80, § 2(d), 99 Stat. 183, 185 (1985). Congress also eliminated the second sentence of the former section 2412(d)(4)(A) that permitted the agency to treat a fee award like other judgments. EAJA now provides simply that "[f]ees and other expenses awarded under this subsection to a party *shall* be paid by any agency over which the party prevails from any funds made available to the agency by appropriation or otherwise." 28 U.S.C. § 2412(d)(4) (emphasis added). These amendments confirm that Congress did not intend that the Judgment Fund be used to pay fee awards under EAJA. The Judgment Fund is available to pay a fee award only if there is *no* agency over which the plaintiffs can be said to have prevailed under EAJA.

## B.

We therefore turn to the question whether "any agency" may be held responsible for the *Cienega Gardens* fee award. As a general rule, the "agency over which the party prevails" under EAJA will be the agency whose regulatory interest was at stake in the litigation and whose actions or policies are successfully challenged in the court action. This interest may be identified by the fact that the agency took affirmative action against the prevailing party, in the form of a regulation or administrative ruling, or it may be identified by the fact that the agency had statutory authority over the regulatory program that the prevailing party successfully challenged. In a typical case, that agency may be named as the plaintiff or the defendant, but EAJA does not require that the agency itself be specifically named as a party. These considerations, as we explain, point towards the conclusion that HUD is the agency responsible under EAJA.

EAJA provides that a court shall award fees upon finding that the "position of the United States" is not "substantially justified." 28 U.S.C. § 2412(d)(1)(A). EAJA defines the "position of the United States" to mean "in addition to the position taken by the United States in the civil action, *the action or failure to act by the agency upon which the civil action is based*." *Id.* § 2412(d)(2)(D) (emphasis added). It further provides that "[w]hether or not the position of the United States was substantially justified shall be determined on the basis of the record *(including the record with respect to the action or failure to act by the agency upon which the civil action is based)* which is made in the civil action for which fees and other expenses are sought." *Id.* § 2412(d)(1)(B) (emphasis added). Congress added these latter two provisions in the same 1985 amendment in which it clarified that agencies could not use the Judgment Fund to pay fee awards assessed against them under EAJA. Pub. L. No. 99-80, §§ 2(b), 2(c)(2), 99 Stat. 183, 184–85. Before the

*Responsibility of Agencies to Pay Attorney's Fee Awards Under EAJA*

1985 amendment, several courts had interpreted EAJA to prohibit consideration of the actions of the agency that preceded the lawsuit.[5] Congress thus made clear through the 1985 amendment that EAJA predicates responsibility for the fee award not simply on the litigating position of the United States, but on the course of regulatory action, or inaction, giving rise to the position of the United States over which the private litigants prevailed.

This definition of the "position of the United States" is consistent with the purpose underlying EAJA. As the Supreme Court has explained, "Congress passed the EAJA in response to its concern that persons 'may be deterred from seeking review of, or defending against, unreasonable governmental action because of the expense involved in securing the vindication of their rights.'" *Sullivan v. Hudson*, 490 U.S. 877, 883 (1989) (quoting Pub. L. No. 96-481, § 202(a), 94 Stat. 2321, 2325 (1980)). Through EAJA, Congress sought "to diminish the deterrent effect of seeking review of, or defending against, governmental action by providing in specified situations an award of attorney fees, expert witness fees, and other costs against the United States." Pub. L. No. 96-481, § 202(b)(1), 94 Stat. at 2325. Congress sought therefore to reduce the cost, and consequent deterrent effect, of challenging or defending against unreasonable government action. *Hudson*, 490 U.S. at 883 ("When the cost of contesting a Government order, for example, exceeds the amount at stake, a party has no realistic choice and no effective remedy. In these cases, it is more practical to endure an injustice than to contest it.") (quoting S. Rep. No. 96-253, at 5 (1979)). By the same token, by transferring the costs of litigation to the agency responsible for the subject matter of the litigation and whose actions or policies are under challenge, EAJA would deter the "unreasonable governmental action" that gave rise to litigation in the first place.

EAJA further recognizes that the agency responsible for the fee award need not be a named party to the lawsuit. EAJA provides that a "prevailing party" may win fees, but the statute contains no corresponding requirement that the agency "over which the party prevails" have been a named party to the litigation. *See* 28 U.S.C. § 2412(d)(1)(A), (d)(4). Indeed, EAJA recognizes that fees may be awarded in any action "brought by or against *the United States*," *id.* § 2412(d)(1)(A) (emphasis added), which is defined to include not only the government as a named party but also "any agency and any official of the United States acting in his or her official capacity." *Id.* § 2412(d)(2)(C). In assigning responsibility for the payment of fee

---

[5] *See Spencer v. NLRB*, 712 F.2d 539, 546–57 (D.C. Cir. 1983) (concluding that "'the position of the United States,' for the purposes of the Act, means the arguments relied upon by the government in litigation," not the underlying action of the government); *Gava v. United States*, 699 F.2d 1367, 1371 (Fed. Cir. 1983) ("In determining an application for attorney's fees under the Act, the inquiry is directed to the justification for the government's litigating position before the court, not the justification for the government's administrative action that prompted the suit."). *But see Natural Res. Def. Council v. EPA*, 703 F.2d 700, 707 (3d Cir. 1983) ("We hold that the word 'position' refers to the agency action which made it necessary for the party to file suit.").

awards, however, Congress stated that the fees shall be paid by "any agency over which the party prevails," *id.* § 2412(d)(4), and not by "the United States" or by one of its officials. This difference in language confirms that the "agency over which the party prevails" will include the agency whose conduct led to "the position of the United States," even if the agency was not named as a party to the litigation.

Applying these principles to the case at hand, we believe that EAJA assigns responsibility for the fee award in the *Cienega Gardens* case to HUD, the agency charged with administering the federal statutory scheme in question. HUD issued the regulations in 1970 that were incorporated into plaintiffs' mortgage notes and initially gave them the right to prepay their HUD-insured loans after twenty years and be released from the affordability restrictions. Following Congress's enactment of ELIHPA and LIHPRHA, HUD again issued regulations that implemented those statutes and recognized what the Federal Circuit held to be the loss of plaintiffs' prepayment rights. Plaintiffs' successful takings claims were predicated on the uncompensated deprivation of property rights created and rescinded under this HUD-administered regulatory scheme. Under these circumstances, we believe that the plaintiffs are most reasonably said to have prevailed over HUD.

In opposition to this conclusion, HUD maintains, and you agree, that HUD should not be deemed the agency responsible for the fee award, because HUD lacked any institutional interest in the litigation surrounding plaintiffs' takings claim. HUD Memo at 4; DOJ Letter at 7. HUD took no direct action against any of the plaintiffs, who did not file any petition with HUD, but instead brought suit in the Court of Claims following the enactment of ELIHPA and LIHPRHA. In addition, plaintiffs' takings claims did not challenge any HUD regulation or administrative decision, and the outcome of the litigation—a monetary award compensating the plaintiffs for their losses—did not affect or alter any existing HUD program. HUD Memo at 4; DOJ Letter at 7. HUD acknowledges that it had an institutional interest in the earlier stages, where the plaintiffs asserted claims for breach of contract and administrative violations. HUD Memo at 7. The agency maintains, however, that once the dismissal of those claims was upheld on appeal, HUD had no remaining interest in the litigation, and specifically had no institutional interest in the third appeal that was the subject of the fee award. At that point, "the plaintiffs' only remaining claim . . . was that the enactment of LIHPRHA constituted a temporary regulatory taking of a property right." *Id.* The governmental entity that effectuated the unconstitutional taking was Congress, which enacted the statutes that of their own force deprived the plaintiffs of their property interests. DOJ Letter at 10. Under this view, HUD itself lacked any institutional interest in the litigation by the time of the fee award, and therefore it should not be deemed to be the agency over which the plaintiffs prevailed.

We disagree, however, with the suggestion that HUD lacked a regulatory interest in plaintiffs' takings claims. HUD acknowledges its "institutional interest" in

*Responsibility of Agencies to Pay Attorney's Fee Awards Under EAJA*

the breach of contract and administrative law claims that arose out of its actions in granting the prepayment rights and then in restricting prepayment under ELIHPA and LIHPRHA. HUD Memo at 7. We see no reason why this institutional interest would not extend to the takings claims that arose out of the very same actions.[6] The *Cienega Gardens* litigation directly challenged the constitutionality of the HUD-administered changes to the low-income housing program. HUD issued the regulations that originally set the terms of plaintiffs' prepayment rights, and when Congress enacted ELIHPA and LIHPRHA, HUD was not a passive observer to events. Rather, HUD issued regulations and other guidance recognizing the loss of the plaintiffs' prepayment rights and setting the terms under which HUD would approve prepayment in the future. By the time of the Federal Circuit's judgment, Congress may have relaxed the restrictions on prepayment through a 1996 statute, *see supra* p. 231, but that was merely a fortuity. Had Congress not altered the statutory scheme, the Federal Circuit decision likely would have led HUD to alter its regulatory policies to prevent the United States from being exposed to continuing liability based on regulatory takings claims.

It is true that the *Cienega Gardens* plaintiffs brought suit against the United States in the Court of Claims without first petitioning HUD for the right to prepay the mortgages in question. HUD Memo at 7. The Federal Circuit found that such an action would have been futile, however. *Cienega Gardens*, 265 F.3d at 1248. HUD's regulations provided that plaintiffs could only exercise their prepayment right if HUD was satisfied that the plaintiffs' plan of action would not unduly diminish the availability of low-income housing.[7] Plaintiffs contended that they could not meet that standard, and the Federal Circuit found the facts underlying this contention to be undisputed. *Cienega Gardens*, 265 F.3d at 1248. Plaintiffs' successful takings claim amounted to a declaration that the existing HUD regulations reflected an uncompensated taking of their prepayment rights. The fact that the remedy in the case was compensation, rather than injunctive relief directed at

---

[6] Indeed, as HUD notes, the agency's attorneys appeared "of counsel" on the government's briefs throughout the litigation, including on the third appeal. HUD Memo at 7. We do not regard the participation of counsel as a basis *ipso facto* for assigning responsibility to HUD, but the participation of HUD attorneys does confirm that HUD constituted the agency with the specific regulatory interest in the *Cienega Gardens* litigation.

[7] HUD states that it "never promulgated regulations to enforce the restrictions on prepayment contained in ELIHPA and LIHPRHA. HUD's regulations permitting prepayment after twenty years remained in effect throughout the time when prepayment was restricted by those statutes." HUD Memo at 2. HUD, however, issued multiple sets of regulations to implement ELIHPA and LIHPRHA, *see supra* p. 218 & n. 1, including regulations to implement the "plan of action" restriction on prepayment. *See* 24 C.F.R. § 248.221(b)(1)(i) (1993) ("The [Federal Housing] Commissioner may approve a plan of action that involves termination of the low income affordability restrictions only upon a written finding that . . . [t]he supply of vacant, comparable housing is sufficient to ensure that the prepayment will not materially affect . . . [t]he availability of decent, safe and sanitary housing affordable to lower and very low income families in the area . . . .").

239

the agency, does not alter the fact that HUD's actions and policies were at issue in the litigation.

In addition to suggesting that HUD lacked a regulatory interest in the takings claim, you and HUD suggest that HUD should not be held responsible for the fee award on the ground that the agency itself did not engage in any unreasonable action to cause plaintiffs' loss. HUD Memo at 7; DOJ Letter at 9. The Federal Circuit described Congress as the responsible actor in taking plaintiffs' property through the enactment of ELIHPA and LIHPRHA. *See, e.g.*, *Cienega Gardens*, 331 F.3d at 1328 (describing the questions on the appeal as whether plaintiffs' property interest was "taken by the enactment of ELIHPA and LIHPRHA" and whether "the regulatory restriction in the statutes" was significant enough to require compensation). Under this view, HUD's regulatory actions amounted to nothing more than implementing the directives of ELIHPA and LIHPRHA. HUD did not add to plaintiffs' injury, and HUD lacked any statutory authority to determine whether those federal laws constituted a taking or to provide the plaintiffs with payment for any lost property interest. Because HUD took no wrongful action, you maintain that "making HUD pay EAJA fees, under the circumstances, would not promote Congress's primary reason for making agencies liable for EAJA fees: to penalize unreasonable agency action." DOJ Letter at 8.

We do not disagree that HUD did nothing more than carry out its statutory obligations in this case, yet that fact does not relieve HUD of its responsibilities under EAJA for fees and costs incurred by plaintiffs who successfully challenged the HUD-administered program. Congress may be the entity most responsible for the regulatory takings recognized by the Federal Circuit, but Congress clearly cannot be the "agency over which the plaintiffs prevailed." *See* 5 U.S.C. § 551(1)(A) (excluding Congress from the definition of "agency" under the Administrative Procedure Act). It is no doubt true that "Congress's primary reason for making agencies liable for EAJA fees" is "to penalize unreasonable agency action." DOJ Letter at 8. Yet EAJA does not require a specific finding of fault before an agency may be held responsible for the award; it requires only a showing that the "position of the United States" was not "substantially justified." 28 U.S.C. § 2412(d)(1)(A). Upon finding that the "position of the United States" is not "substantially justified," EAJA requires payment from the "agency over which the plaintiffs prevailed" without regard to whether the agency properly or improperly exercised its discretion.

For the above reasons, we conclude that HUD does constitute the agency over which the plaintiffs prevailed in *Cienega Gardens*. The agency responsible to pay a fee award against the United States under EAJA is the agency whose regulatory interest is at stake in the litigation. This interest may be identified by the fact that the agency took affirmative action against the prevailing party, in the form of a regulation or administrative ruling, or it may be identified by the fact that the agency had statutory authority over the regulatory program that the prevailing

*Responsibility of Agencies to Pay Attorney's Fee Awards Under EAJA*

party successfully challenged. By either measure, HUD would constitute the agency responsible to pay the fee award to the *Cienega Gardens* plaintiffs.

## C.

Our conclusion that HUD bears responsibility for the fee award does not end our analysis, because EAJA provides for payment by "*any* agency over which the party prevails," suggesting that more than one agency may bear responsibility. Accordingly, we must consider whether another agency, namely DOJ, should be deemed jointly responsible. HUD suggests that if the plaintiffs prevailed over any agency, it was DOJ, because "DOJ, not HUD, was entirely responsible for the arguments made and briefs filed in the third appeal" for which the plaintiffs were awarded fees. HUD Memo at 7. HUD further points out that DOJ, not HUD, had the ability to settle the litigation. *Id*.; *see* 28 U.S.C. § 2414 (2000). This would be true in most cases involving the federal government, however. With the exception of independent agencies that have their own litigating authority, the Attorney General has the statutory authority to control the course of any litigation brought by or against the United States or one of its agencies. 28 U.S.C. § 516 (2000). We do not believe that Congress intended for DOJ to be deemed the "agency over which the party prevails" under EAJA merely by virtue of its statutorily mandated role as litigating counsel.[8] If we were to adopt such an interpretation, DOJ would become responsible for all fee awards under EAJA (except those involving independent agencies), even when the plaintiff has named an agency like HUD as the defendant and has clearly challenged a specific agency action as unreasonable. This interpretation would render largely superfluous the 1985 amendment, in which Congress made clear that the "position of the United States" includes more than the arguments advanced in the briefs; it includes also the "action or failure to act . . . upon which the civil action is based." 28 U.S.C. § 2412(d)(2)(D).

Our view that the regulating agency, and not DOJ, would constitute the agency subject to a fee award is consistent with fee-shifting principles and fee-shifting statutes that govern private litigation, which generally impose fee awards on the parties to the lawsuits, not on the lawyers who represent them.[9] Indeed, parties

---

[8] We need not address whether our conclusion would be any different in a case in which DOJ attorneys engaged in acts of litigation misconduct or advanced a legal argument contrary to the views of the agency involved. We understand that there was no such disagreement or misconduct in this case.

[9] Some fee-shifting statutes specifically identify the party responsible for the fee award. *See, e.g.*, 29 U.S.C. § 2617(a)(3) (2000) (Family and Medical Leave Act) ("The court in such an action shall, in addition to any judgment awarded to the plaintiff, allow a reasonable attorney's fee, reasonable expert witness fees, and other costs of the action *to be paid by the defendant*.") (emphasis added); 42 U.S.C. § 2000e-5(k) (2000) (Title VII) ("In any action or proceeding under this subchapter the court, in its discretion, may allow the prevailing party, other than the Commission or the United States, a reasonable attorney's fee (including expert fees) as part of the costs, and *the Commission and the United States shall be liable for costs the same as a private person*.") (emphasis added). Others speak

bear responsibility for fee awards in the same manner that they do for judgments. It is the exceptional circumstance when a statute or rule specifically identifies that counsel, in addition to the litigant, may be responsible for sanctions or fees.[10] DOJ's authority to direct litigation in the federal courts may provide it with somewhat greater control over the "position of the United States" than a typical attorney would have over the position of the client, yet we see no basis in EAJA to suggest that Congress intended to adopt a novel rule, where counsel would be subject to liability based upon a good faith defense of the position of their clients. Rather, we believe that EAJA, by providing that the fees shall be paid by the "agency over which the party prevails," provides that the responsible agency— whether or not named as a party adverse to the prevailing party—would be the agency that functions as the relevant adversary for fee-shifting purposes, because the litigation implicates its regulatory interests and challenges the agency's actions or policies.[11]

### III.

For the reasons given, we conclude that HUD constitutes the agency over which the *Cienega Gardens* plaintiffs prevailed under EAJA. Because EAJA provides for payment, the Judgment Fund is not available and, therefore, the award must come out of HUD appropriations.

STEVEN A. ENGEL
*Deputy Assistant Attorney General*
*Office of Legal Counsel*

---

in terms of the "prevailing party," but the fee judgment falls on the losing party, not the losing party's counsel. *See, e.g.*, 15 U.S.C. § 1117(a) (2000) (Lanham Act) ("The court in exceptional cases may award reasonable attorney fees to the prevailing party.").

[10] *See, e.g.*, Fed. R. Civ. P. 37(a)(4)(A) (providing in discovery that "the court shall, after affording an opportunity to be heard, require the party or deponent whose conduct necessitated the motion or the party or attorney advising such conduct or both of them to pay to the moving party the reasonable expenses incurred in making the motion, including attorney's fees").

[11] We note that our view does not mean that DOJ could never be the "agency over which the party prevails." A different case would be presented if DOJ's own actions or policies were challenged in the litigation. *See* Memorandum for Stephen R. Colgate, Assistant Attorney General, Justice Management Division, from Richard Shiffrin, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Payment of Attorney's Fees Under the Equal Access to Justice Act* (Aug. 25, 1994) (acknowledging DOJ's responsibility to pay EAJA fee award where DOJ had intervened in bankruptcy litigation to challenge, unsuccessfully, the constitutionality of the Bankruptcy Amendments and Federal Judgeship Act of 1984).

# Complaint

# Exhibit K

# Constitutionality of the Direct Reporting Requirement in Section 802(e)(1) of the Implementing Recommendations of the 9/11 Commission Act of 2007

Section 802(e)(1) of the Implementing Recommendations of the 9/11 Commission Act of 2007 does not prohibit DHS or OMB officials from reviewing, in accordance with established Executive Branch review and clearance procedures, the DHS Chief Privacy Officer's draft section 802 reports before the reports are transmitted to Congress.

Section 802(e)(1) is best interpreted not to prohibit DHS and OMB officials from commenting on a draft CPO report where the CPO is permitted to, and in fact does, transmit to Congress a final report that does not reflect the comments or amendments from such officials.

Section 802(e)(1)'s direct reporting requirement need not be enforced in circumstances where its application would require the CPO to ignore the results of the President's review, through DHS and OMB, of a particular report. In such circumstances, the statute must yield to the President's exercise of his constitutional authority to supervise subordinate Executive Branch officers and their communications with Congress.

January 29, 2008

MEMORANDUM OPINION FOR THE GENERAL COUNSEL
OFFICE OF MANAGEMENT AND BUDGET
AND THE ACTING GENERAL COUNSEL
DEPARTMENT OF HOMELAND SECURITY

You have asked for our opinion regarding the constitutionality of section 802(e)(1) of the Implementing Recommendations of the 9/11 Commission Act of 2007, Pub. L. No. 110-53, 121 Stat. 266, 360 (2007) (codified at 6 U.S.C. § 142 (Supp. I 2007)) (the "Act" or "9/11 Act"). Section 802(e)(1) provides, in relevant part, that the Chief Privacy Officer ("CPO") of the Department of Homeland Security ("DHS" or "the Department") must submit reports "directly to the Congress . . . without any prior comment or amendment by the Secretary, Deputy Secretary, or any other officer or employee of the Department or of the Office of Management and Budget" ("OMB"). 6 U.S.C. § 142(e)(1). Specifically, you have asked whether we read section 802(e)(1) to prohibit DHS and OMB personnel from reviewing, commenting upon, or amending the CPO's reports and, if so, whether such prohibitions are constitutional.[1]

We conclude, first, that section 802(e)(1) does not prohibit DHS or OMB personnel from reviewing, in accordance with established Executive Branch review

---

[1] *See* Letter for Steven G. Bradbury, Principal Deputy Assistant Attorney General, Office of Legal Counsel, from Gus P. Coldebella, Acting General Counsel, Department of Homeland Security (Nov. 6, 2007); Letter for Steven G. Bradbury, Principal Deputy Assistant Attorney General, Office of Legal Counsel, from Jeffrey A. Rosen, General Counsel, Office of Management and Budget (Sept. 25, 2007).

*Opinions of the Office of Legal Counsel in Volume 32*

and clearance procedures, the CPO's section 802 reports before the reports are finalized and transmitted to Congress. The plain text of section 802(e)(1) concerns only the transmittal of reports that have been commented upon or amended by DHS or OMB officials; it does not purport to bar "review" of draft reports by such officials. Furthermore, any reading of the statute that would foreclose such review must be avoided if at all possible because of the serious constitutional issue that would arise if the statute were interpreted to interfere with the President's ability to supervise the work of the CPO through review of the CPO's draft reports by the Secretary of Homeland Security and the Director of OMB. Based upon the same principle of constitutional avoidance, we conclude, second, that the statute must be read not to prohibit DHS and OMB officials from commenting upon a draft report where, consistent with the supervisory review process, the CPO is permitted to, and in fact does, transmit to Congress a final report that does not reflect the comments or amendments suggested by those officials. Third, we conclude, however, that where supervisory review by the President, through the Secretary or the Director of OMB, results in comments or amendments on a draft report by DHS or OMB personnel, the CPO must be allowed to consider and incorporate those comments and amendments in the final report in the manner contemplated by the review. If section 802(e)(1) were applied to prevent the CPO from doing so, the statute would substantially frustrate the President's exercise of his constitutional authority to supervise the actions of a subordinate executive officer (the CPO) and to supervise the content, and particularly any classified or privileged content, of official Executive Branch communications with Congress. To the extent section 802(e)(1)'s application would purport to require that result, section 802(e)(1) would be unconstitutional.

As discussed more fully below, the constitutional grounds for these conclusions are well settled and have been long recognized by all three branches. For decades, the Executive Branch has consistently objected to direct reporting requirements similar to the one at issue here on the ground that such requirements infringe upon the President's constitutional supervisory authority over Executive Branch subordinates and information. The Supreme Court and Congress have also acknowledged and respected this supervisory authority as a fundamental part of our system of government. These precedents from all three branches, and the constitutional principles they recognize, inform our conclusion that the terms of section 802(e)(1) must yield to the extent their application would interfere with the President's constitutional authority to comment upon or amend, through his subordinates at DHS or OMB, a CPO report before the report is transmitted to Congress.[2]

---

[2] If DHS establishes a policy of declining to enforce section 802(e)(1) on the constitutional grounds set forth in this opinion, DHS should report that decision to Congress as required by statute. *See* 28 U.S.C. § 530D(a)(1)(A)(i), (b), (e) (Supp. V 2005) (establishing a 30-day deadline for Executive

*Constitutionality of Direct Reporting Requirement in Section 802(e)(1) of 9/11 Act*

## I.

Congress created the position of the DHS Chief Privacy Officer in the Homeland Security Act of 2002, Pub. L. No. 107-296, § 222, 116 Stat. 2135, 2155 (2002) (codified as amended at 6 U.S.C. § 142 (Supp. V 2005)) ("HSA"). The HSA established the CPO as a "senior official" with significant operational and policy responsibilities who is appointed by, and reports directly to, the Secretary. 6 U.S.C. § 142(a)(1)–(5) (Supp. I 2007).

The 9/11 Act expands the CPO's policymaking authority and permits the CPO to investigate possible violations of privacy laws and programs in a manner consistent with the CPO's status as a senior Executive Branch official who is accountable to the President. 6 U.S.C. § 142(a)–(d) (Supp. I 2007). The provisions of the Act granting the CPO investigative authority contemplate that the CPO will have access to internal Department and Executive Branch information. *Id.* § 142(b)(1)(A). The Act also provides that in reviewing such information and in discharging his investigative and policymaking responsibilities, the CPO "shall report to, and be under the general supervision of, the Secretary." *Id.* § 142(c)(1)(A). Further, the Act states that the CPO's exercise of the statute's new grant of subpoena authority is "subject to the approval of the Secretary," *id.* § 142(b)(1)(C), and that the CPO's investigative authority is subordinate to that of the Department's Inspector General, *id.* § 142(c)(2)(B)(i).

The reporting requirements in section 802(e) were enacted as part of the 9/11 Act provisions that expanded the CPO's statutory authority as outlined above. The House version of the bill (H.R. 1, 110th Cong.) included the direct reporting provision in section 802(e)(1) as part of a broader amendment that would have permitted the CPO to issue and enforce subpoenas without the Secretary's approval, and that would have given the CPO a five-year term of office. The Administration specifically objected to these and other provisions of H.R. 1 in its comments on the bill. *See* Statement of Administration Policy on H.R. 1 (Jan. 9, 2007). The Senate subsequently amended H.R. 1 to remove the provisions granting the CPO independent subpoena authority and a five-year term, but did not alter the direct reporting language. *See* S. 4, 110th Cong. § 503 (as reported in Senate, Mar. 13, 2007). Emphasizing the Senate bill's recognition of the CPO as a senior Executive Branch policy officer, the Administration reiterated its constitu-

---

Branch departments to submit to "Congress a report of any instance in which" they "establish[] or implement[] a formal or informal policy to refrain from enforcing, applying, or administering any provision of any Federal statute . . . on the grounds that such provision is unconstitutional").

Editor's Note: On March 4, 2008, the Secretary of Homeland Security sent a letter report to Congress pursuant to 28 U.S.C. § 530D in which the Department of Homeland Security disclosed and explained its decision to implement a non-enforcement policy regarding section 802(e)(1) of the 9/11 Act based on the legal advice in this memorandum.

tional objection to the bill's direct reporting provision, which was then designated as section 503 of S. 4. *See* Statement of Administration Policy on S. 4 (Feb. 28, 2007). The Senate did not amend the provision, however, and the Senate-passed version was included in the enrolled bill as section 802(e)(1). The President signed the Act on August 3, 2007.[3]

As provided in section 802, the CPO is responsible for investigating and ensuring departmental compliance with federal privacy laws and programs, and has policymaking authority over departmental policies as well as regulatory and legislative proposals for the collection, use, and disclosure of personal information by the federal government generally. *See* 6 U.S.C. § 142(a)–(d). Section 802(e) requires the CPO to prepare an annual report to Congress that addresses the CPO's areas of statutory and policymaking responsibility, including "activities of the Department that affect privacy, complaints of privacy violations, implementation of the Privacy Act of 1974, internal controls, and other matters." *Id.* § 142(a)(6), (e). The direct reporting provision at issue here, section 802(e)(1), provides that the CPO "shall":

> submit reports directly to the Congress regarding performance of the responsibilities of the senior official under this section [the CPO], without any prior comment or amendment by the Secretary, Deputy Secretary, or any other officer or employee of the Department or the Office of Management and Budget[.]

*Id.* § 142(e)(1).

You have asked whether section 802(e)(1) must be interpreted, and, if so, whether it may constitutionally be applied, (1) to prohibit DHS and OMB officials from reviewing a draft report before it is finalized and transmitted to Congress, (2) to prohibit those officials from offering comments upon a draft report even if the comments will not be incorporated or reflected in the final report to Congress, and (3) to prohibit the CPO from considering and actually incorporating into the final report DHS or OMB comments and amendments in the manner contemplated by the President's supervisory review process.

---

[3] It is well settled that Presidents may "'approve legislation containing parts which are objectionable on constitutional grounds.'" *Presidential Authority to Decline to Execute Unconstitutional Statutes*, 18 Op. O.L.C. 199, 202 (1994) (quoting *INS v. Chadha*, 462 U.S. 919, 942 n.13 (1983), and citing authorities dating back to the 1940s for the proposition that "the President's signing of a bill does not affect his authority to decline to enforce constitutionally objectionable provisions thereof").

*Constitutionality of Direct Reporting Requirement in Section 802(e)(1) of 9/11 Act*

## II.

### A.

Section 802(e)(1) is not fairly read to prohibit the CPO from submitting his draft reports for review by DHS and OMB officials before the reports are finalized and transmitted to Congress. The statute refers only to "prior comment or amendment by" DHS and OMB officials; it does not by its terms address any "review" of the draft reports by these officials. Thus, the plain language of the statute permits the CPO to share his draft report with others at DHS, including the Secretary, and to submit it for prior review to OMB, including in accordance with the established OMB clearance process that applies to Executive Branch communications to Congress relating to legislation or legislative proposals. *See* OMB Circular No. A-19, *Legislative Coordination and Clearance* (Sept. 20, 1979).[4]

Interpreting section 802(e)(1) consistent with its text to permit review of draft CPO reports by DHS and OMB officials is also compelled by the principle that statutes must be construed whenever reasonably possible to avoid raising a serious constitutional question. *See Solid Waste Agency of N. Cook Cty. v. Army Corps of Eng'rs*, 531 U.S. 159, 160 (2001). Article II of the Constitution vests the executive power in the President, and makes clear that he may rely upon, and bears responsibility for the conduct of, executive officers who stand subordinate to him. The President cannot fully and effectively discharge his constitutional responsibilities if Congress may, by statute, interfere with his ability to supervise the actions of such officers, especially their communications with Congress. Accordingly, we have long recognized that statutes that interfere with the President's ability to supervise, directly or through subordinate officials, the Executive Branch's communications with Congress raise serious constitutional concerns. *See, e.g., Authority of the Special Counsel of the Merit Systems Protection Board to Litigate*

---

[4] We understand that reports to Congress like those contemplated by section 802(e) ordinarily would be submitted to OMB for review and clearance, and that both OMB and DHS agree that the CPO's reports are subject to the requirements of Circular A-19. Circular A-19 applies, among other things, to "any comment or recommendation on pending legislation included in an agency's annual or special report," *id.* ¶ 5(e), and the CPO's reports must address the CPO's responsibilities under the Act, which include "evaluating legislative and regulatory proposals involving collection, use, and disclosure of personal information by the Federal Government," 6 U.S.C. § 142(a)(3) (Supp. I 2007). Although Circular A-19 excepts from the OMB clearance process "agencies that are specifically required by law to transmit their legislative proposals, reports, or testimony to the Congress without prior clearance," *id.* ¶ 4, this exception applies only to particular independent regulatory agencies that are subject to an agency-wide statutory exemption from Executive Branch clearance procedures, not to subordinate officers within a department or agency like the CPO. *See, e.g.*, 2 U.S.C. § 437d(d) (requiring Federal Election Commission to transmit budget estimates, legislative proposals, and testimony to Congress concurrently with their submission to the President or OMB); 7 U.S.C. § 2(a)(10) (Supp. V 2005) (same for Commodity Futures Trading Commission); 15 U.S.C. § 2076(k) (2000) (same for Consumer Product Safety Commission).

31

*and Submit Legislation to Congress*, 8 Op. O.L.C. 30, 31 (1984) ("*MSPB*") (legislation requiring an Executive Branch officer to submit budget proposals and bill comments directly to Congress represents an "unconstitutional intrusion by the Legislative Branch into the President's exclusive domain of supervisory authority over subordinate officials in the performance of their executive functions"). We therefore read statutes to avoid such interference "unless such construction is plainly contrary to the intent of Congress." *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. and Constr. Trades Council*, 485 U.S. 568, 575 (1988); *see generally MSPB*, 8 Op. O.L.C. at 34–38 (invoking this principle and the President's constitutional authority to supervise both Executive Branch subordinates and their communications with Congress in refusing to construe a statutory provision to "preclude Presidential review of [a subordinate executive officer's] proposed legislative recommendations prior to their submission to Congress"). We see nothing in section 802(e)(1)'s text, or in the legislative history of the CPO provisions of the 9/11 Act, that reveals a clear and unambiguous intent by Congress to preclude simple review of the CPO's draft reports by officials in DHS or OMB (as distinct from the transmittal to Congress of reports that reflect comments or amendments by such officials).

**B.**

Having concluded that section 802(e)(1) does not prevent DHS or OMB from reviewing the CPO's reports before they are transmitted to Congress, we next consider whether the statute is best interpreted to prohibit DHS or OMB officials from commenting upon a draft report even where, at the end of the supervisory review process, the CPO is permitted to, and in fact does, transmit a final report to Congress that does not reflect any comments or amendments by such officials. Based upon the same principle of constitutional avoidance discussed above, we conclude that section 802(e)(1) is best read not to prohibit DHS and OMB from offering comments on a draft report where those comments are not reflected in the final report as transmitted.

It appears reasonably clear from the face of the statute that Congress was most concerned in section 802(e)(1) with preventing the CPO from transmitting to Congress reports that have been revised pursuant to comments and suggestions made by officials in DHS and OMB. That intent is suggested by the statute's focus on the requirement to "submit" the report "directly" to Congress without any "prior comment or amendment" by such officials. Although the statute could be read more broadly to prohibit the transmittal of any report that has been the subject of any comment by DHS or OMB officials, even where the final report itself does not in any way reflect those comments, such a broad reading is not compelled by the plain text of the statute. We take it that Congress is most interested in the substance of the report submitted by the CPO, and the central purpose of the

*Constitutionality of Direct Reporting Requirement in Section 802(e)(1) of 9/11 Act*

statute is attempting to ensure that the substance of the report reflects the views of the CPO, rather than the views of other officials in DHS or at OMB.

In light of the ambiguity in the statute, we believe the canon of constitutional avoidance requires an interpretation that will avoid raising a serious conflict with the President's constitutional authority to supervise, through review and comment by the President's subordinates at DHS and OMB, the work of the CPO and the content of his communications to Congress. *See MSPB*, 8 Op. O.L.C. at 34–38; *Solid Waste Agency*, 531 U.S. at 160. Accordingly, where the President's supervisory review permits the CPO to transmit a final report to Congress that does not reflect suggested comments or amendments by DHS or OMB personnel, we believe that the statute is best interpreted to permit both the review and the suggested comments.

## C.

The remaining question is whether section 802(e)(1) would be constitutional if applied to prohibit the CPO from incorporating into his report comments and amendments made by DHS and OMB officials, acting in the exercise of the President's supervisory authority, where their supervisory review contemplates that the CPO will accommodate their comments and amendments in the final version of the report to Congress. We conclude that applying section 802(e)(1) to require the CPO to reject the results of the President's review of a report in such circumstances would substantially conflict with two aspects of the President's constitutional authority: the President's authority to supervise subordinate Executive Branch officers and the President's authority to protect against the unauthorized disclosure of constitutionally privileged information. This Office has for decades consistently advised that where applying a statutory provision would give rise to one or both of these serious constitutional conflicts, the Executive Branch need not enforce the provision.

## 1.

If applied in the manner described above, section 802(e)(1)'s directive that the CPO submit reports to Congress "without any prior comment or amendment" by DHS or OMB would interfere directly with the President's constitutional authority to supervise subordinate Executive Branch officers. The Supreme Court recognized the Constitution's vesting of this power in the President more than two centuries ago. *See Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 165–66 (1803) (recognizing that the President has constitutional authority to exercise certain executive powers without interference from other branches whether he exercises those powers directly or through subordinate "officers, who act by his authority and in conformity with his orders"). Since *Marbury*, all three branches have recognized the President's constitutional authority to supervise certain Executive

33

Branch officers without interference from the other branches. These precedents, which we discuss below, include the Supreme Court's 1988 decision in *Morrison v. Olson* as well as decades of congressional and Executive Branch decisions. These precedents support the conclusion that statutory reporting requirements cannot constitutionally be applied to interfere with presidential supervision and control of the communications that Executive Branch officers such as the CPO send to Congress.

The constitutional authority in question was first recognized by the Supreme Court in cases involving statutory attempts to limit the President's supervision of executive officers by restricting his ability to remove them. In 1926, the Supreme Court, citing *Marbury*, elaborated on the President's constitutional authority to exercise the ultimate form of supervision—at will removal—over certain Executive Branch officers without legislative interference. *See Myers v. United States*, 272 U.S. 52 (1926). *Myers* held that a statutory "provision of the law of 1876, by which the unrestricted power of removal of first class postmasters is denied to the President, is in violation of the Constitution and invalid." *Id.* at 176. The Court based this conclusion on Article II, which "grants to the President the executive power of the Government, i.e., the general administrative control of those executing the laws." *Id.* at 163–64. The Court explained:

> If there is a principle in our Constitution, indeed in any free Constitution, more sacred than another, it is that which separates the Legislative, Executive and Judicial powers. If there is any point in which the separation of the Legislative and Executive powers ought to be maintained with great caution, it is that which relates to officers and offices.
>
> . . . .
>
> The ordinary duties of officers prescribed by statute come under the general administrative control of the President by virtue of the general grant to him of the executive power, and he may properly supervise and guide their construction of the statutes under which they act in order to secure that unitary and uniform execution of the laws which Article II of the Constitution evidently contemplated in vesting general executive power in the President alone.
>
> . . . .
>
> [T]o hold otherwise would make it impossible for the President, in case of political or other difference with the Senate or Congress, to take care that the laws be faithfully executed.

*Id.* at 116, 135, 164.

*Constitutionality of Direct Reporting Requirement in Section 802(e)(1) of 9/11 Act*

Since the Court decided *Myers* in 1926, it has, on a case-by-case basis, upheld some legislative limits (specifically, statutory removal restrictions) on the President's ability to supervise certain types of officers. *See, e.g., Humphrey's Ex'r v. United States*, 295 U.S. 602 (1935); *Wiener v. United States*, 357 U.S. 349 (1958); *Morrison v. Olson*, 487 U.S. 654 (1988). Importantly, however, none of these cases involved an effort by Congress to constrain the President's ability to supervise—through removal or otherwise—Executive Branch officers who, like the CPO, possess broad operational and policymaking responsibility for core Executive Branch functions.

*Humphrey's Executor* and *Wiener* upheld legislative limits on the President's ability to supervise, through removal, officers who served on "independent" commissions and performed, in the Court's words, "quasi-judicial" and "quasi-legislative" functions. *Humphrey's Ex'r*, 295 U.S. at 624, 628 (upholding removal restrictions on members of an independent agency (the Federal Trade Commission) that could not "be characterized as an arm or eye of the executive"); *Wiener*, 357 U.S. at 352 (1958) (upholding removal restrictions on War Claims Commission members charged with "adjudicatory" functions). The Court has since declared that these decisions do not undermine the constitutional analysis in *Myers* of the President's supervisory authority over Executive Branch officers such as the CPO. *See, e.g., Bowsher v. Synar*, 478 U.S. 714, 725 (1986) (in upholding "the power of Congress to limit the President's powers of removal of a Federal Trade Commissioner" in *Humphrey's Executor*, the Court "distinguished *Myers*, re-affirming its holding that congressional participation in the removal of executive officers is unconstitutional").

The same is true of the Court's decision in *Morrison v. Olson*. Although *Morrison*, unlike *Humphrey's Executor* and *Wiener*, upheld removal restrictions on an officer (the independent counsel then authorized by the independent counsel provisions of the Ethics in Government Act, which are no longer in effect) who did perform a clearly executive function (the investigation and prosecution of unlawful conduct), the decision makes clear that its analysis does not extend to the President's supervisory authority over Executive Branch officers who, like the CPO, have policymaking and other broad operational responsibility for Executive Branch functions. In upholding the relevant statute's "for cause" limits on the President's ability to remove an independent counsel, the Court emphasized that the independent counsel in question occupied a unique office characterized by "limited jurisdiction and tenure and lacking [the] policymaking or significant administrative authority" typically associated with Executive Branch officials. *Morrison*, 487 U.S. at 691. Having thus distinguished an independent counsel under the Ethics in Government Act from officers such as the CPO, the Court expressly reaffirmed the "undoubtedly correct" determination in *Myers* that "there are some 'purely executive' officials who must be removable by the President at will if he is to 'be able to accomplish his constitutional role." *Id.* at 690 (quoting *Myers*, 272 U.S. at 132–34).

35

Although the Court has not had occasion (presumably for justiciability reasons) to opine on the constitutionality of statutory direct reporting requirements per se, the political branches have long recognized that statutes imposing such requirements merit the same constitutional analysis as statutes that impose removal restrictions on Executive Branch officers. The reason is that both types of statutes interfere with the President's constitutional authority to supervise the Executive Branch subordinates he relies upon to discharge his Article II functions. We have consistently cited this constitutional authority before and after *Morrison* in objecting to statutory reporting requirements functionally identical to section 802(e)(1).

In 1977, for example, the Department objected to a draft bill that would have required inspectors general to submit reports "directly to Congress without clearance or approval by the agency head or anyone else in the executive branch" as an impermissible legislative interference with the President's Article II right of "general administrative control" over executive officials, a presidential power that necessarily "includes the right to coordinate and supervise all replies and comments from the executive branch to Congress." *Inspector General Legislation*, 1 Op. O.L.C. 16, 17–18 (1977). Congress responded by deleting the offending provision, and acknowledged the Administration's separation of powers concerns in the bill's legislative history. *See Establishment of Offices of Inspector and Auditor General in Certain Executive Departments and Agencies*, S. Rep. No. 95-1071, at 9, *reprinted in* 1978 U.S.C.C.A.N. 2676, 2684 ("[T]he Committee has deleted certain features of the earlier inspector general legislation which carried the greatest potential for tension between the inspector general and the agency head, and the executive and legislative branches.").

In 1982, we raised the same constitutional objection to a statutory provision that purported to require the Administrator of the Federal Aviation Administration to submit budget estimates and comments on legislative proposals concurrently to Congress and the President. *See Constitutionality of Statute Requiring Executive Agency to Report Directly to Congress*, 6 Op. O.L.C. 632, 641 (1982) ("*Constitutionality of Direct Reporting*"). Although we acknowledged that the text of the relevant provision "could be read to require the Administrator to submit any budget information or legislative comments directly to Congress prior to any approval or even review by the Administrator's superiors," *id.* at 639, we explained that such reporting would be "entirely inconsistent with the separation of powers" and with "the corollary right of the President to control his subordinates within the Executive Branch." *Id.* at 639–40. Accordingly, in keeping with the canon of constitutional avoidance, we interpreted the statute to apply only to final documents, thereby permitting the Administrator's superiors in the Executive Branch to review and edit preliminary drafts of the relevant reports and proposals. *See id.* at 640–41.

*Constitutionality of Direct Reporting Requirement in Section 802(e)(1) of 9/11 Act*

In 1984, we similarly advised that a statute authorizing the Special Counsel of the Merit Systems Protection Board—"an Executive Branch officer subject to the supervision and control of the President"—to submit budget proposals and bill comments directly to Congress represented an "unconstitutional intrusion by the Legislative Branch into the President's exclusive domain of supervisory authority over subordinate officials in the performance of their executive functions." *MSPB*, 8 Op. O.L.C. at 31, 35–36 (concluding that legislation that would "require an Executive Branch officer to submit budget information and legislative recommendations directly to Congress, prior to their being reviewed and cleared by the President or another appropriate reviewing official, would constitute precisely the kind of interference in the affairs of one Branch by a coordinate Branch which the separation of powers was intended to prevent").

In 1988, we reiterated this constitutional analysis in objecting (as we did in 1977) to a proposal to add a direct reporting requirement in the Inspector General Act. *See* Memorandum for Thomas M. Boyd, Acting Assistant Attorney General, Office of Legislative Affairs, from John O. McGinnis, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: H.R. 3049; H.R. 3285; H.R. 2126* (Apr. 22, 1988) (enclosing draft letters for Representative Morris K. Udall, Chairman, Subcommittee on Energy and the Environment, Committee on Interior and Insular Affairs). As in 1977, Congress deleted the offending provision from the bill, which was enacted four months after the Supreme Court decided *Morrison v. Olson*. *See* Inspector General Act Amendments of 1988, Pub. L. No. 100-504, § 102(f), 102 Stat. 2515 (Oct. 18). At approximately the same time we objected to the Inspector General Act proposal, we concluded that a "[s]tatutory provision requiring the Director of the Centers for Disease Control to distribute an AIDS information pamphlet to the public 'without necessary clearance of the content by any official, organization or office' violate[d] the separation of powers by unconstitutionally infringing upon the President's authority to supervise the executive branch." *Statute Limiting the President's Authority to Supervise the Director of the Centers for Disease Control in the Distribution of an AIDS Pamphlet*, 12 Op. O.L.C. 47, 47 (1988).

We continued to apply the constitutional analysis underlying the foregoing precedents after the Supreme Court decided *Morrison* in June 1988 because we concluded that *Morrison* does not affect the analysis of constitutional limits on statutory restrictions of the President's ability to supervise—through removal or otherwise—Executive Branch officers like the CPO. *See, e.g.*, *The Constitutional Separation of Powers Between the President and Congress*, 20 Op. O.L.C. 124, 169 (1996) ("*Constitutional Separation of Powers*") (concluding that "restrictions on the President's power to remove officers with broad policy responsibilities" should continue to "be deemed unconstitutional" after *Morrison* because the "*Morrison* Court had no occasion to consider the validity of removal restrictions affecting principal officers, officers with broad statutory responsibilities, or officers involved in executive branch policy formulation," and *Morrison* expressly

*Opinions of the Office of Legal Counsel in Volume 32*

affirmed that *Myers* "was undoubtedly correct . . . in its broader suggestion that there are some 'purely executive' officials who must be removable by the President at will if he is to be able to accomplish his constitutional role").

In 1989, we advised the general counsels of the Executive Branch that concurrent reporting requirements offend the separation of powers and "infringe upon the President's authority as head of a unitary executive to control the presentation of the executive branch's views to Congress." *Common Legislative Encroachments on Executive Branch Authority*, 13 Op. O.L.C. 248, 255 (1989) ("*Common Legislative Encroachments*").

In 1996, we similarly advised that "concurrent reporting requirements" clearly implicate "the President's performance of his constitutionally assigned functions" and "impair the Constitution's great principle of unity and responsibility in the Executive department." *Constitutional Separation of Powers*, 20 Op. O.L.C. at 174–75 (internal quotation marks and citations omitted).[5]

In 1998, the Department notified Congress that a proposed reporting requirement virtually identical to section 802(e)(1) should be removed from a bill because the provision "would interfere with the President's control over the executive branch and with his legitimate interest in overseeing the presentation of the executive branch's views to Congress." Letter for William V. Roth, Chairman, Committee on Finance, United States Senate, and Bill Archer, Chairman, Committee on Ways and Means, United States House of Representatives, from L. Anthony Sutin, Acting Assistant Attorney General, Office of Legislative Affairs at 4 (June 8, 1998).

In 2000, we raised similar separation of powers objections to a direct reporting requirement in the Medicare Rx Act, *see* Memorandum for Robert Raben, Assistant Attorney General, Office of Legislative Affairs, from Evan H. Caminker, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: H.R. 4680—Medicare Rx 2000 Act* (June 26, 2000), and Congress ultimately removed the provision from the legislation, *see* Pub. L. No. 108-173, 117 Stat. 2066 (2003).[6]

---

[5] Some might argue that our conclusions with respect to section 802(e)(1) are inconsistent with the suggestion in our 1996 opinion that "courts . . . might uphold the validity of a concurrent reporting requirement imposed for a legitimate congressional purpose on a specific agency with limited, domestic, and purely statutory duties." 20 Op. O.L.C. at 175. We disagree. In making this statement, the 1996 opinion was making an observation about how courts "might" view such a requirement with respect to agencies whose duties differ substantially from those of DHS. The opinion did not endorse the constitutionality of concurrent reporting requirements with respect to these or any other agencies. To the contrary, the opinion concluded, quoting *Myers*, that direct reporting requirements "impair the Constitution's 'great principle of unity and responsibility in the Executive department.'" *Id.*

[6] The original bill to which the Administration objected died in the Senate, but the legislation was reconsidered in the 107th Congress, *see Medicare Modernization and Prescription Drug Act of 2002*, H.R. Rep. No. 107-539 (2002), and was enacted without the objectionable provision, *see* Pub. L. No. 108-173, 117 Stat. 2066 (2003).

*Constitutionality of Direct Reporting Requirement in Section 802(e)(1) of 9/11 Act*

And, in 2004, we issued two opinions in which we concluded that two different statutory provisions, if construed or enforced to permit Executive Branch officers to communicate directly with Congress without appropriate supervision by the President or his subordinates, would violate the constitutional separation of powers and, specifically, the President's Article II authority to supervise Executive Branch personnel. *See Authority of HUD's Chief Financial Officer to Submit Final Reports on Violations of Appropriations Laws*, 28 Op. O.L.C. 248, 252–53 (2004) ("*Authority of HUD's CFO*"); *Authority of Agency Officials to Prohibit Employees from Providing Information to Congress*, 28 Op. O.L.C. 79, 80–82 (2004) ("*Authority of Agency Officials*"). These opinions, like their predecessors, applied the same settled reasoning we follow here:

> The [judicial] decisions and the long practical history concerning the right of the President to protect his control over the Executive Branch are based on the fundamental principle that the President's relationship with his subordinates must be free from certain types of interference from the coordinate branches of government in order to permit the President effectively to carry out his constitutionally assigned responsibilities. The executive power resides in the President, and he is obligated to take care that the laws are faithfully executed. In order to fulfill those responsibilities, the President must be able to rely upon the faithful service of subordinate officials. To the extent that Congress or the courts interfere with the President's right to control or receive effective service from his subordinates within the Executive Branch, those other branches limit the ability of the President to perform his constitutional function.

*Authority of HUD's CFO*, 28 Op. O.L.C. at 252 (internal quotation marks and citations omitted).

## 2.

The constitutional authorities outlined above lead to the conclusion that section 802(e)(1) would be unconstitutional if applied to prevent the CPO from incorporating into his final report comments and amendments suggested by the President's review of the report through the President's subordinates at DHS and OMB. The very statute that contains section 802(e)(1) establishes the CPO as a subordinate officer accountable to the Secretary and ultimately to the President, and vests the CPO with a broad range of policymaking and operational authority within the Executive Branch. 6 U.S.C. § 142(a)–(c) (Supp. I 2007). Section 802 expressly designates the CPO as the "senior official in the Department" who has "primary responsibility for privacy policy," which includes responsibility for "assuring" departmental compliance with "privacy protections," particularly those contained in the information handling requirements of the Privacy Act of 1974, as well as

39

*Opinions of the Office of Legal Counsel in Volume 32*

responsibility for "evaluating legislative and regulatory proposals involving collection, use, and disclosure of personal information by the Federal Government." 6 U.S.C. § 142(a)(1)–(3). Additional provisions in section 802 further vest the CPO with broad authority to coordinate the implementation of "programs, policies, and procedures involving civil rights, civil liberties, and privacy considerations," *id*. § 142(a)(5), and with authority to investigate and report on, with "access to all records, reports, audits, reviews, documents, papers, recommendations, and other materials available to the Department," *id.* § 142(b)(1)(A), the "activities of the Department that affect privacy, including complaints of privacy violations, implementation of the Privacy Act of 1974, internal controls, and other matters," *id.* § 142(a)(5); *see also id.* § 142(a)(6), (b)–(c).

The CPO's responsibilities establish the CPO as the kind of Executive Branch officer with "broad statutory responsibilities" and "executive branch policy" authority that the Supreme Court "had no occasion to consider" in *Morrison*, *Constitutional Separation of Powers*, 20 Op. O.L.C. at 169, but who clearly falls within the class of "'purely executive' officials" over whom *Myers* concluded the President must be able to exercise full supervision in order to "accomplish his constitutional role." *Morrison*, 487 U.S. at 689 (quoting *Myers*, 272 U.S. at 132–34). The CPO is an executive officer who assists the President in performing functions—most notably the execution of statutes and the formulation of Executive Branch policy and legislative recommendations, *see* 6 U.S.C. § 142(a), (c)(1)(A), (d)—that lie at the core of the President's constitutional duties under Article II. *See Morrison*, 487 U.S. at 689–90; *Constitutional Separation of Powers*, 20 Op. O.L.C. at 169. For this reason, the Constitution requires that the President be able to supervise the CPO's activities, including and especially the CPO's communications with Congress, without legislative interference. *See, e.g.*, *Constitutionality of Direct Reporting*, 6 Op. O.L.C. at 633 ("The separation of powers requires that the President have ultimate control over subordinate officials who perform purely executive functions and assist him in the performance of his constitutional responsibilities. This power includes the right to supervise and review the work of such subordinate officials, *including the reports issued either to the public or to Congress*.") (emphasis added).

Section 802(e)(1) substantially interferes with the President's ability to exercise this constitutional authority to the extent it purports to bar the CPO from revising his report to reflect comments from the DHS or OMB officials through whom the President supervises the CPO and his reports. The fact that section 802(e)(1) expressly prohibits only comments or amendments by DHS and OMB officials, not comments by the President or other Executive Branch officials, does not change the constitutional analysis. It is well settled that the President must rely upon Executive Branch subordinates in order to "accomplish his constitutional role." *Morrison*, 487 U.S. at 690; *Myers*, 272 U.S. at 133; *Williams v. United States*, 42 U.S. (1 How.) 290, 297 (1842); *Constraints Imposed by 18 U.S.C. § 1913 on Lobbying Efforts*, 13 Op. O.L.C. 300, 306 n.12 (1989); *Opinion on*

*Constitutionality of Direct Reporting Requirement in Section 802(e)(1) of 9/11 Act*

*Relation of the President to the Executive Departments*, 7 Op. Att'y Gen. 453, 479 (1855). And it is similarly well settled that frustrating the President's ability to rely on his subordinates unconstitutionally interferes with the President's authority under Article II. *See Myers*, 272 U.S. at 132–34; *Morrison*, 487 U.S. at 689–90.

The President relies upon DHS and OMB not only to assist him in supervising the CPO and the CPO's reports to Congress, but also in exercising his constitutional authority over the matters the CPO's report addresses, most notably the execution of privacy laws and policies. In purporting to prohibit the CPO from incorporating DHS or OMB comments in his report, section 802(e)(1) directly interferes with the President's ability to supervise the manner in which the CPO— a subordinate who qualifies as the type of "purely executive officer" over whom the Supreme Court has said the President must retain full supervisory authority— reports to Congress on the Executive Branch's handling of matters (most notably the execution of privacy laws and the development of privacy policy and legislative proposals) for which the President is constitutionally responsible. Such interference is impermissible regardless of its purported oversight or other justifications. Broad though Congress's powers are, Congress may not exercise those powers "in ways that violate constitutional restrictions on its own authority or that invade the constitutional prerogatives of other branches." *Constitutionality of Proposed Statutory Provision Requiring Prior Congressional Notification For Certain CIA Covert Actions*, 13 Op. O.L.C. 258, 261 (1989). Because section 802(e)(1) would effect precisely such an invasion if applied to require the CPO to exclude from his report comments that the President's review, through DHS or OMB, contemplates be incorporated, we conclude that the Executive Branch need not enforce the provision in such circumstances.

**3.**

For the reasons set forth above, the conclusion that certain applications of section 802(e)(1) would interfere with the President's ability to supervise the CPO is constitutionally problematic regardless of Congress's justifications for the provision. We note, however, that even if it were appropriate for us to balance Congress's purported need for an unedited report against the degree to which section 802(e)(1)'s prohibition on editing would impair the President's Article II functions, we would conclude that Congress's asserted interest fails to justify the restrictions that section 802(e)(1) places on the President's authority. *Cf. Morrison*, 487 U.S. at 695 (balancing Congress's interest in restricting the President's ability to remove an independent counsel against the degree to which the re-

strictions would "prevent the Executive Branch from accomplishing its constitutionally assigned functions").[7]

The 9/11 Act's text and legislative history do not establish any congressional need for direct reporting, much less that direct reporting "is demonstrably critical to the responsible fulfillment of [the requesting committee's] functions." *Senate Select Comm. on Presidential Campaign Activities v. Nixon*, 498 F.2d 725, 731 (D.C. Cir. 1974); *compare Morrison*, 487 U.S. at 693 (emphasizing that the challenged statutory limits on the President's removal authority were determined to be "essential, in the view of Congress, to establish the necessary independence of the office"). But even were we to assume that section 802(e)(1) serves a compelling congressional oversight need, applying the provision to preclude the CPO from incorporating DHS or OMB comments on a report would "unduly trammel[] executive authority" under the kind of balancing framework the Court employed in *Morrison*. The reason is that applying the provision in this manner would, unlike the removal restrictions in *Morrison*, interfere with the "President's need to control the exercise of" a subordinate Executive Branch officer's authority

---

[7] We do not read *Morrison* to require such balancing here because, as we explained in Part II.C.1, *supra*, the Court's opinion in *Morrison* does not affect the analysis of the constitutional problem with legislative provisions that, like section 802(e)(1), interfere with the President's authority to supervise traditional Executive Branch officers like the CPO. *See Morrison*, 487 U.S. at 691.

Nor do we read the *Nixon* cases cited in our 1982 opinion as requiring us to evaluate section 802(e)(1)'s constitutionality in light of Congress's "need" for the unedited report the provision purports to require. It is true that our 1982 opinion analyzed the constitutionality of imposing a concurrent reporting obligation on the FAA in terms of whether the requirement was supported by a "very compelling and specific [legislative] need." 6 Op. O.L.C. at 633, 641–42. This approach was, however, a departure from the Office's prior opinions objecting to direct reporting requirements regardless of their oversight value. *See, e.g.*, *Inspector General Legislation*, 1 Op. O.L.C. at 17–18. Since 1982, our opinions and advice regarding the constitutionality of direct and concurrent reporting requirements have returned to the approach we employed in 1977. *See, e.g.*, *Common Legislative Encroachments*, 13 Op. O.L.C. at 255 (concluding, without considering oversight or other justifications, that concurrent reporting requirements should be opposed on constitutional grounds if proposed in legislation, and that "if enacted," these provisions should be "construed as applying only to 'final' recommendations that have been reviewed and approved by the appropriate superiors within the Executive Branch, including OMB"); Letter for William V. Roth, Chairman, Committee on Finance, United States Senate, and Bill Archer, Chairman, Committee on Ways and Means, United States House of Representatives, from L. Anthony Sutin, Acting Assistant Attorney General, Office of Legislative Affairs at 4 (June 8, 1998) (raising constitutional objections to direct reporting provisions without considering their oversight or other legislative value); *Authority of Agency Officials*, 28 Op. O.L.C. 79 (explaining that a direct reporting provision posed constitutional problems without regard to whether the provision served legitimate oversight or other needs); *Authority of HUD's CFO*, 28 Op. O.L.C. 248 (same). That is also the approach we apply here, because the relevant portion of the 1982 opinion rests on authorities that balance Congress's need for information with the "practical need for confidentiality in Executive Branch deliberations," not with the constitutional principles that have long been held to preclude legislative interference with the President's authority to supervise traditional Executive Branch officers. *See* 6 Op. O.L.C. at 638–41; *see also id.* at 640 n.3 (emphasizing that this Office knew of no instance in which Congress had imposed the type of concurrent reporting requirement at issue in the opinion "upon a purely executive agency that is under the President's direct supervision and control").

*Constitutionality of Direct Reporting Requirement in Section 802(e)(1) of 9/11 Act*

on issues (the execution of federal statutes, Executive Branch policy formulation, and the protection of privileged information) that are "central to the functioning of the Executive Branch." *Id*. at 691.

As noted, the President cannot effectively perform his constitutional functions without the aid of Executive Branch agencies and officers. *See, e.g.*, *Myers*, 272 U.S at 133. The CPO is such an officer, and DHS and OMB are such agencies. Indeed, they are the agencies best able (and, in DHS's case, uniquely able, because the report pertains largely to DHS activities) to assist the President in discharging his constitutional authority to supervise not just the CPO and his reports, but also the Executive Branch's handling of the matters addressed in those reports. The statute requires that the CPO's reports address DHS's implementation of federal privacy laws, as well as Executive Branch privacy policy and legislative recommendations on privacy issues. *See* 6 U.S.C. § 142(a), (e). Section 802(e)(1)'s prohibition on the incorporation of DHS or OMB comments into the report would deprive the President of his ability to ensure that a report to Congress on privacy matters on behalf of the Executive Branch reflects the input of the Executive Branch officers on whom the President relies to discharge his constitutional authority over the report, the officer who transmits it, and the substantive matters that the report addresses. Section 802(e)(1)'s prohibition on incorporating OMB comments in the CPO's report to Congress would also deprive the President of the benefits of the OMB review process that Presidents have relied upon for decades to ensure that a single officer's or department's communications to Congress do not conflict with the President's policy program or legal obligations, and also do not compromise constitutionally privileged information or otherwise undermine the President's ability to exercise his constitutional authority. *See* OMB Circular No. A-19, ¶¶ 3–4, 8 (1979). Because certain applications of section 802(e)(1) would impose these substantial burdens on the President's ability to exercise his constitutional supervisory authority, we would consider those applications of the provision constitutionally objectionable even if we were to balance the degree to which they burden the President's Article II authority against the provision's oversight or legislative value.

### 4.

Certain applications of section 802(e)(1) would also conflict with the President's constitutional authority to protect against the unauthorized disclosure of classified and other types of constitutionally privileged information.

We have long concluded that statutory provisions that purport to authorize Executive Branch officers to communicate directly with Congress without appropriate supervision by the President or his subordinates violate the separation of powers because such provisions infringe upon the President's constitutional authority to protect against the unauthorized disclosure of constitutionally privileged information, most notably classified national security information. As

the Clinton Administration explained in a 1998 Statement of Administration Policy ("SAP") on S. 1668, a bill that purported to give employees in the intelligence community a right to disclose certain types of privileged information to Congress without Presidential authorization:

> This provision is clearly contrary to the Supreme Court's explicit recognition of the President's constitutional authority to protect national security and other privileged information. Congress may not vest lower-ranking personnel in the Executive branch with a "right" to furnish national security or other privileged information to a member of Congress without receiving official authorization to do so. By seeking to divest the President of his authority over the disclosure of such information, S. 1668 would unconstitutionally infringe upon the President's constitutional authority.

This Office further developed the position stated in the SAP in testimony before Congress. *See Whistleblower Protections for Classified Disclosures*, 22 Op. O.L.C. 92 (1998) (reproducing the relevant testimony).

   The President's constitutional authority to protect against the unauthorized disclosure of privileged information is not "limited to classified information, but extends to all deliberative process or other information protected by executive privilege." *Authority of Agency Officials*, 28 Op. O.L.C. at 81. "Because [a] statute[] may not override the constitutional doctrine of executive privilege, [it] may not act to prohibit the supervision of the disclosure of any privileged information, be it classified, deliberative process or other privileged material." *Id.* Applying this principle, we have consistently advised that the President's ability to protect against the unauthorized disclosure of information potentially protected by executive privilege may not be restricted by statute. *See, e.g.*, Memorandum for Peter J. Wallison, Counsel to the President, from Charles J. Cooper, Assistant Attorney General, Office of Legal Counsel at 3 n.6 (Sept. 8, 1986) ("Consistent with our view that Congress cannot override executive privilege by statutory enactment, we do not believe the 'whistleblower' provisions allow an employee to escape sanctions for disclosure of material covered by executive privilege."). More importantly here, we have concluded in the specific context of statutory reporting requirements that "the Constitution compels that the head of [a] department must have the authority to direct" subordinates preparing reports to Congress to "make whatever modifications are deemed necessary" to prevent the unauthorized disclosure in those reports of sensitive law enforcement or executive privileged information. *Legislation to Establish Offices of Inspector General—H.R. 8588*, Hearings before the Subcomm. on Governmental Efficiency and the District of Columbia of the S. Comm. on Governmental Affairs, 95th Cong. 141 (1978) (testimony of Lawrence A. Hammond, Deputy Assistant Attorney General, Office of Legal Counsel) ("Hammond Testimony"); *see also* Memorandum for Robert M.

*Constitutionality of Direct Reporting Requirement in Section 802(e)(1) of 9/11 Act*

McNamara, Jr., General Counsel, Central Intelligence Agency, from Todd D. Peterson, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Legal Authority to Withhold Information from Congress* at 3 (Sept. 9, 1998) (the "application of [statutory] reporting requirements . . . is limited by a constitutional restraint—the executive branch's authority to control the disclosure of information when necessary to preserve the Executive's ability to perform its constitutional responsibilities"). As we explained 30 years ago:

> This conclusion springs, first, from the President's duty to see that the laws are faithfully executed. His immediate subordinates are charged with carrying out that constitutional duty. If a department head discovers in a report that, for instance, grand jury or tax return information has been . . . included, it is his duty to see that it is deleted. This is the simplest and clearest case. In each case an enactment having the force of law prohibits disclosure—even to Congress—and for the department head to allow a report to go out without alteration would be to disregard those enactments and fail in the faithful execution of the laws.
>
> . . . .
>
> In addition . . . , there are some limited circumstances in which it has been recognized that the President may restrict the disclosure of confidential information and information relating to national security, diplomatic and military secrets . . . . [I]f an [Executive Branch subordinate] decides to disclose confidential information, the head of the department should have the opportunity to review that intended disclosure and initiate the process of internal Executive Branch scrutiny to determine whether the President should be asked to make the decision to withhold that document or portions of it from Congress. Any law which interferes with the President's power to make these sorts of deliberative judgments would, in the Department's opinion, offend the core concept of separation of powers upon which the Supreme Court based its recognition of a Presidential privilege.

Hammond Testimony at 141–43. Congress acknowledged the foregoing constitutional principles in the Senate report on the legislation (the Inspector General Act) addressed in the Department's testimony. S. Rep. No. 95-1071, at 32, 1978 U.S.C.C.A.N. at 2707 ("Insofar as [executive privilege] is constitutionally based, the committee recognizes that section 5(b) cannot override it.").

There is no question that section 802(e)(1) would interfere with the President's ability to protect against the unauthorized disclosure of privileged information if applied to preclude the CPO from accepting DHS or OMB amendments made to protect such information. If section 802(e)(1) were so applied, it would substan-

tially constrain the President's ability to protect against the unauthorized disclosure of privileged information by limiting the Executive Branch subordinates and processes on which the President may rely, and typically does rely, to exercise his constitutional authority over such information. To that extent, as well, the statute as so applied would be unconstitutional.

### III.

In summary, we conclude that section 802(e)(1) does not prohibit DHS or OMB officials from reviewing, in accordance with established Executive Branch review and clearance procedures, the CPO's draft section 802 reports before the reports are submitted to Congress. We further conclude that section 802(e)(1) is best interpreted not to prohibit DHS or OMB officials from commenting upon a draft CPO report where the CPO is permitted to, and in fact does, transmit to Congress a final report that does not reflect comments or amendments from such officials. Finally, we conclude that section 802(e)(1)'s direct reporting requirement need not be enforced in circumstances where its application would require the CPO to ignore the results of the President's review, through DHS and OMB, of a particular report. In such circumstances, the statute must yield to the President's exercise of his constitutional authority to supervise subordinate Executive Branch officers and their communications with Congress. In the event DHS were to implement this conclusion by adopting a policy not to enforce section 802(e)(1) in the circumstances described above, DHS should report the policy to Congress as required by 28 U.S.C. § 530D.

STEVEN G. BRADBURY
*Principal Deputy Assistant Attorney General*
*Office of Legal Counsel*

# Complaint

# Exhibit L

## Authority of the President to Blockade Cuba

Under international law, the President may institute a blockade of Cuba as an incident to a state of war, and conceivably a blockade could also be justified as a necessary measure of defense.

The legality of the blockade could probably be tested by Cuba, by other countries, and by their nationals in the courts of the United States, and Cuba and other countries could raise the legality issue before the United Nations and the Organization of American States. It is not clear whether this issue could be raised before the International Court of Justice.

January 25, 1961

MEMORANDUM OPINION FOR THE ATTORNEY GENERAL[*]

In response to your request, I am transmitting the attached memorandum on the above-entitled subject. In view of the length of the memorandum, I believe it would be helpful to summarize the conclusions reached.

The memorandum concludes that the President is authorized to institute a blockade as an incident to a state of war. However, a blockade is a belligerent act which, as a matter of international law, is ordinarily justified only if a state of war, legal or de facto, exists. Conceivably a blockade could also be justified in circumstances in which the blockading country can establish it to be a necessary measure of defense. Whether the necessary facts required to support such a contention exist, however, is not known to me.

The legality of the blockade could probably be tested by Cuba, by other countries, and by their nationals in the courts of the United States. In addition, Cuba and other countries could raise the issue of the legality of the blockade before the United Nations and the Organization of American States. It is not clear whether this issue could be raised before the International Court of Justice.

\* \* \* \* \*

This is in response to your request for the views of this Office as to the President's authority to declare a blockade, by the naval air forces of the United States, of the ports and coast of Cuba. We first discuss the legal circumstances which have been held to justify the imposition of a blockade, and in this connection the President's authority to act. Next, we consider whether under applicable principles of law a case may be made for a blockade of Cuba. Finally, we consider the question of the forums, both domestic and international, which may be available for challenging the validity of a United States blockade of Cuba. In view of the way in which the question has been put to us, we have not undertaken in any manner to consult with the Department of State, the expert agency in this field.

---

[*] Editor's Note: The matter preceding the asterisks is the cover memorandum to the Attorney General. Assistant Attorney General Kramer signed both the cover and the main memorandum.

*Supplemental Opinions of the Office of Legal Counsel in Volume 1*

## I.

At the outset it should be noted that both courts and commentators are agreed that a blockade involves a state of war; i.e., it is the right of a belligerent alone. Thus, in the *Prize Cases*, 67 U.S. (2 Black) 635 (1862), in which the Supreme Court sustained the power of the President to proclaim a blockade of the ports of the United States seized by the southern states in rebellion, the decision turned on the question whether a state of war existed. As the Court put it: "Let us enquire whether, at the time this blockade was instituted, a state of war existed which would justify a resort to these means of subduing the hostile force." *Id.* at 666. The Court concluded that the military insurrection of the Southern States gave rise to a state of war which "[t]he President was bound to meet . . . in the shape it presented itself, without waiting for Congress to baptize it with a name; and no name given to it by him or them could change the fact." *Id.* at 669. On this basis, the Court held that the President "had a right, *jure belli*, to institute a blockade of ports in possession of the States in rebellion, which neutrals are bound to regard." *Id.* at 671.

Other decisions of the Supreme Court recognize the principle that blockade is an incident of a state of war. In *McCall v. Marine Ins. Co.*, Justice Story, writing for the Court, stated:

> The right to blockade an enemy's port with a competent force, is a right secured to every belligerent by the law of the nations. No neutral can, after knowledge of such blockade, lawfully enter, or attempt to enter, the blockaded port. It would be a violation of neutral character, which, according to established usages, would subject the property engaged therein to the penalty of confiscation. In such a case, therefore, the arrest and restraint of neutral ships attempting to enter the port, is a *lawful* arrest and restraint by the blockading squadron.

12 U.S. (8 Cranch) 59, 65 (1814) (emphasis in original). And in *Olivera v. Union Ins. Co.*, Chief Justice Marshall stated, that "a belligerent may lawfully blockade the port of his enemy, is admitted." 16 U.S. (3 Wheat.) 183, 194 (1818). A forthright statement was made by the Supreme Court of West Virginia in the case of *Grinnan v. Edwards*:

> A blockade, is the exercise of belligerent right; before a blockade can be declared, a war must exist; and a blockade lawfully declared, is conclusive evidence that a state of war exists between the nation declaring such a blockade, and the nation whose ports are blockaded.

21 W. Va. 347, 356 (1883).

*Authority of the President to Blockade Cuba*

International law experts have the same view of the blockade. George Grafton Wilson, Professor Emeritus of International Law, Harvard University, states: "The term blockade, properly used, involves a state of war." 4 *Encyclopedia Americana* 98d (1958). In the seventh edition of *Oppenheim's International Law*, edited by the late Professor Lauterpacht (subsequently a judge of the International Court of Justice), it is stated:

> Blockade is the blocking by men-of-war of the approach to the enemy coast, or a part of it, for the purposes of preventing ingress and egress of vessels or aircraft of all nations. . . . Although blockade is . . . a means of warfare against the enemy, it concerns neutrals as well, because the ingress and egress of neutral vessels are thereby interdicted, and may be punished.

2 *id.* at 768 (1952). In a fairly recent article, a blockade is described as the means by which a belligerent cuts off "all access to the coast of the enemy." S.W.D. Rowson, *Modern Blockade: Some Legal Aspects*, 1949 Brit. Y.B. Int'l L. 346, 349. Our own Department of State took the position in 1919 that no blockade could be instituted absent a state of war. In that year, in connection with a proposal that the Allied Governments blockade Bolshevist Russia, it telegraphed the American Commission to Negotiate Peace as follows: "A blockade before a state of war exists is out of the question. It could not be recognized by this Government." *Scope of Blockade*, 7 Hackworth Digest § 624, at 125.

A technical departure from the rule that a blockade can be imposed only as an incident to a state of war is President McKinley's action in 1893. On April 20, 1898, Congress by joint resolution directed the President to use the land and naval forces of the United States to compel the Government of Spain to relinquish its authority over Cuba. Pub. Res. No. 55-24, 30 Stat. 738. In accordance with this resolution, President McKinley, on April 22, 1898, issued a proclamation instituting a naval blockade of the north coast of Cuba. 14 *Compilation of the Messages and Papers of the Presidents* 6472 (James D. Richardson ed., 1909). It was not until April 25, 1898, that Congress declared that a state of war with Spain existed. Pub. L. No. 55-189, 30 Stat. 364 (1898). In the declaration it was stated, however, that a state of war had existed since April 21, 1898. *Id.* This was, of course, prior to the date of the blockade. At best, the departure from the established rule was only a technical one.

The other incident that is worthy of note is President Truman's order in 1950 blockading Korea. On June 30, 1950, President Truman announced that "[i]n keeping with the United Nations Security Council's request for support to the Republic of Korea in repelling the North Korean invaders and restoring peace in Korea," he had authorized the United States Air Force "to conduct missions on specific military targets in northern Korea wherever militarily necessary, and had ordered a naval blockade of the entire Korean coast." White House Statement

*Supplemental Opinions of the Office of Legal Counsel in Volume 1*

Following a Meeting Between the President and Top Congressional and Military Leaders to Review the Situation in Korea, *Pub. Papers of Pres. Harry S. Truman* 513 (1950). It should be observed that, under Article 42 of the United Nations Charter, the Security Council is authorized "to take such action by air, sea or land forces as may be necessary to maintain or restore international peace," and a blockade by Members of the United Nations is expressly included among the permissible actions. The Korean blockade is not a precedent here. There the blockade was authorized by the United Nations; in the instant case, as we understand it, the United States would proceed unilaterally. Moreover, it would appear that the Korean blockade was justified under the traditional rule that such action can be taken only in connection with a state of war. There was a de facto state of war between North Korea and the United Nations.

Mention should also be made of what is termed a "pacific blockade." This is said to be "a blockade during time of peace"; it has been used by several European nations "as a compulsive means of settling an international difference." 2 *Oppenheim's International Law* at 144–45; Wilson, 4 *Encyclopedia Americana* at 98d. There appears to be some question, however, as to whether a pacific blockade is a permissible form of international conduct. Professor Hyde states:

> Such action is to be deemed pacific merely in the sense that the blockading State is disposed to remain at peace, while the State whose territory is blockaded does not elect to treat the operation as one constituting an act of war or as compelling it to make war upon its adversary.

2 Charles Cheney Hyde, *International Law, Chiefly As Interpreted and Applied by the United States* § 592, at 179–80 (1922). Professor Hyde notes that, while on certain occasions European countries have found it possible to resort to blockade without producing a state of war, the United States "has never had recourse to pacific blockade." *Id*. at 180. Moreover, the United States appears to have taken the position that a pacific blockade does not authorize the blockading state to interfere with United States shipping. *Id*. at 180–82.

Assuming the existence of a state of war, both practice and authority indicate that the President, in the exercise of his constitutional power as Commander in Chief, can order a blockade of the enemy. President Lincoln took such action in 1861, and his authority was sustained in the *Prize Cases*, 67 U.S. (2 Black) 635 (1863). President Truman took similar action in Korea. With respect to the latter, it has been said that the blockade "was supported and respected by other Members [of the United Nations] except the members of the Soviet bloc." Leland M. Goodrich & Anne P. Simons, *The United Nations and the Maintenance of International Peace and Security* 481 (1955).

*Authority of the President to Blockade Cuba*

## II.

The United States is not in a state of war with Cuba in the traditional sense. From the facts available to us, it does not appear that Cuba has resorted to military action against the United States or that the United States has resorted to such action against Cuba. Nor has Congress declared that a state of war exists between the United States and Cuba. Accordingly, the principles of international law, as presently developed and followed by the United States, would seem to furnish no legal justification for the imposition by this government of a blockade of Cuba. Moreover, to the extent that a pacific blockade is a permissible instrument of international conduct, resort thereto by the United States would apparently represent a reversal of United States policy. A further obstacle in this regard is that the blockaded state must also choose not to regard the blockade as an act of war. We are not in a position to judge whether this course would be followed by Cuba.

In this posture, we turn to the question whether it is, nevertheless, possible to argue that a blockade of Cuba is justifiable. That the United States is engaged in a "cold war" with major communist nations and with Cuba is plain. To keep communist imperialism from engulfing the United States is a matter of vital national interest. As one author has put it, with respect to United States policy to further this interest, and also to keep Axis aggression from American shores during World War II:

> Interventions undertaken to further these interests were lawful if those who authorized them believed that intervention was a last resort to safeguard the nation from extreme peril and proper means of intervention were used. . . .

Doris A. Graber, *Crisis Diplomacy: A History of U.S. Intervention Policies and Practices* 211–12 (1959).

An example of the exercise of presidential power of this nature in the naval field is the action of President Roosevelt in 1941, when Nazi power was at its zenith and the peril to the United States great. On July 7, 1941, the President sent a message to Congress announcing that as Commander in Chief he had ordered the Navy to take all necessary steps to insure the safety of communications between Iceland and the United States as well as on the seas between the United States and all other strategic outposts and that troops had been sent to Iceland in defense of that country. The President justified these actions on the ground that the United States could not permit "the occupation by Germany of strategic outposts in the Atlantic to be used as air or naval bases for eventual attack against the Western Hemisphere." *Memorandum on the Authority of the President to Repel the Attack in Korea*, 23 Dep't of State Bull. 173, 175 (1950).

If the President is satisfied, on the basis of the facts known to him, that the Cuban situation presents a grave threat to the safety of the free nations of the

*Supplemental Opinions of the Office of Legal Counsel in Volume 1*

Western Hemisphere, as for example, that they are in imminent danger of attack from hostile forces stationed in Cuba or en route to Cuba from communist countries, it is arguable that, whatever the earlier history of the doctrine of blockade, that concept ought to be accommodated to the situation in hand, not as a device of making war but as a reasonable and internationally permissible means of preventing aggression against peaceful nations. Whatever the facts mobilized to justify a blockade, they would receive careful scrutiny in the forums in which the legality of the action is open to challenge. In addition, the reaction of world opinion would depend upon the strength of the factual justification for the action. We are not, of course, in any position to know what the actual facts are which could be relied upon as justification, and therefore we cannot possibly assess the strength of the possible factual justification.

### III.

This portion of the memorandum discusses which forums may be available for challenging the validity of a blockade of Cuba.

### A. Domestic Forums

In the *Prize Cases*, 67 U.S. (2 Black) 635, 665 (1863), involving the blockade of southern ports during the Civil War, the Supreme Court stated that "[n]eutrals have a right to challenge the existence of a blockade de facto, and also the authority of the party exercising the right to institute it." There several neutral vessels were captured and brought in as prizes by public ships of the United States. Libels were filed by the proper United States Attorneys, and in each such case the United States district court pronounced a decree of condemnation on the ground that the ships had broken or were attempting to break the blockade. The owners of the ships appealed from these decrees. And, as pointed out above, the Supreme Court held the blockade to be a proper exercise of power by the United States as a belligerent. This method of challenging the validity of a blockade would appear to be available to neutral ships today. If such ships are captured on the ground that they were attempting to break the Cuban blockade, they could be treated as prizes and placed within the prize jurisdiction of the federal district courts, provided the captures could be deemed to have been made "during war." 10 U.S.C. §§ 7651, 7652 (1958).[1]

If the vessels were not placed under prize jurisdiction by the United States itself, the ship and cargo owners would not have that avenue of access to our courts. *Ling v. 1,689 Tons of Coal*, 78 F. Supp. 57 (W.D. Wash. 1942). However, in addition to suits in admiralty against the United States under 28 U.S.C. § 1333

---

[1] Section 7651 provides that the prize jurisdiction of the federal courts "applies to all captures of vessels as prize during war by authority of the United States or adopted and ratified by the President."

(1958), they and others claiming loss by reason of the blockade might be authorized to file suits "founded . . . upon the Constitution" in the Court of Claims pursuant to 28 U.S.C. § 1491 (1958), or, in certain cases, the district courts, pursuant to 28 U.S.C. § 1346 (1958). Furthermore, the blockade might give rise to litigation in domestic courts exclusively between private parties owing to its interference with rights under contracts or with other rights. The domestic remedies available for challenging the validity of the blockade would be open to all neutral countries and their nationals, including those of the Communist bloc. In the absence of a state of war, it might also be possible for Cuban nationals to resort to our courts for the purpose of testing the legality of the blockade.

## B. International Forums

In addition to the courts of the United States, a number of international forums appear to be available in which the legality of the blockade as a matter of international law could be raised. It appears that this question could properly be brought before (1) the Security Council and General Assembly of the United Nations and (2) the Organization of American States. It is unclear whether it could be raised before the International Court of Justice.

1. The Charter of the United Nations is a collective treaty concluded for the purpose of safeguarding peace, and provides a means for investigating and determining complaints of alleged aggressive action by a member of State. In our opinion, the procedure provided by the U.N. Charter for these purposes would be available to Cuba and other nations affected by the blockade.

The matter could be brought either before the General Assembly or the Security Council. The former, however, is empowered only to discuss problems and make recommendations to the member nations and to the Security Council. U.N. Charter arts. 10–12. Chapter VII (arts. 39–51) deals with action respecting threats to the peace, breaches of the peace and acts of aggression. It provides that "[t]he Security Council shall determine the existence of any threat to the peace . . . or decide what measures shall be taken in accordance with Articles 41 and 42, to maintain or restore international peace . . . ." (art. 39). The Security Council is authorized to decide "what measures not involving the use of armed forces are to be employed to give effect to its decisions"; and it may call upon members of the United Nations to apply such measures, including various economic sanctions and severance of diplomatic relations (art. 41). As noted earlier, in the event these measures prove to be inadequate, the Security Council may resort to other action to restore peace, including "blockade, and other operations by air, sea, or land forces of members of the United Nations" (art. 42). For this purpose, the Security Council may call on all members of the United Nations to contribute to the maintenance of international peace with armed forces, assistance and facilities (art. 43). The Charter also provides that nothing in it shall impair the inherent right of individual or collective self-defense if an armed attack occurs against a Member

*Supplemental Opinions of the Office of Legal Counsel in Volume 1*

of the United Nations, until the Security Council has taken the measures necessary to maintain international peace (art. 51).

It seems reasonably clear that in providing that the Security Council may take action to deal with threats to peace, including specifically blockade measures, the members of the United Nations intended that such action should not be taken unilaterally except as provided by Article 51 (where the individual member suffering an armed attack may take such action in self-defense). That the United States, England and France have so construed the U.N. Charter is demonstrated by the position taken by these nations in bringing to the attention of the Security Council the threat to peace created by the Soviet blockade of West Berlin. It was claimed that the Soviet blockade was a method used for the expansion of its power in disregard of its responsibility under international agreements, and that it constituted duress and threat of force wholly inconsistent with the obligations imposed on members of the United Nations by the Charter.[2] The Security Council was requested to remove the threat to peace,[3] and it took jurisdiction over the matter. However, the Security Council failed to adopt the resolution offered by the Allied Powers because of the Soviet veto. U.N. Doc. S/1048 (Oct. 22, 1948); 1948–49 U.N.Y.B. 286, U.N. Sales No. 1950.I.11.

Another case involved the Egyptian blockade of the Suez Canal to prevent goods from reaching the State of Israel. Egypt claimed that the Egyptian-Israel Armistice Agreement of 1949 did not end but merely suspended hostilities, that its belligerent rights were left intact, and that it was legally justified in imposing restrictions on the free use of the Canal. When attempts to mediate the dispute failed, Israel brought the matter up for consideration by the Security Council. On September 1, 1951, the Security Council passed a resolution which called upon Egypt "to terminate the restrictions on the passage of international commercial shipping and goods through the Suez Canal wherever bound and to cease all interference with such shipping beyond that essential to the safety of shipping in the Canal itself and to the observance of the international conventions in force." S.C. Res. 95, U.N. Doc. S/RES/95 (Sept. 1, 1951). When Egypt defied the Security Council, the Government of Israel brought the matter up again before the Security Council. 1954 U.N.Y.B. 62, U.N. Sales No. 1955.I.25. On March 19, 1954, a draft resolution was placed before the Security Council which called upon Egypt, "in accordance with its obligations under the Charter to comply" with the 1951 resolution. U.N. Doc. S/3188. Eight members of the Security Council, including the United States, voted for it, but the Soviet Union vetoed the resolution. 1954 U.N.Y.B. 74.

---

[2] Statement by Philip C. Jessup, Deputy U.S. Representative in the Security Council, *Review of Allied Action on Berlin Blockade*, 19 Dep't of State Bull. 541 (Oct. 31, 1948).

[3] *Id.* at 547; Statement by Philip C. Jessup, Deputy U.S. Representative in the Security Council, *The United Nations and Specialized Agencies: U.S. Urges Acceptance of Draft Resolution on Berlin Crisis*, 19 Dep't of State Bull. 572 (Nov. 7, 1948).

*Authority of the President to Blockade Cuba*

Thus it would appear to be fairly clear from these incidents that blockade measures taken unilaterally by a nation, other than in self-defense or in a war, and outside the framework of the United Nations Charter, are likely to be brought before, and considered by, the Security Council. Whether the blockade was undertaken as a justifiable measure of self-defense would obviously be the issue in the instant situation. Of course, any proposed action in the Security Council would be subject to the veto power of the United States.

2. The Organization of American States ("OAS"), of which both the United States and Cuba are members, is also a forum in which the legality of a Cuban blockade could be subjected to investigation and determination. Although there is no express reference to blockade in the OAS Charter, there are many provisions designed to bar unilateral action by any member constituting a threat to the common peace. *See id.* arts. 13, 16–18, 24–25, Apr. 30, 1948, 2 U.S.T. 2416, T.I.A.S. No. 2361, 119 U.N.T.S. 3.[4]

Article 25 provides that in the event of aggression endangering the peace of America, the member States shall apply the measures and procedures established in the special treaties on the subject. The pertinent "special" treaty for security purposes appears to be the Rio Pact,[5] which is closely linked with the Charter. Under the Rio Pact, an Organ of Consultation (meeting of Foreign Ministers) shall gather "without delay" (art. 3) in case of an armed attack, and "immediately" (art. 6) if the integrity or political independence of any American state should be affected by an act of aggression or by any fact or situation that might endanger the peace of America.

The Organ is to decide, by two-thirds vote (art. 17) "the measures which must be taken" for the common defense and preservation of peace (art. 6). Decisions are binding upon all states, except that no state can be required to use armed force without its consent (art. 20). The measures agreed upon by the Organ shall be executed through procedures and agencies in existence or those which may be created (art. 21). It would seem clear that in the circumstances here involved the OAS would be authorized to determine whether a blockade is an act of aggression.

In its relationships with Cuba, the United States has stated that "the proper forum for the discussion of any controversies between the Government of Cuba and the governments of other American Republics is the Organization of American States." *Security Council Considers Cuban Complaint: Statement of July 18*, 43 Dep't of State Bull. 199, 199 (Aug. 8, 1960) (statement of U.S. Representative Henry Cabot Lodge) ("Lodge Statement"). On June 27, 1960, the United States Government submitted to the Inter-American Peace Committee a memorandum entitled *Provocative Actions of the Government of Cuba Against the United States*

---

[4] The text of the OAS Charter appears in 18 Dep't of State Bull. 666 (May 23, 1948).

[5] Inter-American Treaty of Reciprocal Assistance, *opened for signature* Sept. 2, 1947, 62 Stat. 1681, T.I.A.S. No. 1838, *reprinted in* 17 Dep't of State Bull. 565 (Sept. 21, 1947).

*Supplemental Opinions of the Office of Legal Counsel in Volume 1*

*Which Have Served to Increase Tensions in the Caribbean Area*, U.N. Doc. S/4388 (July 15, 1960), *reprinted in* 43 Dep't of State Bull. 79, 79 (July 18, 1960). This memorandum, which sets forth many provocative acts of Cuba in contributing to international tension, was in response to requests made by the Peace Committee under a study assignment given to it by the American Foreign Ministers in 1959. *Id.*; *American Foreign Ministers Conclude Santiago Talks*, 41 Dep't of State Bull. 342, 343 (Sept. 7, 1943); Lodge Statement, 43 Dep't of State Bull. at 199.

The United States Representative to the Security Council has taken the position that the Security Council of the U.N. should take no action on the Cuban complaint until discussions of the problem have taken place in the Organization of American States and an attempt to resolve it has been made in that forum. Lodge Statement, 43 Dep't of State Bull. at 200. In Mr. Lodge's opinion, the procedure was to go to the regional organization first and to the United Nations as a last resort. In the event the United States undertook the action here considered, presumably the OAS machinery would be available to Cuba as it has been to the United States.

3. It is unclear to what extent the International Court of Justice would have jurisdiction to pass upon the legality of the blockade.

It seems doubtful whether the Court could accept jurisdiction if Cuba sought to institute an action against the United States. In filing its acceptance of the compulsory jurisdiction of the Court, the United States has agreed (except for its reservation on domestic matters[6]) to be bound only "in relation to any other state accepting the same obligation." Statute of the International Court of Justice art. 36(2), June 26, 1945, 59 Stat. 1055, 1060. Cuba has not filed its acceptance of the compulsory jurisdiction of the International Court. It would, therefore, appear that Cuba has not accepted the same obligation[7] as the United States, and that an essential condition is lacking for the Court's exercise of compulsory jurisdiction over the United States in a case which Cuba is the plaintiff.

However, even if the validity of the blockade cannot be decided by the Court in on action to Cuba, it is possible that the question is subject to adjudication in a suit

---

[6] On the basis of the reservation, the United States could defeat the jurisdiction of the court merely by asserting that a blockade of Cuba involved a domestic matter.

[7] Oliver J. Lissitzyn, in *The International Court of Justice: Its Role in the Maintenance of International Peace and Security* (1951), indicates the bases of the Court's jurisdiction as follows:

> The jurisdiction of the Court over disputes submitted to it as contentious cases rests in principle on the consent of the parties. This consent can be given either (1) by a declaration recognizing as compulsory the jurisdiction of the Court, with or without limitation, under the "optional clause" of Article 36 of the Statute, or (2) by an undertaking in any other form to recognize as compulsory the jurisdiction of the Court with respect to a class of existing or future disputes, or (3) by an express or tacit agreement to submit a particular dispute to the Court.

*Id.* at 61.

*Authority of the President to Blockade Cuba*

by a third state which is adversely affected by the blockade and which has accepted compulsory jurisdiction. In addition it should be noted that Article 96 of the United Nations Charter provides that the General Assembly or the Security Council may ask the Court for an advisory opinion "on any legal question," and that the Assembly may authorize other organs, or specialized agencies to do so. Thus, although a state is not authorized to request an advisory opinion, it may persuade one of the designated organs to make the request.

However the matter is presented, a basic problem for the Court would be whether a blockade raises a political or a legal issue. The U.N. Charter provides that "legal disputes" should as a general rule be referred by the parties to the International Court of Justice in accordance with the provisions of the Statute of the Court (art. 36). The implication is that "political questions," unlike "legal questions," should not, therefore, be decided by the Court. What is a legal, as opposed to a political, question presents an extremely difficult issue. *See* Lissitzyn, *supra* note 7, at 74. No case of a blockade appears to have been presented to the Court. The closest precedents are the Corfu Channel Case, *id*. at 78–81, in which Albania's action in laying a clandestine minefield was treated as a legal question within the jurisdiction of the Court, and the Fisheries Case (U.K. v. Nor.), Judgment, 1951 I.C.J. 116 (Dec. 18), in which the Court accepted jurisdiction over a dispute between Norway and the United Kingdom as to whether Norway had the right to reserve to its nationals fishing rights in certain areas off the Norwegian coast. These precedents do not appear necessarily to control the question presented by a blockade. In addition, it is of significance that no attempt has been made to bring either the Berlin blockade or the Egyptian blockade of Israel before the Court.

ROBERT KRAMER
*Assistant Attorney General*
*Office of Legal Counsel*

205